MORGAN, LEWIS & BOCKIUS LLP
Eric Meckley (Bar No. 168181)
eric.meckley@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105-1126
Tel: +1.415.442.1000

MORGAN, LEWIS & BOCKIUS LLP
Christopher Boran (admitted *pro hac vice*)
christopher.boran@morganlewis.com
110 North Wacker Drive, Suite 2800
Chicago, IL 60606-1511
Tel: +1.312.324.1000

Jeremy P. Blumenfeld (admitted *pro hac vice*)
jeremy.blumenfeld@morganlewis.com
Brian W. Sullivan (admitted *pro hac vice*)
brian.sullivan@morganlewis.com
2222 Market Street
Philadelphia, PA 19103-3007
Tel: +1.215.963.5000

Abbey M. Glenn (Bar No. 267751)
abbey.glenn@morganlewis.com
1111 Pennsylvania Ave, NW
Washington, DC 20004-2541
Tel: +1.202.739.3000

Attorneys for Defendants
ELON MUSK; X CORP.; TWITTER, INC.
CHANGE OF CONTROL AND
INVOLUNTARY TERMINATION
PROTECTION POLICY; TWITTER, INC.
CHANGE OF CONTROL SEVERANCE
AND INVOLUNTARY TERMINATION
PROTECTION POLICY; LINDSAY
CHAPMAN; BRIAN BJELDE; AND
DHRUV BATURA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PARAG AGRAWAL, NED SEGAL, VIJAYA GADDE, and SEAN EDGETT,<br><br>Plaintiffs,<br><br>vs.<br><br>ELON MUSK; X CORP., F/K/A TWITTER, INC.; TWITTER, INC. CHANGE OF CONTROL AND INVOLUNTARY TERMINATION PROTECTION POLICY; TWITTER, INC. CHANGE OF CONTROL SEVERANCE AND INVOLUNTARY TERMINATION PROTECTION POLICY; LINDSAY CHAPMAN; BRIAN BJELDE; AND DHRUV BATURA,<br><br>Defendants. | Case No. 3:24-cv-01304-MMC<br><br>Hon. Maxine M. Chesney<br><br>**DECLARATION OF ERIC MECKLEY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS COUNT V OF THE COMPLAINT**<br><br>Action Filed:  March 4, 2024 |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECLARATION OF ERIC MECKLEY ISO
DEFENDANTS' MOTION TO DISMISS COUNT V OF
THE COMPLAINT
CASE NO. 3:24-cv-01304-MMC

**DECLARATION OF ERIC MECKLEY**

I, Eric Meckley, declare as follows:

1.      I am an attorney licensed to practice in the State of California.  I am a Partner at the law firm of Morgan, Lewis & Bockius, counsel of record for Defendants Elon Musk, X Corp., Twitter, Inc., Change of Control an Involuntary Termination Protection Policy, Twitter, Inc. Change of Control Severance and Involuntary Termination Protection Policy, Lindsay Chapman, Brian Bjelde and Dhruv Batura (collectively "Defendants").  I make this declaration in support of Defendants' Motion to Dismiss Count V of the Complaint.  Unless otherwise stated, the following facts are based upon my personal knowledge and if called as a witness in this action I could and would testify competently thereto.

2.      Attached as **Exhibit A** is a true and correct copy of the redacted version of the Appeal Denial Letter, from The Twitter Severance Administration Committee to David L. Anderson (Sidley Austin LLP) dated January 12, 2024.

Executed in San Francisco, California on May 20, 2024.


 /s/ Eric Meckley
Eric Meckley

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# EXHIBIT A

# UNREDACTED VERSION FILED UNDER SEAL



January 12, 2024

**X Corp**
1355 Market St #900
San Francisco, CA
94103

**BY FEDERAL EXPRESS AND E-MAIL (DLANDERSON@SIDLEY.COM)**

Mr. David L. Anderson
Partner
Sidley Austin LLP
555 California Street
San Francisco, CA 94104

RE:     Appeals of Parag Agrawal, Ned Segal, Vijaya Gadde, and Sean Edgett Under the Twitter, Inc.
        Change of Control and Involuntary Termination Protection Policy and the Twitter, Inc. Change of
        Control Severance and Involuntary Termination Plan

Dear Mr. Anderson,

On behalf of the Twitter Severance Administration Committee (the "Committee"), we write this letter (the
"Appeal Response Letter") in response to your September 15, 2023, letter (the "Appeal") appealing Ms.
Lindsay Chapman's (the "Claims Administrator") denial of the claims for benefits of Parag Agrawal, Ned
Segal, Vijaya Gadde, and Sean Edgett[1] (collectively, the "Claimants") under the Twitter, Inc. Change of
Control and Involuntary Termination Protection Policy as restated effective August 8, 2014 and the
Twitter, Inc. Change of Control Severance and Involuntary Termination Protection Policy as amended and
restated effective February 22, 2017,[2] as applicable (the "Claim Responses").  The differences between
these two plan documents are not relevant to the Appeal and the applicable plan is referred to herein as
the "Plan."

After a thorough review of the Appeal, attachments, Plan document, and records before the Committee,
the Committee has decided to deny the Appeal.  The Claimants were terminated for Cause and are not
entitled to benefits under the Plan.

---

[1] While the Claims Administrator responded to the Claimants individually, the Claimants have filed a
consolidated appeal.  The Committee reviewed each Claimant's actions individually and considered each
Claimant's individual claim for benefits when evaluating the Appeal.  Nevertheless, consistent with the
consolidated Appeal, this response letter addresses all of the Claimants.

[2] The Company's records do not reflect that the Twitter, Inc. Change of Control Severance and
Involuntary Termination Protection Policy as amended and restated effective February 22, 2017, (the
"2017 Plan") was formally adopted.  The Committee understands that the 2017 Plan was intended to be a
restatement of the Twitter, Inc. Change of Control and Involuntary Termination Protection Policy as
restated effective August 8, 2014 Change of Control Severance (the "2014 Plan") and, for purposes of
evaluating Mr. Edgett's appeal, is treating it as such.



## I.      SUMMARY OF DECISION

When terminating the Claimants, Twitter, Inc. (the "Company")[3] provided the Claimants with letters explaining that they were being terminated for Cause as that term is defined under the Plan, including due to their gross negligence and willful misconduct.  The Appeal argues that this statement was pretextual, that there was not Cause to terminate the Claimants because the Claimants did not engage in willful misconduct or gross negligence, that the Company concocted the idea that the Claimants were being terminated for Cause to avoid paying severance benefits under the Plan and as part of Elon Musk's pattern and practice of refusing to fulfill his obligations, and that, even if there were facts that could support a finding of Cause, it was not possible for the Company to terminate the Claimants for Cause because Mr. Musk was not aware of these facts when the Claimants were terminated.

The Committee has considered these arguments and the others raised in the Appeal and has reviewed the supporting material included with the Appeal.  The Committee has also worked with the Company to identify materials relevant to the arguments raised in the Appeal and has continued working with the Company to understand whether the Claimants were terminated for Cause.  The materials that the Committee has reviewed show that the Cause to terminate the Claimants was far from a "mere pretext." In short:

- The Claimants caused the Company to pay tens of millions of dollars in legal fees that were billed in clear violation of the Company's 2022 Outside Counsel Billing Guidelines (the "Billing Policy") and the relevant engagement letters.  Additionally, the Claimants caused the Company to pay approximately $80 million dollars[4] in gratuitous and excessive success fees that were not required under the terms of the relevant engagement letters, and which were entered into in violation of applicable law and/or rules of ethics.  Disturbingly, the Claimants accelerated the payment of these fees over Mr. Musk's objections, which prevented X Holdings I, Inc. and X Holdings II, Inc. (collectively, "Buyer") from auditing these fees to ensure that the Company paid only those amounts that it was legally obligated to pay.  This acceleration was particularly egregious because the Claimants failed to engage in any meaningful review of these fees prior to payment and disabled the protective measures that the Company had put in place to prevent the payment of improper fees.  Moreover, given the accelerated timetable and the fact that the Claimants and the Company's board of directors (the "Board") knew that Mr. Musk would ultimately bear the cost of any amounts unnecessarily paid to the law firms, the Committee has determined that the Claimants and the Board fell victim to moral hazard and dereliction of their responsibility to serve as good stewards of the Company's resources and prevent the gratuitous and unnecessary outflow of more than $100 million in Company assets.

- The Claimants engaged in a number of activities that flagrantly violated the terms of the Agreement and Plan of Merger by and among X Holdings I, Inc., X Holdings II, Inc. and Twitter, Inc. Dated as of April 25, 2022 (the "Merger Agreement"), thereby risking the consummation of the merger.[5]  For example, despite the standstill provision in the Merger Agreement:

  - The Claimants authorized and approved a dramatic increase in retention bonuses payable to members of their respective teams.  It appears that the Claimants recognized that the Merger Agreement required Buyer to consent to and increase retention bonuses because

---

[3] Where context so dictates, the "Company" means X Corp. and not Twitter, Inc.

[4]  The Tasher Report characterizes the success fees as more than $100 million dollars.  The Committee understands that this is because the Company paid the full amount requested by the Primary Law Firms, despite the fact that the Company was not obligated under the terms of the engagement letters to pay more than $20 million of the hourly fees billed by the Primary Law Firms.

[5] *See, e.g.,* Section 7.2(a) of the Merger Agreement (providing that Buyer's obligation to consummate the Acquisition is generally conditioned upon the Company's compliance, in all material respects, with the terms of the Merger Agreement).



they caused the Company to request that Buyer and Mr. Musk consent to a retention bonus program in connection with the acquisition.  When Buyer refused to consent to this program, Claimants took matters into their own hands and dramatically increased the retention bonuses that they were providing to members of their own teams.

- o   The Claimants allowed four new participants to be added to the Plan, generally increasing the severance benefits available to these individuals by millions of dollars each, and the Company's potential severance obligations by more than $50 million in total.  Shockingly, the Claimants allowed an executive to recommend to the Compensation Committee of the Board that the executive herself be added to the Plan (an act that smacks of self-dealing at Buyer's expense and that could potentially increase that executive's compensation by nearly $15 million dollars) and allowed a former executive who the Company was in the process of firing to be added to the Plan.

- •   The Claimants fostered a culture of excessive spending and a lack of fiscal responsibility during their tenure as Twitter's top executives.  Despite mounting operating losses and an ongoing lack of profitability, the Claimants allowed the Company to become a poster child for Silicon Valley excess.  Under the Claimants' watch, the Company also spent hundreds of millions of dollars on underutilized infrastructure and hundreds of millions of dollars on prime real estate leases, all while pursuing rapid headcount growth (seeking to double their headcount over four years).  The Company also spent tens of millions of dollars on lavish team building events and other perks (including seven free-to-employee restaurants in its San Francisco HQ).  While the Company had in place a procurement and sourcing team, the Claimants did not effectively utilize this teams for cost savings or to leverage negotiating power; spending transactions were instead focused on "time to resolution" (i.e., how quickly they could get the deal done).

Based on the foregoing, and having considered the Appeal's arguments to the contrary, the Committee has concluded that the Claimants were terminated for Cause.  Accordingly, they did not have an "Involuntary Termination" and are not entitled to benefits under the Plan.

## II.   BACKGROUND

Before turning to the substance of the Appeal, it is appropriate to consider the context in which the Appeal was filed and other relevant background facts.

### A.   The Committee

The Company established the Committee to hear appeals under the Plan and vested it with the power to do so.  In its review of the Appeal, the Committee considered the Appeal, the attachments to the Appeal, expert reports prepared to assist the Committee in evaluating the expert report included with the Appeal, a memorandum from counsel addressing certain legal issues raised in the Appeal, the Claim Responses, the attachments to the Claim Responses, the initial claims for benefits (the "Claims"), attachments to the Claims, and additional materials provided by the Company with respect to certain issues raised in the Appeal, Claims, and/or Claim Responses.  These materials, and the other materials considered by the Committee, are enumerated in Appendix B.

### B.   The Plan Document and Related Documents

When considering the Appeal, the Committee reviewed the relevant portions of the Plan document, including as modified with respect to Mr. Agrawal and the 2017 Plan with respect to Mr. Edgett, the relevant portions of the Twitter, Inc. 2013 Equity Incentive Plan ("Equity Plan"), the relevant portions of the Merger Agreement, the April 25, 2022 Company PSU Clarification, and the Value Creation Company PSUs ("VCA Agreements").  In reviewing these documents, the Committee determined that the provisions described as "particularly relevant" in the Claim Responses are particularly relevant to the Appeal.  The



sections of the Claim Responses discussing these provisions are hereby incorporated into this Appeal Response Letter.[6]

Notwithstanding the assertions in the Appeal, the Committee interprets these documents to be "related documents" as that term is used in the "Administration" section of the Plan.  The Committee has determined that these documents are "related documents" because they relate to the Claimants' claims for benefits, inform the administration of the Plan with respect to the Claimants, and must be considered and interpreted in order for the Committee to administer the Plan properly.

### C.    Factual Background[7]

The Claimants served at the highest level of the Company's executive leadership.  Mr. Agrawal was the Company's Chief Executive Officer and was responsible for supervising the Company's finances and partnerships, and for managing the Company's operations.  Mr. Segal was the Company's Chief Financial Officer and was responsible for managing the Company's finances, payroll, equity and other payments, and authorizing and approving the payment of Company expenses.  Ms. Gadde was the Company's Chief Legal Officer and was responsible for managing Legal (Commercial, Corporate, Litigation, IP, Employee, Product, Data Privacy), Policy, Trust and Safety, and for overseeing relationships with outside counsel.  Mr. Edgett was the Company's General Counsel and was responsible for managing Legal (Commercial, Corporate, Litigation, IP, Employee, Product, Data Privacy) and for overseeing relationships with outside counsel.  In addition to the obligations that the Claimants had in their capacities as employees of the Company, the Claimants had fiduciary obligations in their capacities as officers of the Company and agents of the Board.

The Company was purchased by Buyer through a contentious, high profile $44 billion acquisition (the "Acquisition").  After Mr. Musk and Buyer notified the Company that Mr. Musk and Buyer were terminating the acquisition due to the Company being in material breach of multiple provisions of the Merger Agreement, the Company filed a lawsuit against Mr. Musk and Buyer, seeking to enforce the terms of the Merger Agreement and to cause the Acquisition to close on its original terms.  The Claimants were intimately familiar with the terms of the Merger Agreement, having been involved in the negotiation of its terms in their respective corporate capacities and as members of "Staff" (the Company's primary executive management team), and were directly involved with, and responsible for, retaining counsel to assist the Company with the Acquisition and related litigation and/or the payment of fees to the law firms that were retained for these purposes.

This lawsuit was stayed after Mr. Musk and Buyer agreed to move forward with the acquisition on its original terms and on October 27, 2022, the Acquisition closed.  The same day, each of the Claimants received a letter from the Company indicating that "effective immediately as of the closing of the [Acquisition], your employment at the Company was terminated for Cause . . . as defined in the in the [sic] Company's Change of Control and Involuntary Termination Protection Policy as amended and restated, effective August 8, 2014 . . . which is incorporated by reference into your Employment Agreement.  Specifically, you have engaged in conduct that constitutes Cause within the meaning of the Policy, including, but not limited to, prongs (e) ('your gross negligence or willful misconduct in the performance of your duties') and (g) ('your failure to cooperate in good faith with a governmental or

---

[6] These sections include, but are not limited to, Section 4. "Relevant Plan Provisions," Section 5. "Relevant Equity Plan Provisions," and Section 6. "Relevant Merger Agreement Provisions" of the Claim Responses.

[7] The Claim Responses include significant background information that is not disputed in the Appeal.  The facts described in the Claim Responses are hereby incorporated into this Appeal.  For the avoidance of doubt, this includes the information described in Part I, Sections 1-9 of the Agrawal, Gadde, and Segal Claim Responses and Part I, Sections 1-8 of the Edgett Claim Response.



internal investigation of the Company or its directors, officers or employees, if the Company has requested your cooperation').”[8]

On November 29, 2022, the Claimants submitted their Claims. The Claims asserted that the Claimants were entitled to benefits under the Plan because each Claimant: (1) was an Eligible Employee, (2) had their employment end during the Change of Control Period, and (3) had their employment end as the result of an Involuntary Termination. The Claims Administrator considered the Claims and concluded, among other things, that the Claimants' employment did not end as a result of an Involuntary Termination, because the Claimants' employment was terminated for Cause and such termination occurred prior to the effective date of the Claimants' resignation for Good Reason (if applicable). The Claims Administrator reached this decision because she determined that the Claimants engaged in gross negligence and/or willful misconduct when the Claimants (1) agreed to and accelerated certain law firm payments, (2) approved and/or paid retention bonuses in amounts that were outside of the ordinary course of business and inconsistent with past practice, which violated the Merger Agreement's interim operating restrictive covenants and put the consummation of the Acquisition at risk, and (3) presided over and caused the Company to engage in excessive and wasteful spending. The Claims Administrator communicated this denial to the Claimants by letters dated May 26, 2023, and explained to the Claimants that the Company was still investigating their conduct.

The Claimants appealed this denial by letter dated September 15, 2023. The Appeal again asserts that the Claimants are entitled to benefits under the Plan because each Claimant (1) was an Eligible Employee, (2) had their employment end during the Change of Control Period, and (3) had their employment end as the result of an Involuntary Termination. It further asserts that the Claims Administrator erred in concluding that the Claimants' employment was not terminated as the result of an Involuntary Termination because:

- the articulated bases for terminating the Claimants' employment were pretextual and unrelated to the actual reason(s) that the Claimants were terminated, and that it is not appropriate for the Company or the Committee to continue investigating the Claimants after their employment was terminated;

- the Claimants did not engage in gross negligence or willful misconduct because (1) the decision to pay the law firm invoices was the result of a diligent process, is protected by the business judgment rule, and was ratified by the Company's Board, (2) the retention bonuses were consistent with past practice, necessary given the circumstances, and ratified by the Company's Board, and (3) the conduct that the Claims Administrator described as "corporate waste" was performed pursuant to the Company's 2020 three-year plan, which was formulated by former CEO, Jack Dorsey, approved by the Board; and

- Mr. Agrawal, Mr. Segal, and Ms. Gadde submitted "Good Reason" resignation letters that caused their resignations to be "Involuntary Terminations."

## III.   THRESHOLD LEGAL ISSUES RAISED IN THE APPEAL

Before delving into the Appeal's primary argument that Claimants' employment was terminated due to an Involuntary Termination, it is necessary to consider the threshold legal issues raised in the Appeal.

---

[8] For conciseness, the Appeal Response Letter consolidated its discussion of the Claimants' termination letters into one quotation. However, for clarity, the Committee notes that Mr. Segal's termination letter did not indicate that he was terminated for a "failure to cooperate in good faith with a governmental or internal investigation of the Company or its directors, officers or employees, if the Company has requested your cooperation[.]"



**A. How should the Committee determine whether an individual was terminated for Cause?**

In the Claim Responses, the Claims Administrator independently determined that each Claimant's employment was terminated "for Cause" under the Plan by evaluating whether the conditions for Cause were met. In response, the Appeal argues that the determination of whether the Claimants were terminated "for Cause" under the Plan is bound by "the true motivation for Mr. Musk's termination decisions" at the time of the terminations.[9] The Appeal cites two cases for this assertion: *Napoli v. Johnson & Johnson, Inc.*, 624 F. App'x 861, 864-65 (5th Cir. 2015) and *Peck v. SELEX Sys. Integration, Inc.*, 895 F.3d 813, 820-21 (D.C. Cir. 2018).[10]

Consistent with this position, the Appeal argues that the Claims Administrator's finding of "Cause" was wrong because it was based on "pretextual," "post hoc justifications," and because "the [Claim] Administrator show[ed] no interest whatsoever in the true motivations for Mr. Musk's termination decisions."[11] Regarding these motivations, the Appeal alleges that "Mr. Musk did not have knowledge of the actions that are now claimed [i.e., by the Claims Administrator] to constitute Cause at the time of the Officers' termination," and that "Mr. Musk orchestrated the closing and termination plan as a pretext to cut off the Officers' severance, 'extract[] vengeance,' and save himself money."[12] The Appeal concludes: "Because the Company did not terminate the Officers for Cause at the time of their termination, that ends the inquiry and makes the Officers eligible for benefits."[13]

This raises an issue of Plan interpretation: Should the determination of whether a Claimant was terminated "for Cause" under the Plan be a question of whether Mr. Musk or the Company, based on their motivations and facts known to them at the time of termination, terminated the Claimant for Cause (i.e., because they engaged in acts that rose to the level of Cause)?

Based on the terms of the Plan and the weight of relevant case law,[14] the Committee has determined that it is authorized independently to make the determination based on whether "Cause" exists under the relevant facts and circumstances, regardless of whether the grounds constituting "Cause" are discovered or articulated post-termination. This conclusion is supported by the following:

- The Committee has broad discretionary authority under the Plan to determine benefit eligibility, and therefore may adopt a reasonable interpretation of what it means for a participant to be terminated "for Cause" under the Plan. It would be reasonable for the Committee to determine whether the Claimants were terminated "for Cause" based on whether "Cause" exists under the relevant facts and circumstances, without being bound by Mr. Musk's or the Company's subjective motivations and knowledge, at the time of termination, for terminating the Claimants.

- The Plan does not expressly require the Company or Administrator to determine, at the time of a participant's termination of employment, the reason for the termination, including whether or not termination is "for Cause" (much less the underlying reasons). On the contrary, multiple grounds that constitute "Cause" under the Plan may occur after a participant's employment has terminated, implying that the Committee should determine "Cause" based on all relevant facts and circumstances, including those that arise or are discovered post-termination. Further, the

---

[9] Appeal at 10.
[10] Appeal at 14-15, 37.
[11] *See* Appeal at 14–37.
[12] Appeal at 34, 37.
[13] Appeal at 37; *see also* Appeal at 70 ("The Administrator Cannot Continue to Investigate the Officers' Conduct in an Attempt to Find Cause After the Fact.").
[14] The Committee's interpretation of the relevant case law is informed by the memorandum from its counsel addressing certain legal issues raised in the Appeal (specifically, those addressed in this Section III).



Plan specifically indicates that the Board must provide written notice of the act or omission constituting "Cause" in certain circumstances, to provide an opportunity to cure, but *not* where a participant engaged in gross negligence or willful misconduct in the performance of their duties.

- The Committee worked with counsel to research applicable case law.  Based on counsel's research, the weight of relevant case law strongly supports the conclusion that an ERISA administrator's determination of "cause" for termination is a question of whether "cause" for termination exists under the relevant facts and circumstances, regardless of whether the grounds constituting "cause" are discovered or articulated post-termination.  The relevant case law generally falls into two groups, as follows: (1) in the ERISA claim-for-benefits context, courts have upheld reclassification of retirement and layoff as termination for cause, based on evidence discovered or rationales articulated post-termination; and (2) courts largely permit the use of "after-acquired evidence" (i.e., evidence discovered by the employer or administrator after the employee's termination) for purposes of retroactively justifying the termination as lawful or "for cause."  Adopting the Appeal's position, that the determination of "Cause" is bound by Mr. Musk's or the Company's motivations or knowledge at the time of termination, would not be consistent with the weight of relevant case law.

These reasons are discussed in more detail below.

### 1.   The Committee has broad discretionary authority under the Plan to determine "Cause," pursuant to *Firestone*.

The Plan grants the Administrator the "full discretion to administer and interpret the Policy," and any such decisions "will be conclusive and binding on all persons and be given the maximum possible deference allowed by law."[15]  The Plan defines the Administrator as "the Compensation Committee or its delegate." When Mr. Musk purchased the Company and dissolved its Board of Directors, he became the Sole Director of the Company.  In his capacity as the Sole Director of the Company, he allocated the authority to hear initial claims for benefits under the Plan to the Claims Administrator and subsequently allocated authority to hear appeals under the Plan to the Committee.

Under the Supreme Court's *Firestone* decision, the Committee has the discretionary authority to interpret the Plan and determine benefit eligibility, including as to issues of fact.[16]  Accordingly, under *Firestone* and its progeny, it is the Committee's "own judgment"—rather than the employer's judgment—that governs whether a claimant was terminated "for Cause" for purposes of Plan benefits.[17]

---

[15] More specifically, the "Administration" section of the Plan provides that: "The Administrator will have full discretion to administer and interpret the Policy. Any decision made or other action taken by the Administrator with respect to the Policy, and any interpretation by the Administrator of any term or condition of the Policy, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. The Administrator is the 'named fiduciary' of the Policy for purposes of ERISA and will be subject to the fiduciary standards of ERISA when acting in such capacity."

[16] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989); *see also Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006) (footnote omitted) (language conferring "full and final" authority to the plan administrator means that the "policy clearly gave to the plan administrator the power to decide according to its own judgment"); *see also Day v. AT&T Disability Income Plan*, 698 F.3d 1091, 1096 (9th Cir. 2012) (extending this discretionary authority to findings on issues of fact).

[17] *See Thygeson v. U.S. Bancorp*, No. CV-03-467-ST, 2004 WL 2066746, at *17 (D. Or. Sept. 15, 2004) (holding that "the Severance Committee had the authority to make an independent determination of [the claimant's] eligibility for severance benefits, such that it would not have been futile for him to file a claim for benefits" even after the employer's human resources department notified him that he was terminated for cause and ineligible for severance).



Based on *Firestone* principles, the Committee has the discretion to determine whether the Claimant was terminated "for Cause" under the Plan based on: (1) whether Mr. Musk or the Company, based on their motivations and knowledge at the time of termination, actually terminated the Claimant for Cause (i.e., "for Cause" is interpreted as "by reason of" or "due to"); or (2) whether "Cause" exists under the relevant facts and circumstances, regardless of whether the grounds constituting "Cause" are discovered or articulated post-termination or served as the sole motivation for the termination of the Claimants. However, the terms of the Plan and the weight of other persuasive legal authorities favor the latter interpretation, as discussed below.

### 2. Grounds constituting "Cause" under the Plan may occur post-termination.

Several of the grounds constituting "Cause"—specifically, (a) through (d) and (g) below—could occur post-termination, which implies that the Committee may determine "Cause" based on facts that arise or are discovered post-termination, and thus that the Company's motivations and knowledge at the time of termination are not determinative as to whether or not a participant is terminated "for Cause" under the Plan:

> "Cause" means (a) your unauthorized use or disclosure of the Company's confidential information or trade secrets, which use or disclosure causes material harm to the Company; (b) your breach of any agreement between you and the Company; (c) your failure to comply with the Company's written policies or rules, including its code of conduct; (d) your conviction of, or plea of "guilty" or "no contest" to, a felony under the laws of the United States or any state thereof; (e) your gross negligence or willful misconduct in the performance of your duties; (f) your continuing failure to perform assigned duties after receiving written notification of the failure from the Board (or for Eligible Employees other than the Chief Executive Officer, from the Chief Executive Officer); or (g) your failure to cooperate in good faith with a governmental or internal investigation of the Company or its directors, officers or employees, if the Company has requested your cooperation; <u>provided, however</u>, that "Cause" will not be deemed to exist in the event of subsections (b), (c) or (f) above unless you have been provided with (i) 30 days' written notice by the Board or [sic] the act or omission constituting "Cause" and (ii) 30 days' opportunity to cure such act or omission, if capable of cure.

Below are examples of grounds for termination for "Cause" that may occur post-termination, based on Company policies and rules:

- The Employee Inventions Assignment and Confidentiality Agreement signed by the Claimant[18] requires the Claimant to (1) provide the company assistance "beyond the termination of my employment with the Company," and (2) keep confidential the Company's information "during my employment and after its termination"—requirements that continue to apply post-termination. Therefore, under item (b) above, a participant's "breach of any agreement between [the participant] and the Company" could occur post-termination.

- The Tweep Security and Privacy Policy states that "[y]ou may not retain any Twitter data … after offboarding"—a requirement that applies post-termination. Therefore, under item (c) above, a participant's "failure to comply with the Company's written policies or rules, including its code of conduct" could occur post-termination.

The fact that the grounds for "Cause" may occur post-termination implies that whether a participant was terminated "for Cause" under the Plan should be a question of whether "Cause" exists under the relevant

---

[18] Parag Agrawal (May 18, 2011), Vijaya Gadde (July 8, 2011), Ned Segal (July 10, 2017), and Sean Edgett (August 27, 2012).



facts and circumstances—an inquiry separate from and thus not bound by the Company's motivations or knowledge at the time of such termination.  In other words, it is one matter for the Company to terminate an officer (for whatever reason stated or none), and a separate matter for the Committee to determine independently whether the termination rises to the level of termination "for Cause" under the Plan.

> **3.     The Plan does not require contemporaneous notice to a participant of termination for "gross negligence" or "willful misconduct" under the Plan.**

The Plan does not expressly require the Company or Administrator to determine, at the time of a participant's termination of employment, the reason for the termination, including whether or not termination is for "Cause."  While the Plan requires the Board to provide a participant with an opportunity to cure within thirty days certain grounds for "Cause" that are capable of cure, if the Company decides to terminate the participant's employment, neither the Company nor the Administrator is required to articulate the reason for termination, which may be different from the grounds identified in the cure notice.  And in any event, the grounds capable of cure do not encompass "gross negligence" or "willful misconduct," meaning the cure notice is not required with respect to the Claimants.[19]

These provisions support the conclusion that it is one matter for the Company to terminate an officer (for whatever stated reason or none), and a separate matter for the Committee to determine independently whether the termination rises to the level of a termination "for Cause" under the Plan (including, if applicable, whether cure procedures were satisfied).  In other words, the Committee is not bound by the grounds for "Cause" articulated in the Company's termination letters to the Claimants, nor were such letters necessary for the Committee to find that a Claimant's termination was "for Cause" under the Plan.[20]

> **4.     The weight of relevant case law strongly supports the conclusion that an ERISA administrator's determination of "cause" for termination should not be bound by the employer's motivations and knowledge at the time of termination.**

The Committee worked with counsel to research (with a focus on ERISA-covered disputes) whether a "for cause" determination must be made based on the employer's motivations and knowledge, at the time of termination, for terminating the employee.   In sum, counsel identified two groups of relevant case law that generally reached consistent conclusions.  To the contrary, the Appeal cites to a Fifth Circuit case that appears to take a minority view.

> **a.     In the ERISA claim-for-benefits context, courts have upheld post-termination reclassification of retirement and layoff as termination for cause.**

The first group of relevant cases addresses whether, in the ERISA claim-for-benefits context, an employment termination may be later reclassified as having been for cause, making the employee ineligible for benefits.  Counsel identified two cases supporting such reclassification (*Berg* and *Tardio*)— indicating that an ERISA administrator's determination of whether a termination was "for cause" is not bound by the employer's motivations or knowledge, at the time of termination, for terminating the

---

[19] *See* Plan Section "Cause" ("'Cause' will not be deemed to exist in the event of subsections (b), (c) or (f) above unless you have been provided with (i) 30 days' written notice by the Board or [sic] the act or omission constituting 'Cause' and (ii) 30 days' opportunity to cure such act or omission, if capable of cure.").
[20] *See Thygeson*, 2004 WL 2066746, at *17.



employee—and one case (*Ebner*) rejecting such reclassification under a unique set of facts, as discussed below.

In *Berg v. BCS Financial Corp.*, the parties did not dispute the facts that the board of directors allowed the general counsel ("GC") to announce that he was retiring, and that the board did not, at the time of termination, determine that the GC was terminated "for cause."[21]  Months after the GC's retirement and in connection with his administrative claims for nonqualified deferred compensation benefits, the claims and appeals fiduciaries determined that the GC was terminated "for cause" based on his dishonesty and embezzlement.  The district court upheld the denial of benefits because "the [plan] does not expressly require [the employer] or the Administrator to make a 'contemporaneous' determination that [the GC] was terminated for cause" and that because "the administrator retains discretion under Section 3.2 to interpret the [plan's] terms the [plan] administrator could classify [the general counsel's] termination 'for Cause' after his departure from [the employer]."[22]  Here, the Plan also does not require the Administrator to make a contemporaneous determination that a participant is terminated for Cause and provides the Administrator with discretion to interpret the terms of the Plan, including the Cause definition.[23]

Similarly, in *Tardio v. Boston Scientific Corp.*, the employer retroactively reclassified a sales representative's termination of employment as a termination for cause despite previously informing the sales representative that his termination would be a severance-eligible "layoff."[24]  The employer reclassified the sales representative's termination because, after receiving the layoff notice but before his termination date, the sales representative destroyed a company product valued at nearly $80,000.  Following a post-termination investigation into this incident and more than seven weeks after the termination date, the employer confronted the sales representative and informed him that his termination was reclassified as 'for cause' and therefore he was not entitled to layoff severance benefits.  The district court upheld the plan administrator's reliance on this reclassification, even though the reclassification was made more than seven weeks after the sales representative's termination date.

In sum, by upholding reclassifications of retirement (*Berg*) and layoff (*Tardio*) as terminations for cause, these cases support the view that whether an employee was terminated "for cause" under an ERISA plan is a question of whether "cause" exists under the relevant facts and circumstances at the time the claim is administered—not a question of whether the employer, based on its motivations and knowledge at the time of termination, terminated the employee because of the actions that gave rise to "cause. "

The third case, *Ebner v. Perlick Corp.*, has a unique set of facts and took a minority view.[25]  In *Ebner*, the court granted a former employee's claim for continued deferred compensation plan payments, holding that the employer may not, more than two years after the employee had resigned voluntarily, reclassify the resignation as a termination for cause and thereby cease paying benefits.  The facts in *Ebner* are unique because, among other things, the employer had sat on the after-acquired evidence, discovered "shortly after [the employee] left," for two years before attempting to stop benefit payments.[26]  (There is no similar allegation under the Appeal, as the Claimants were told they were being terminated for Cause and provided with information describing this Cause in connection with their Claims.)  The case appears to take the minority view insofar as in the ERISA claim-for-benefits context and in the "after-acquired evidence" context (discussed in more detail in the next section), counsel identified only a few cases

---

[21] No. 04 C 7922, 2006 WL 273541 (N.D. Ill. Feb. 2, 2006).

[22] *Id.* at *13.

[23] *See* Plan Section "Administration" ("[t]he Administrator will have full discretion to administer and interpret the policy . . . . [A]ny interpretation by the Administrator of any term or condition of the Policy . . . will be conclusive and binding on all persons[.]").

[24] No. 18-CV-1446 (WMW/BRT), 2020 WL 209278 (D. Minn. Jan. 14, 2020).

[25] No. 2:21-CV-00871-SCD, 2023 WL 4446369 (E.D. Wis. June 8, 2023), *appeal filed*, No. 23-2340 (7th Cir. July 7, 2023).

[26] *Id.* at *1.



supporting *Ebner*'s "once resigned, always resigned" rule (none from within the Ninth Circuit), but many cases supporting the view that a resignation may be retroactively reclassified as termination for cause.

> **b.  The after-acquired evidence doctrine indicates that the Committee's determination of "Cause" should be based on the relevant facts and circumstances, not bound by the employer's motivations and knowledge at the time of termination.**

The second group of relevant cases concerns the "after-acquired evidence" doctrine.  This is a line of cases, primarily developed in the wrongful termination context, that allows employers to take into account evidence of an employee's wrongdoing discovered after the time of termination of employment.  By way of background, ERISA claim-for-benefits cases addressing the use of after-acquired evidence developed from the Supreme Court's seminal ruling on the use of after-acquired evidence in the federal disability discrimination context: *McKennon v. Nashville Banner Publishing Co.*[27]  In *McKennon*, the employer sought to bar relief fully under a federal discrimination statute based on discovery of after-acquired evidence of "wrongdoing that, in any event, would have led to the employee's termination on lawful and legitimate grounds."[28]

Every case counsel identified in the ERISA claim-for-benefits context that addressed the Supreme Court's seminal ruling in *McKennon* has permitted an ERISA administrator to rely on after-acquired evidence for purposes of determining benefit eligibility.[29]  In following *McKennon*, these courts have noted that "[i]n the ERISA context, the issue is whether Plaintiff is properly entitled to benefits: ***a determination which does not require an analysis into the employer's motivations.***"[30]  The key rationale for allowing ERISA administrators to consider after-acquired evidence is that, otherwise, "wrongdoers [could] collect benefits in perpetuity so long as they could successfully cover their tracks until after they left [the employer]."[31]  This rationale appears particularly relevant here, because the Claimants were high-level executives in control of the Company.

In short, the *McKennon* line of cases in the ERISA claim-for-benefits context strongly supports the conclusion that the Committee should make an independent determination of whether the Claimants were terminated "for Cause," based on whether "Cause" exists under the relevant facts and circumstances, regardless of whether the grounds constituting "Cause" are discovered or articulated post-termination.  This conclusion is generally supported by case law counsel found outside the ERISA context as well, including a 2022 decision by the Delaware Court of Chancery in the corporate governance context.[32]

---

[27] 513 U.S. 352 (1995).

[28] *Id.* at 354.

[29] *See Berg*, 2006 WL 273541, at *13 (upholding plan administrator's decision to deny benefits by reclassifying former general counsel's retirement as termination for cause based on after-acquired evidence of dishonesty and embezzlement); *Argenbright v. Zix Corp.*, No. Civ. 3:04-CV-1061-H, 2005 WL 1421775, at *3 (N.D. Tex. June 14, 2005) ("In the ERISA context, the 'after-acquired' evidence doctrine serves to establish a Plaintiff's unworthiness to receive benefits under the Plan[.]"); *see also Rinaldi v. CCX, Inc.*, 388 F. App'x 290, 293, 295 (4th Cir. 2010) (affirming trial court decision that found employer could avoid paying severance benefits if it could prove it would have terminated CEO for cause had it been aware of CEO's "questionable travel reimbursement requests").

[30] *Argenbright*, 2005 WL 1421775, at *3 (emphasis added); *see also Berg*, 2006 WL 273541, at *11 (quoting *Argenbright*, 2005 WL 1421775, at *3).

[31] *See Berg*, 2006 WL 273541, at *13.

[32] *See Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 879, 881 (Del. Ch. 2022), *judgment entered sub nom. In re Metro Storage Int'l LLC v. Harron*, No. 2018-0937-JTL, 2022 WL 2473354 (Del. Ch. July 5, 2022) (the after-acquired evidence doctrine "applies all the more persuasively in th[e] setting[] where a faithless fiduciary like [the president] concealed the wrongdoing that could have supported a for-cause



Counsel identified only two cases for the Committee in the ERISA claim-for-benefits context that refused to consider after-acquired evidence, which is a minority view.[33]  Both cases are factually distinct from the facts underlying the Appeal, and neither cited *McKennon* or otherwise meaningfully discussed the after-acquired evidence doctrine.  Accordingly, the Committee does not find these cases persuasive.

### c.     The Fifth Circuit's *Napoli* decision took a minority view.

The Appeal cites *Napoli v. Johnson & Johnson, Inc.*,[34] a split decision in the U.S. Court of Appeals for the Fifth Circuit, for the proposition that an ERISA administrator's determination of whether an employee's termination was "for cause" must be based on the employer's motivations and knowledge, at the time of termination, for terminating the employee.[35]  In *Napoli*, the employee was initially told that he was

termination.  If the after-acquired evidence doctrine did not apply, then the faithless fiduciary would benefit from his wrongful acts."); *see, e.g., Kulick v. Gamma Real Est. LLC, No. 1:20-CV-03582-MKV, 2022 WL 4467341, at *9-11* (S.D.N.Y. Sept. 23, 2022) (holding that under LLC agreement governed by Delaware law, company may rely on after-acquired evidence that executive "misus[ed] [company] resources for personal gain" to "retroactively assign 'cause'" for termination, in order to repurchase executive's units at no cost; executive "cannot not now reap the gains of his concealment," where "it is undisputed that any investigation could not be conducted thoroughly in the few final hours of [executive's] employment"); *Schnidrig v. Columbia Mach., Inc.,* 80 F.3d 1406, 1412 (9th Cir. 1996) (where employee resigned and sued under the ADEA, court stated that employer's discovery of after-acquired evidence "may bear upon" the former employee's remedy upon a finding of liability); *Peterson v. Nat'l Sec. Techs., LLC,* No. 12-CV-5025-TOR, 2013 WL 1758857, at *11 (E.D. Wash. Apr. 24, 2013) (where former employee resigned and sued under 42 U.S.C. § 1981 and Washington Law Against Discrimination, court denied former employee's motion for summary judgment to prohibit the employer from raising after-acquired evidence of wrongdoing); *Martin v. Scott & Stringfellow, Inc.,* No. 3:08-cv-417, 2009 WL 54510, at *1-2 (E.D. Va. Jan. 8, 2009) (where employee resigned due to an allegedly hostile work environment and claimed constructive discharge under ADEA, court allowed defendant to amend its answer to assert an after-acquired evidence defense); *Davis v. Fox & Roach LP,* No. CV 20-2497, 2022 WL 2757413, at *4 (E.D. Pa. July 14, 2022) ("In the employment discrimination context, after-acquired evidence is evidence of an employee's misconduct that does not come to light until after they resign or are terminated."); *Pastrana v. Loc. 9509, Commc'ns Workers of Am., AFL-CIO,* No. 06-CV-1779 W(AJB), 2008 WL 5054112, at *2 (S.D. Cal. Nov. 20, 2008) (upholding reliance on after-acquired evidence of wrongdoing for termination, where terminated employee sued the employer for unlawful discharge and the union for breach of the duty of fair representation under Section 301 of the Labor Management Relations Act); *but see von Pein v. Hedstrom Corp.,* No. 04 C 553, 2004 WL 1102317, at *3, *4 (N.D. Ill. May 4, 2004) (refusing to consider after-acquired evidence in contractual dispute regarding severance benefits governed by Illinois state law, because the lone, unpublished Illinois appellate decision on this issue refused to consider after-acquired evidence and the appeal of the employer in this decision was not taken up by the Illinois Supreme Court).

[33] *See Hansen v. Harper Excavating, Inc.,* No. 2:05CV940 DAK, 2007 WL 1378561 (D. Utah May 8, 2007) (holding that after-acquired evidence of an employee's alleged drug use may not be used to deny COBRA benefits; employer argued that had it known of the employee's alleged drug use, it would have never hired the employee in the first place); *Ebner,* 2023 WL 4446369 (holding that the employer may not, more than two years after the employee had resigned voluntarily, reclassify the resignation as a termination for cause and thereby cease paying benefits, based on after-acquired evidence of alleged misrepresentation of financial forecasts).

[34] 624 F. App'x at 864-65.

[35] The Appeal also cites an Eighth Circuit case for this proposition: "*Peck v. SELEX Sys. Integration, Inc.,* 895 F.3d 813, 820-21 (D.C. Cir. 2018) (finding that company's stated justification in terminating an employee for cause was inconsistent with the employee's conduct)."  Appeal at 15.  But this case does not address whether a determination of "cause" is bound by the employer's motivations and knowledge, at the time of termination, for terminating the employee.  In *Peck,* an employee's eligibility for deferred compensation benefits turned on whether he was terminated for "cause" under the plan.  *Id.* at 819.  The



eligible for severance benefits, but just days after his termination, his attorney received a letter from company counsel that he was terminated for committing a "Group I violation" of company policy, "based on allegations that 'he wrongfully expensed over $3,000 on his American Express account.'"[36]  Based on this letter, the administrator denied the employee's administrative appeal for benefits.[37]  Despite this letter, the majority concluded that the administrator abused its discretion for lack of substantial evidence that the employee "actually was" discharged for violation of company policy:

> Although this letter proves that Johnson & Johnson claimed—***after the fact and in the midst of a dispute over benefits***—that it had fired Napoli for a Group I violation, the letter is not substantial evidence that Johnson & Johnson ***actually did*** fire Napoli for a Group I violation. The letter does not reference, and the record does not contain, any personnel records or contemporaneous employment documents showing that Napoli ***actually was fired*** for a Group I violation or for making improper expenditures. We are aware of no case, and Johnson & Johnson does not provide one, holding that a single, cursory, post-termination letter—one that fails to detail the alleged violation or cite to ***contemporaneous accounts of the violation***—constitutes substantial evidence.[38]

Counsel advised that the view adopted by the majority opinion is in the minority, in light of the weight of the case law discussed above.[39]  Specifically, the majority's approach—requiring an ERISA administrator's decision to be based on "evidence that [the employee] actually was discharged for violating company policy"—does not comport with the cases allowing retroactive reclassification of retirement or layoff as termination for cause, and *McKennon*'s progeny in the ERISA space that allowed the use of after-acquired evidence to deny benefits, as discussed above.  Given that *Napoli* is not controlling on the interpretation of the Plan,[40] counsel has explained that the Committee is **not** required to adopt its approach. Consistent with this advice, the Committee has decided not to adopt the Fifth Circuit's approach as explained in *Napoli*.

### 5.    Conclusion

In sum, the Committee does not agree that it is required to interpret "for Cause" to mean that Mr. Musk or the Company were aware of, and motivated to terminate the Claimants by, the facts that the

---

plan defined "cause" as, in relevant part, the employee's refusal to perform "his or her material duties and obligations of his or her employment." *Id.*  The company told the employee that such duties are whatever the employee is directed to assume, and therefore, when the employee refused to relocate to a different city for a different position, the company terminated the employee for "cause" and notified the employee of its position.  *Id.*  The court disagreed with the company's view, stating that based on the reasonable expectation of the parties, the "material duties and obligations" are those connected to his then-current position before termination of employment.  *Id.* at 820.  Accordingly, the court held that "[the employee] did not refuse to perform the duties of his employment with the company when he declined to assume the different duties of a different position in a different location" and thus was not terminated for "cause" under the plan.  *Id.* at 820-21.

[36] *Id.* at 862; *id.* at 866 (dissenting opinion).

[37] *Id.* at 862.

[38] *Id.* at 864 (footnotes omitted; emphasis added).

[39] The dissent criticized the majority's "disturbing misapplication of the 'substantial evidence' test." *Napoli*, 624 F. App'x at 866 (dissenting opinion).  The dissent would have held that the letter, issued just days after the employee's termination, constitutes "concrete, direct, and unrebutted evidence" of the reason for the termination: a Group I violation, based on allegations that 'he wrongfully expensed over $3,000 on his American Express account.'"  *Id.*  Accordingly, the dissent "would conclude that the low substantial evidence bar has been met."  *Id.* at 867.

[40] *See* Plan Section "Applicable Law" ("The provisions of the [Plan] will be construed, administered and enforced in accordance with ERISA and, to the extent applicable, the internal substantive laws of the state of California (but not its conflict of laws provisions).").



Committee has determined constitute Cause (as discussed below).  The Committee interprets applicable law and the terms of the Plan to mean that a Claimant is terminated "for Cause" under the Plan if "Cause" exists under the relevant facts and circumstances, regardless of whether the grounds constituting "Cause" are discovered or articulated post-termination.

> **B.    May the Committee determine that a Claimant was terminated "for Cause" even if the Company did not articulate, at the time of termination, the factual basis for the termination "for Cause"?**

Under the Plan, a claimant who incurs an "Involuntary Termination" may be entitled to severance benefits.[41]  The Plan defines the term "Involuntary Termination" as including a "termination of employment by [the Eligible Employee] for Good Reason."[42]

The Appeal asserts that "[o]n October 27, 2022, Mr. Agrawal, Ms. Gadde, and Mr. Segal sent letters to the Company indicating that their employment circumstances constituted Good Reason within the meaning of the [Plan]."  And that these letters triggered a thirty-day cure period, ending on November 27, 2023.  The Appeal argues that Mr. Agrawal, Ms. Gadde, and Mr. Segal could not have been terminated "for Cause" under the Plan because the Company failed to supply the factual basis for their termination "for Cause" before their resignation for Good Reason was effective.[43]  The Appeal explained:

> But the Good Reason terminations were effective before the Company ever provided any factual basis for a finding of Cause.  Under the Administrator's interpretation, the Good Reason provisions would be meaningless and could be trumped by a simple declaration of Cause.  If the Company wanted to trigger a Cause termination, it had to supply a factual basis before the Good Reason terminations were effective.  Having failed to do so, three of the Officers are entitled to have their claims granted without regard to the Company's later attempt to invoke the Cause provisions.[44]

The Committee disagrees.  As discussed above in Section III.A.4.a, counsel has advised that the weight of relevant case law strongly supports the conclusion that if a participant engages in conduct constituting "cause" for termination, the employer may retroactively reclassify the resignation as termination for cause—which implies that the factual basis for the termination for "cause" is generally not required to be articulated at the time of termination.[45]

In addition, counsel has explained that the weight of relevant case law strongly supports the conclusion that an employer is not required to identify the facts constituting "cause" committed by the employee, at the time of termination, in order to terminate the employee "for cause."  While, again, the Appeal

---

[41] *See* Plan Section "Severance Benefits."

[42] Plan Section "Involuntary Termination."

[43] *See* Appeal at 73-74.

[44] Appeal at 74.

[45] *See Berg*, 2006 WL 273541, at *13 (upholding plan administrator's denial of benefits decision to deny benefits by reclassifying former general counsel's retirement as termination for cause based on after-acquired evidence of dishonesty and embezzlement); *Tardio*, 2020 WL 209278, at *5 (upholding reclassification of sales representative's "layoff" as termination for cause, based on post-termination investigation of the sales representative's misconduct in his last days of employment, even though the reclassification was made more than seven weeks after the sales representative's termination date); *but see Ebner*, 2023 WL 4446369 (holding that the employer may not, more than two years after the employee had resigned voluntarily, reclassify the resignation as a termination for cause and thereby cease paying benefits, where the employer had sat on the after-acquired evidence for two years before attempting to stop benefit payments).  *See also* Section III.A.4.b above regarding after-acquired evidence.



identified a contrary Fifth Circuit decision,[46] counsel identified multiple cases holding that notice to the employee of termination for cause (and notice of the underlying reasons) are not required at the time of termination except to the extent expressly required by the applicable contract.[47]

Here, the Appeal concedes that under the Plan, the grounds for "Cause" termination cited in the October 27, 2022 termination letters—i.e., gross negligence and willful misconduct—"did not require advance notice to the affected employee."[48]  By contrast, the Plan requires the Board to provide written notice of the certain other grounds constituting "Cause" to provide an opportunity to cure these grounds if capable of cure, in order to terminate an employee on those grounds.[49]  These provisions support the conclusion that under the Plan, the Company was also not required to notify each Claimant, at the time of termination, of the specific facts constituting "gross negligence" or "willful misconduct" by the Claimant.

Accordingly, the Committee has determined that the Company's failure to identify, at the time of termination, the factual basis for terminating the Claimants "for Cause" due to their "gross negligence" or "willful misconduct," does not preclude the Committee from finding that these Claimants were terminated "for Cause."

### C.  What constitutes "gross negligence" or "willful misconduct" under the Plan?

In the Claim Responses, the Claims Administrator determined that because the Plan does not define "gross negligence" or "willful misconduct," these terms should be interpreted consistent with their ordinary meaning, and consulted the Black's Law Dictionary's definitions of these terms to understand their ordinary meaning.  More specifically, the Claims Administrator explained:

> To determine their ordinary meaning, I have consulted Black's Law Dictionary.  Black's Law Dictionary defines "gross negligence" as "[a] lack of even slight diligence or care" and as "[a] conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party, who may typically recover exemplary damages."  It also indicates that "gross negligence" is also termed "willful negligence" or "advertent negligence," meaning "[n]egligence in which the actor is aware of the unreasonable risk that he or she is creating.

> Black's Law Dictionary defines "willful misconduct" as "[a] dereliction of duty; unlawful, dishonest, or improper behavior, esp. by someone in a position of authority or trust" that

---

[46] *See Napoli*, 624 F. App'x at 861 (reversing ERISA administrator's denial of benefits on the grounds of a "Group I violation," where the employer did not identify this reason for termination until days after the termination); *but see id.* at 866 (dissenting opinion) (stating that plan administrator's decision should be upheld because the employer's letter regarding termination for "Group I violation" on the basis of unauthorized use of company credit card, sent days after the termination, constitutes "concrete, direct, and unrebutted evidence" of the reason for the termination: a Group I violation).

[47] *See Delvecchio v. Bayside Chrysler Plymouth Jeep Eagle, Inc.*, 271 A.D.2d 636, 638-39, 706 N.Y.S.2d 724, 726 (2000) (holding that "corporate defendants' failure to provide written notice to the [director] did not, under the circumstances of this case, render the termination for cause ineffective" because "the contract . . . did not afford the [director] an opportunity to cure . . . .notice was not a material term of the contract."); *Storetrax.com, Inc. v. Gurland*, 168 Md. App. 50, 70–71, 895 A.2d 355, 367 (2006), *aff'd*, 397 Md. 37, 915 A.2d 991 (2007) ("Although . . . the [Employment] Agreement required [the employer] to provide, at a minimum, ten days['] notice of termination, [the employer] was not required to state the reason for [the vice president's] termination for cause and, if terminated "for cause" . . . he was not entitled to an opportunity to cure.").

[48] Appeal at 8.

[49] *See* Plan Section "Cause" ("'Cause' will not be deemed to exist in the event of subsections (b), (c) or (f) above unless you have been provided with (i) 30 days' written notice by the Board or the act or omission constituting 'Cause' and (ii) 30 days' opportunity to cure such act or omission, if capable of cure").



is "committed voluntarily and intentionally."  In the employment context, Black's Law Dictionary defines "willful misconduct of an employee" as "[t]he deliberate disregard by an employee of the employer's interests, including its work rules and standards of conduct, justifying a denial of unemployment compensation if the employee is terminated for the misconduct."[50]

In response, the Appeal argues that the terms "gross negligence" and "willful misconduct" under the Plan are both "terms of art in corporate governance" and refer to a breach of the duty of care and the duty of loyalty, respectively.[51]  In this regard, the Appeal cites the expert report of Professor Steven Davidoff Solomon, Esq. (the "Solomon Report"), which opines that the Claims Administrator erred by failing to recognize that "gross negligence" and "willful misconduct" are terms of art in the context of corporate officers and must be interpreted to require deference to the Claimants' conduct consistent with the deferential business judgment rule standard.  Citing Delaware case law on corporate governance standards, the Appeal argues that these terms should be interpreted as incorporating the "business judgment rule":

> Both [terms] stem from the fundamental principle of the business judgment rule, which establishes a presumption that in making a business decision, the officers and directors of a corporation "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[52]

Accordingly, the Appeal discussed the definitions of "gross negligence" and "willful misconduct" under Delaware case law, emphasizing that "the . . . gross negligence standard focus on process, rather than outcomes."[53]  Thereafter, the Appeal states:

> If the Administrator had acknowledged the accepted understanding of these terms, the Administrator would have to contend with the principle that the actions of the Officers are presumed to be valid under the business judgment rule unless tainted by irregularity or self-interest.[54]

The Appeal argues that Delaware corporate governance standards for gross negligence and willful misconduct, premised on the business judgment rule, should govern the interpretation of "gross negligence" and "willful misconduct" under the Plan because "Twitter was a Delaware corporation . . . and thus Delaware law governed its internal affairs" (also known as the "internal affairs doctrine").  More specifically, the Appeal explains that:

> Throughout the Officers' tenure, Twitter was a Delaware corporation (*see* Merger Agreement at 1), and thus Delaware law governed its internal affairs, including the duties owed to the Company by its officers and directors.  *See VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 112-13 (Del. 2005); *Vaughn v. LJ Int'l, Inc.*, 174 Cal. App. 4th 213, 223 (2009) (Delaware law governs the relationship between Delaware corporations and their officers and directors pursuant to the internal affairs doctrine).  Even in the case of California corporations, California courts look to Delaware law for guidance.  *See, e.g., Oakland Raiders v. NFL*, 93 Cal. App. 4th 572, 586 n.5 (2011) ("we

---

[50] Agrawal Claim Response, Part II, Section 2. (A.) at p. 38; Edgett Claim Response, Part II, Section 2. (A.) at p. 31; Gadde Claim Response, Part II, Section 2. (A.) at p. 36; Segal Claim Response, Part II, Section 2. (A.) at p. 36.

[51] Appeal at 38.

[52] Appeal at 38-39 (quoting *Orman v. Cullman*, 794 A.2d 5, 19-20 (Del. Ch. 2002) (internal quotation marks omitted).

[53] *See* Appeal at 39.

[54] Appeal at 40.



may properly rely on corporate law developed in the state of Delaware given that it is identical to California corporate law for all practical purposes[]").[55]

After discussing the definitions of "gross negligence" and "willful misconduct" under Delaware law and the effect of the business judgment rule, the Appeal asserts that the Black's Law Dictionary definitions of these terms are "comparable" (but not identical) to the definitions of these terms in the context of Delaware corporate governance law.[56]

The Appeal thus raises the question of whether the terms "gross negligence" and "willful misconduct" under the Plan must be interpreted based on Delaware corporate governance standards, which include the business judgment rule. The Committee worked with counsel to research the issue of how these terms should be interpreted. The Committee's determinations are set forth below.

### 1.   The Committee is not required to apply Delaware corporate governance standards.

The Committee is not aware of any reason that it would be required, under ERISA or the internal affairs doctrine, to apply Delaware corporate governance standards for purposes of interpreting "gross negligence" and "willful misconduct" under the Plan.[57] The Appeal does not cite, and counsel did not find, any case in the ERISA claim-for-benefits context that mentions the internal affairs doctrine, much less requires administrators of ERISA-covered severance plans to learn and apply the corporate governance laws of the state where the plan sponsor is incorporated. On the contrary, counsel did identify a case in the ERISA claim-for-benefits context where the court applied the terms of a plan concerning corporate governance without looking to the laws of the state of the plan sponsor's incorporation.[58] This is not surprising, because applying the internal affairs doctrine to an ERISA plan conflicts with three long-standing principles of ERISA: (1) the employer, as settlor, has broad discretion to design its benefit plans, including to use a choice-of-law provision different from the employer's state of incorporation; (2) an ERISA-covered plan is a separate legal entity with a separate governance structure[59]; and (3) the administrator, if granted discretion under the plan's terms, has broad discretionary authority under *Firestone* to adopt any reasonable interpretation of the plan's terms.

Here, the Plan does not specify that "Cause" must be interpreted under Delaware corporate governance standards, and the Claimants—the highest-level executives at the Company—had ample opportunity to negotiate with the Company to add this language into the Plan. Instead, the Plan states that it "will be construed, administered and enforced in accordance with ERISA" and grants the Committee broad discretionary authority to interpret the Plan.[60] Accordingly, to construe the plan "in accordance with ERISA," the Committee may adopt any reasonable interpretation of "gross negligence" and "willful misconduct" and is not bound by the corporate governance standards of Delaware of any other state.

---

[55] Appeal at 39, n.117.

[56] Appeal at 40.

[57] Appeal at 39 n.117.

[58] *See, e.g.*, *Miniace v. Pac. Mar. Ass'n*, 424 F. Supp. 2d 1168, 1175 (N.D. Cal. Feb. 23, 2006) (dispute regarding whether president of California corporation was terminated "for unsatisfactory performance and/or misconduct, including, but not limited to, termination due to a lack of ability to perform" under ERISA-covered severance plan).

[59] *See* 29 U.S.C. section 1132(d) ("[a]n employee benefit plan may sue or be sued under this subchapter as an entity").

[60] Plan Section "Applicable Law"; *see* Plan Section "Administration."



    2.      **The Committee is not required to—and has decided not to—apply the Delaware business judgment rule for purposes of interpreting "gross negligence" and "willful misconduct" under the Plan.**

Consistent with the advice of counsel and the Foster Report (discussed below), the Committee has determined that is not required to apply the Delaware business judgment rule for purposes of interpreting "gross negligence" and "willful misconduct" under the Plan.  The Committee has reached this conclusion principally because the Plan does not reference the business judgment rule, expressly or impliedly.  The absence of any reference to the business judgment rule in the Plan is significant for the following reasons:

- Although the Appeal argues that the terms "gross negligence" and "willful misconduct" impliedly incorporate the business judgment rule, the Appeal does not cite, and counsel did not identify, any ordinary meanings of these terms, such as those provided in Black's Law Dictionary definitions, that incorporate the business judgment rule.

- The Appeal does not cite, and counsel did not identify, any case in the ERISA claim-for-benefits context that mentions the business judgment rule.  On the contrary, in other ERISA contexts, fiduciary or non-fiduciary, courts and the U.S. Department of Labor have rejected application of the business judgment rule.[61]

- The Appeal does not cite, and counsel did not identify, any case in a Delaware (or California) state court applying the business judgment rule to the interpretation of a severance agreement.

- "Gross negligence" and "willful misconduct" are standards of conduct, whereas the business judgment rule is not a standard of conduct, but a standard of judicial review within a burden-shifting framework, as discussed below.  The Appeal does not cite, and counsel did not identify, any case in the ERISA claim-for-benefits context where a claims/appeals fiduciary applied (or was required to apply) a burden-shifting framework for purposes of interpreting plan terms, such as terms concerning grounds for termination of employment.

The Committee has determined not to apply the Delaware business judgment rule to its interpretation of "gross negligence" and "willful misconduct" under the Plan, for the reasons set forth above, and because, as discussed below, the relevant legal authorities indicate that the business judgment rule is a unique creature of corporate governance laws, and hence should not be applied under an ERISA-covered plan unless expressly invoked in the plan itself.

    a.      **The Delaware business judgment rule is a standard of judicial review (within a burden-shifting framework)—not a standard of conduct.**

Delaware corporate governance law distinguishes between standards of conduct and standards of judicial review, and the business judgment rule is a standard of judicial review rather than a standard of conduct:

> "When determining whether corporate fiduciaries have breached their duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review."  (citation omitted) "The standard of conduct describes what directors are

---

[61] *See Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996) (affirming application of ERISA fiduciary duties to fiduciary actions because "[t]he business judgment rule is a creature of corporate, not trust, law"); *Donovan v. Mazzola*, 716 F.2d 1226, 1231 (9th Cir. 1983) (holding that ERISA's prudent person test, rather than business judgment rule, applies to fiduciary actions, based on "the applicable ERISA statute, its legislative history, and relevant case law"); *Solis v. Couturier*, No. 208-CV-02732-RRB-GGH, 2009 WL 3055207, at *4 (E.D. Cal. Sept. 17, 2009) (agreeing with the U.S. Department of Labor's position that business judgment rule is not a defense to violation of ERISA by non-fiduciary person).



expected to do and is defined by the content of the duties of loyalty and care." *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 35 (Del. Ch. 2013). **When litigation arises, directors are not judged by the standard of conduct, but rather through the lens of a standard of review**. *Id.* at 35–36; Melvin Aron Eisenberg, *The Divergence of Standards of Conduct and Standards of Review in Corporate Law*, 62 Fordham L.Rev. 437, 437 (1993). "In each manifestation, the standard of review is more forgiving of directors and more onerous for stockholder plaintiffs than the standard of conduct." (citation omitted).

"Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).[62]

Counsel has explained that, as a standard of judicial review, the business judgment rule is one part of a burden-shifting framework. Specifically, "the business judgment rule[] . . . establishes a presumption that in making a business decision, the officers and directors of a corporation 'acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"[63] "[T]o rebut the presumption, a shareholder plaintiff assumes the burden of providing evidence that the board of directors, in reaching its challenged decision, breached any one of its triad of fiduciary duties: good faith, loyalty, or due care."[64] "If the shareholder plaintiff succeeds in rebutting the presumption of the business judgment rule, the burden shifts to the defendant directors to prove the 'entire fairness' of the transaction."[65] Otherwise, "if the shareholder plaintiff fails to meet that evidentiary burden, the business judgment rule attaches and operates to protect the individual director-defendants from personal liability for making the board decision at issue."[66]

The business judgment rule has the effect of protecting directors and officers with a powerful presumption that is frequently outcome determinative in shareholder derivative litigation:

[B]ecause the effect of the proper invocation of the business judgment rule is so powerful and the standard of entire fairness so exacting, the determination of the appropriate standard of judicial review frequently is determinative of the outcome of derivative litigation.[67]

As stated above, the Plan does not expressly invoke any standard of judicial review for purposes of determining whether a participant is terminated "for Cause." Counsel did not identify any case law suggesting that the business judgment rule, or any other standard of judicial review, should be applied when an ERISA fiduciary applies the plan's terms, or that terms regarding standards of conduct in a severance or employment agreement, such as "gross negligence" or "willful misconduct," impliedly incorporate any standard of judicial review, such as the business judgment rule.

---

[62] *Pell v. Kill*, 135 A.3d 764, 783–84 (Del. Ch. 2016) (footnotes omitted) (emphasis added).
[63] Appeal at 38-39 (quoting *Orman*, 794 A.2d at 19-20 (Del. Ch. 2002) (internal quotation marks omitted)).
[64] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1164 (Del. 1995).
[65] *McMullin v. Beran*, 765 A.2d 910, 917 (Del. 2000) (citation omitted).
[66] *Id.* (internal quotations and citation omitted).
[67] *Nixon v. Blackwell*, 626 A.2d 1366, 1376 (Del. 1993) (internal quotation marks omitted).



   **b.    The key policy motivations and context for the Delaware
          business judgment rule are unique and not implicated under the
          Plan.**

The business judgment rule is intended to "deter costly, baseless suits by creating a screening
mechanism to eliminate claims where there is only a suspicion expressed solely in conclusory terms."[68]
Delaware case law indicates that by shielding directors and officers from significant exposure (stemming
from derivative litigation) when they act in their corporate capacity in most circumstances, the business
judgment rule is designed to empower centralized management to make business decisions on behalf of
the corporation and to protect against sub-optimal risk acceptance for the corporation.[69]  This appears
consistent with the following concepts in the Solomon Report—which the Appeal relies on—regarding the
policy motivations of business judgment rule:

   36.    The fundamental idea of risk-taking is implemented through the corporate
   governance principle embedded within the business judgment rule. . . .

   37.    Courts, practitioners, and academics have repeatedly endorsed this rule as
   fundamental to the success of the corporate enterprise.  The business judgment rule
   induces "qualified persons to serve as directors" and "aligns director attitudes toward
   risk—they will capture little of the eventual payoff from success but face litigation
   exposure from failure—with stockholder risk preferences as influenced by holding a
   diversified portfolio of stock."  In this regard, the business judgment rule "which requires
   that the judiciary not second-guess business decisions made in good faith and with due
   care, even if they turn out badly, is also designed to protect the economic value served
   by central management."  It does so by "insulating managers from fear that pursuit of an
   attractive, but risky, business venture will leave them liable" if the venture fails.[70]

In contrast to the business judgment rule, the Plan has a different and far narrower motivation: "to
provide certain protections to a select group of key [Twitter] employees if their employment is negatively
affected by a change of control of Twitter."  It would be reasonable to expect that a relatively higher
standard for gross negligence and willful misconduct applies in the corporate governance context to
empower centralized management and appropriate risk-taking, and a relatively lower standard applies in
a contractual benefits context to avoid executives receiving significant compensation despite bad acts
that may be contrary to the interests of the corporation.  The context is also different because nothing in
the Plan contemplates the significant exposure stemming from derivative litigation.  A finding of "Cause"
under the Plan simply precludes the former executive from receiving this particular benefit and does not
trigger the type of exposure that directors and officers may face in derivative litigation.  Thus, the key
policy motivations and context underlying the business judgement rule do not appear to be implicated
when the Committee is asked to interpret the terms of the Plan and to decide whether a former executive
is entitled to benefits under the Plan.

   **c.    In California, the business judgment rule does not apply to
          officers.**

The Plan states that "[t]he provisions of the [Plan] will be construed, administered and enforced in
accordance with ERISA and, to the extent applicable, the internal substantive laws of the state of

---

[68] *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000).
[69] *See In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 614 (Del. Ch. 2005) ("The business
judgment rule exemplifies and animates this idea" of "the empowerment of centralized management, in
the form of boards of directors and the subordinate officers they choose, to make disinterested business
decisions."); *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1052 (Del. Ch. 1996) (the business judgment
rule is a "protection against a threat of sub-optimal risk acceptance.").
[70] Solomon Report at 13, 14 (citations and footnotes omitted).



California (but not its conflict of laws provisions)."  Accordingly, the Committee may (but is not required to) consider California's substantive law with respect to the scope of the business judgment rule.  Under California law, the business judgment rule does **not** protect corporate officers.[71]  This weighs against the application of the Delaware business judgment rule under the Plan, which does not expressly invoke the business judgment rule and, to the extent applicable, California law.

> ### d.    The Committee finds the Foster Report persuasive, and the Solomon Report not persuasive, on this issue.

Mr. Jonathan F. Foster (the "Foster Report") opined that in his experience, as a board member of public and private companies and a chair of various compensation committees, there is "no basis . . . to assume that the legal meaning of 'gross negligence' and 'willful misconduct' will be determined by reference to the business judgment standard" and, instead, "[g]iven that executive employment terms often vary, experienced officers and directors expect that any such terms will be followed as written and not superseded by an interpretation of these terms from a different perspective."[72]  This opinion is consistent with applicable law, and accordingly, the Committee has found this opinion to be credible and persuasive.

The Solomon Report opines that the Administrator is required to "apply the presumption of the business judgment rule to decisions made by officers and directors"[73] for purposes of determining benefit eligibility under the Plan.  The Committee has determined that the Solomon Report is not persuasive, not credible, and not supported by the terms of the Plan or applicable law, for the reasons explained above.

---

[71] *Gaillard v. Natomas Co.*, 208 Cal. App. 3d 1250, 1265 (1989) (holding that where directors are "acting as officer employees of the corporation . . . the business judgment rule . . . should not apply"); *FDIC v. Van Dellen*, No. CV 10-4915 DSF SHX, 2012 WL 4815159, at *6 (C.D. Cal. Oct. 5, 2012); *In re AWTR Liquidation Inc.*, 548 B.R. 300, 320 (Bankr. C.D. Cal. 2016).  This is true under both California common law and the California Corporations Code; *FDIC v. Perry*, No. CV 11-5561-ODW MRWX, 2012 WL 589569, at *3, *4 (C.D. Cal. Feb. 21, 2012); *FDIC v. Reis*, No. SACV122212JSTANX, 2013 WL 12126777, at *5 (C.D. Cal. Sept. 5, 2013); *FDIC v. Faigin*, No. CV 12-03448 DDP CWX, 2013 WL 3389490, at *11 (C.D. Cal. July 8, 2013).

[72] The Committee notes that the Solomon Report, discussed in more detail in Section IV.B.1, concludes that the Claims Administrator erred in failing to afford the Claimants the deference provided under the business judgment rule.  The Committee does not agree with this conclusion and interprets the Plan to provide it with the deference to interpret Plan terms, including the definitions of these terms.

[73] *Id.* at 20.



3.   **The Committee has decided to take into account the legal duties that the Claimants owed the Board and the Company.**

a.   **The Claimants had duty to disclose material information to the Board.**

For purposes of applying "gross negligence" and "willful misconduct" under the Plan, the Committee has determined that it may consider the following legal duties of corporate officers to disclose material information to the board of directors under Delaware law.[74]

First, "[o]fficers . . . are fiduciaries in their capacities as agents who report to the board of directors."[75] Thus, although generally "the fiduciary duties of officers are the same as those of directors,"[76] because officers are agents of the board, they "owe additional and more concrete duties to the[] [board]."[77] Specifically, as fiduciaries and as agents of the board, officers must disclose to the board material information that the board would wish to have.[78]

Moreover, an officer's duty to provide material information to the board "extends beyond what the [officer] actually knows to encompass what the [officer] has reason to know or should know."[79] This

---

[74] We note that California law is likely aligned with Delaware law on this particular issue, because generally Delaware corporate law "is identical to California corporate law for all practical purposes." *See* Appeal at 39 n.117 ("Even in the case of California corporations, California courts look to Delaware law for guidance. *See, e.g., Oakland Raiders v. NFL*, 93 Cal. App. 4th 572, 586 n.5 (2011) ("[W]e may properly rely on corporate law developed in the state of Delaware given that it is identical to California corporate law for all practical purposes.")"); s*ee also Charter Twp. of Clinton Police & Fire Ret. Sys. v. Martin*, 162 Cal. Rptr. 3d 300, 314, 219 Cal. App. 4th 924, 942 (Cal. App. 2 Dist., 2013) (same); *Bader v. Anderson*, 101 Cal. Rptr. 3d 821, 833, 179 Cal. App. 4th 775, 791, n.5 (Cal. App. 6 Dist., 2009) (finding "instructive" Delaware case law adjudicating corporate law matters "since Delaware corporate law is not inconsistent with California law").

[75] *Lebanon Cnty. Ems.' Ret. Fund v. Amerisourcebergen Corp.*, No. CV 2019-0527-JTL, 2020 WL 132752, at *21 (Del. Ch. Jan. 13, 2020), *aff'd*, 243 A.3d 417 (Del. 2020).

[76] *Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009).

[77] *Metro Storage Int'l LLC*, 275 A.3d at 844.

[78] *See Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980) (finding that "officers . . . directors . . . [and] key managerial personnel . . . . [have] a duty to disclose information that is relevant[,]" to their duties as an agent, to their principals); *Lebanon Cnty.*, 2020 WL 132752, at *21 (noting that "[b]oth as corporate fiduciaries and as agents, officers . . . have a duty to provide the board of directors with information that the directors need to carry out their duties and perform their statutory role"); *Metro Storage*, 275 A.3d at 851 n.24 (officers have the duty to provide "the facts [that] are material to the [officer's] duties to the [board.]" (internal citation and quotation omitted)); *Hampshire Grp., Ltd. v. Kuttner*, No. CIV.A. 3607-VCS, 2010 WL 2739995, at *13, 34 (Del. Ch. July 12, 2010) (holding that officers have a duty to disclose to the board "material information relevant to the affairs of the agency entrusted to them," and that an officer breaches the duty of loyalty by not making such disclosures (citation omitted)); *In re McDonald's Corp. S'holder Derivative Litig.*, 289 A.3d 343, 365-66 (Del. Ch. 2023) (noting that "[a]s agents, officers owe a duty to disclose relevant information if they have notice of facts which they should know may affect the decisions of their principals as to their conduct[]"); *see also* 2 Model Bus. Corp. Act. Ann. § 8.42(b)(1) (4th ed. 2009) ("The duty of an officer includes the obligation to inform . . . the board . . . of information . . . known to the officer to be material to . . . [the] board[.]").

[79] *McDonald's*, 289 A.3d at 365; *see also Metro Storage*, 275 A.3d at 851 n. 24 ("An agent has a duty to use reasonable effort to provide the principal with facts that the agent knows, has reason to know, or should know when . . . [s]ubject to any manifestation by the principal, the agent knows or has reason to know that the principal would wish to have the facts or the facts are material to the agent's duties to the principal." (quoting 3 Am. Jur. 2d Agency § 222, Westlaw (database updated Feb. 2022))).



stems from an officer's fiduciary duty of care, which "requires that fiduciaries inform themselves of material information before making a business decision and act prudently in carrying out their duties."[80]

These cases, which discussed officers' duties as agents to the board (including the specific duty to disclose material information to the board), generally all refer to, and derive their reasoning from, the Restatement of Agency.[81]  Accordingly, the Committee may consider this secondary legal authority when considering whether a Claimant fulfilled his or her obligations to the Company and to the Board, and thus whether he or she engaged in "gross negligence" and/or "willful misconduct."  The most recent version of the Restatement of Agency states:

> An agent has a duty to use reasonable effort to provide the principal with facts that the agent knows, has reason to know, or should know when (1) subject to any manifestation by the principal, the agent knows or has reason to know that the principal would wish to have the facts or the facts are material to the agent's duties to the principal; and (2) the facts can be provided to the principal without violating a superior duty owed by the agent to another person.[82]

Second, under Delaware law, officers, like directors, are subject to a "duty of candor . . . to disclose all material information relevant to corporate decisions from which they may derive a personal benefit."[83] An officer's failure to disclose such material information violates this duty of candor and may constitute "fraud upon the board."[84]  When the board is so misled, the resulting decisions "are voidable at the behest of innocent parties to whom a fiduciary duty was owed and breached, and whose interests were thereby materially and adversely affected."[85]

Similarly, outside Delaware, an officer's decisions to use corporate assets in ways that may benefit themselves without adequate disclosure to the board of directors or other internal oversight authority may warrant termination of employment for cause (including misconduct, breach of fiduciary duty, and willful misconduct).[86] Finally, the Committee notes that "poor work performance of sufficient willfulness or severity may constitute gross misconduct."[87]

---

[80] *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1049-50 (Del. 2021).

[81] *See Metro Storage*, 275 A.3d at 848, 851; *McDonalds*, 289 A.3d at 365; *Hampshire*, 2010 WL 2739995, at *13 n.85.

[82] Restatement (Third) of Agency § 8.11 (2006).

[83] *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) (citing 8 Del. Code. § 144).

[84] *See id.* at 1283-84 (holding that at a board meeting regarding the potential sale of the company, "silence" of CEO and COO regarding their prior tip to a competing bidder "in the face of their rigorous affirmative duty of disclosure" was misleading, deceptive, and constituted a "fraud upon the board").

[85] *Firefighters' Pension Sys.*, 251 A.3d at 268 (citing *Mills*, 559 A.2d at 1283-84) (internal quotation marks omitted).

[86] *Cf. Miniace*, 424 F. Supp. 2d at 1173-75, 1180 (an officer's failure to inform the board of directors of his compensation decisions that have a "profound impact" on the company's officers and finances and that "provided a tremendous benefit for himself and his friends" may constitute a misconduct and breach of fiduciary duty, even if the officer is vested with the discretionary authority to make such compensation decisions and the decisions are reasonable); *von Pein*, 2004 WL 1102317, at *5 (N.D. Ill. May 4, 2004) ("Especially in today's business environment, where corporate management faces increased scrutiny as to the use of company funds for personal reasons, an executive's request to a subordinate to raid the corporation's coffers for a private loan, coupled with instruction not to disclose the undertaking, could constitute willful misconduct.").

[87] *Sell v. Universal Surveillance Sys., LLC*, No. 1:16-CV-660-RP, 2017 WL 3712188, at *4, *5 (W.D. Tex. July 6, 2017) (finding, in a non-ERISA severance dispute, that an employee who was terminated "as part



>    b.    **The Claimants had a duty to "act prudently" to filter only appropriate items for the Board's consideration.**

Corollary to their fiduciary duty to disclose material information to the Board, the Claimants had a duty to "inform themselves of material information before making a business decision and act prudently in carrying out their duties."[88]  A "critical part of an officer's job is to identify red flags, report upward, and address them if they fall within the officer's area of responsibility."[89]  Accordingly, the Claimants had a duty to "act prudently" as a filter to the Board, by informing themselves of material information, identifying red flags, and presenting only appropriate items for the Board's consideration.

>    4.    **If the Committee finds that a Claimant committed "gross negligence" or "willful misconduct" under the Plan, under what circumstances would Board approval or ratification fail to cleanse the Claimant's "gross negligence" or "willful misconduct"?**

In the Claim Responses, the Claims Administrator noted that each "Claimant was a filter to the Board and should never have put the Board in a position to approve" the law firm payments.  As such, the Claims Administrator determined that "while the Board approved and ratified" the law firm payments, the Board's "ratification does not moot or otherwise relieve the Claimant[s] of the consequences of [their] gross negligence and willful misconduct[]" because the Claimants "appear[ed] to have kept the Board in the dark on the legal fee issues[.]"  In support, the Claims Administrator cited an email from a Board member who "respond[ed] OMFG when she was informed of the legal fees being presented for [Board] approval and ratification on the Closing Date[.]"  As the Claims Administrator noted, this response "calls into question whether the Board's ratification was made with knowledge of the facts leading up to closing (including the fact that these fees were not agreed to in advance of the services being rendered)."  Furthermore, with respect to Mr. Agrawal, the Claims Administrator noted that in addition to presenting the legal fees to the Board, he also "voted in favor of ratifying these last-minute payments."

In response, the Appeal argues that "there is no support for these assertions."[90]  The Appeal maintains that because the "Board . . . approved the retention of the law firms and the attorneys' fees payments, [and] directed the Officers to make those payments . . . . the [Claimants] were not only authorized, but required, to make the payments to comply with their fiduciary duties to the Company."[91]  Moreover, the Appeal asserts that because "the [Claimants] met repeatedly with the Transactions Committee about the fees, conducted and shared their due diligence about the fees, and provided fee information to the full Board[,]" the Claimants kept the Board fully apprised of the legal fees and "ensur[ed]" that the Board made the decision to approve the legal fees "with knowledge of the relevant facts."[92]  Finally, the Board member asserts that her email response does not show that she was unaware of the amount of legal fees, "instead, [she] was expressing outrage that Mr. Musk had caused the Company to spend so much in unnecessary fees."[93]

---

of a reduction-in-force due to financial hardship" could be classified as terminated for cause if the employee's poor work performance rose to the level of gross misconduct).

[88] *See United Food*, 262 A.3d at 1049-50 ("officers of a Delaware corporation owe two overarching fiduciary duties—the duty of care and the duty of loyalty . . . . [and] the duty of care requires that fiduciaries inform themselves of material information before making a business decision and act prudently in carrying out their duties"); *see also McDonald's*, 289 A.3d at 365 (the "standard of conduct at the officer level . . . include[s] a duty to act carefully, loyally, and in good faith to gather and provide information").

[89] *McDonald's*, 289 A.3d at 366.

[90] Appeal at 57.

[91] Appeal at 57.

[92] Appeal at 58.

[93] Appeal at 58.



This raises an issue of Plan interpretation:  If the Committee finds that a Plan participant committed "gross negligence" or "willful misconduct" under the Plan, under what circumstances would Board approval or ratification cleanse the participant's "gross negligence" or "willful misconduct"?

The Plan does not address this issue.  Accordingly, the Committee worked with counsel to research legal guidance, the weight of which strongly supports the conclusion that if an officer commits wrongdoing by taking an action, and the board of directors approves or later ratifies the action, this approval or ratification does not cleanse the officer's wrongdoing if the board was not fully informed as to all material facts regarding the action because the board "cannot approve (and ratify) what it did not know."  This proposition is supported by the following authorities:

- Under Delaware law in the corporate governance context, for board approval or ratification of an officer's actions to be valid, the board "must have [k]nowledge, actual or imputed, of all material facts . . . ."[94]  If the board of directors is not fully informed as to all material facts regarding an action, the board's subsequent ratification of the action is not a defense to a breach of fiduciary duty claim against the officer for taking the action, because "[t]he Board, like shareholders, cannot approve (and ratify) what it did not know."[95]

- Under Restatement (Third) of Agency (2006), "[r]atification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority."[96]  Generally, "ratification retroactively creates the effect of actual authority."[97]  However, "[a] person is not bound by ratification made without knowledge of material facts involved in the original act when the person was unaware of such lack of knowledge."[98]  This is because "[r]atification requires that the principal have actual knowledge of material facts . . . ."[99]  Where a principal is not "bound" by the agent's action because the principal was not fully informed as to the material facts regarding the action, it is implied that the principal has not cleansed any wrongdoing by the agent associated with taking the action.

Based on these authorities, the Committee has determined that if a claimant committed "gross negligence" or "willful misconduct" under the Plan by taking an action, and the Board had approved or later ratifies the action, the approval or ratification does not cleanse the claimant's "gross negligence" or "willful misconduct" if the Board was not fully informed as to all material facts regarding the action.

### 5. The Committee may (but is not required to) take into account legal ethics requirements regarding contingency fee arrangements (to the extent any Claimant approved, or presented to the Board for approval or ratification, payment of contingency fees to law firms).

By way of background, in the Claim Responses, the Claims Administrator explains that the Company paid certain contingency fees to Wachtell, Lipton, Rosen & Katz ("Wachtell"), Wilson Sonsini Good Rich Rosati ("WSGR"), and Simpson Thacher & Bartlett LLP ("STB").  Such contingency fees were not contemplated

---

[94] *Klig v. Deloitte LLP*, 36 A.3d 785, 794 (Del. Ch. 2011) (quoting *Frank v. Wilson & Co.*, 32 A.2d 277, 283 (Del. 1943) (internal quotation marks omitted).

[95] *See In re Xura, Inc., S'holder Litig.*, No. CV 12698-VCS, 2018 WL 6498677, at *13 (Del. Ch. Dec. 10, 2018) (holding that where there was "a reasonable inference that the Board was not fully informed of [the CEO's] conduct," "there is no basis to invoke Board ratification as a defense at the pleading stage, even assuming that board ratification would be a defense to a CEO's alleged breach of fiduciary duty").  The court in *Xura* did not decide as a general matter whether proper ratification by a board would be a defense to, or otherwise "cleanse," an officer's breach of fiduciary duty.  *Id.* at *13.

[96] Restatement (Third) of Agency (2006), § 4.01.

[97] *Id.* § 4.02(1).

[98] *Id.* § 4.06.

[99] *Id.* § 4.06, cmt. b.



in the original written engagement letters between the Company and these firms.  Rather, the contingency fees were agreed to in the days leading up to the closing of the transaction.

Generally, contingency fees are governed by applicable state laws.  Here, the Wachtell and WSGR fee agreements are governed by California law and STB's fee agreement is governed by New York law, as follows:

- Under California law, for a contingency fee to be permitted, the relevant agreement "shall be in writing," include "[a] statement of the contingency fee rate that the client and attorney have agreed upon," "[a] statement as to how disbursements and costs incurred in connection with the prosecution or settlement of the claim will affect the contingency fee and the client's recovery," "[a] statement as to what extent, if any, the client could be required to pay any compensation to the attorney for related matters that arise out of their relationship not covered by their contingency fee contract," and "a statement that the fee is not set by law but is negotiable between attorney and client."[100]  Under California law, the contingency fee agreement must be made "**at the outset of the representation** in a signed writing."[101]

- Similarly, under rules promulgated by the New York State Unified Court System, the method by which the legal fee is to be determined must be included in a written engagement letter.[102]  Where the fee is a contingency fee, the fee must be set forth in writing "**[p]romptly after a lawyer has been employed**" in the matter.[103]

An agreement that does not satisfy these laws and rules on contingency fees is generally considered to be unenforceable as a matter of law.[104]

### 6.     Conclusion

Given the Committee's discretionary authority to interpret "gross negligence" and "willful misconduct" under the Plan, the Committee hereby adopts the ordinary meaning of the terms "gross negligence" and "willful misconduct," as informed by the definitions of these terms in the Black's Law Dictionary.  For purposes of applying these definitions, the Committee will not apply the business judgment rule, as explained in Section III.C.2, and may consider, where relevant, the applicable legal authorities discussed in Section III.C.3 through III.C.5 above.

## IV.   WERE THE CLAIMANTS TERMINATED "FOR CAUSE" UNDER THE PLAN?

Under the Plan, an Eligible Employee will have a "COC Qualified Termination" and be eligible for benefits if (1) during the Change of Control Period, (2) their employment with the Company terminates as the result of an involuntary termination.[105]  The Committee agrees with the Claimants and the Claims

---

[100] Cal. Bus. & Prof. Code, §§ 6147(a)(1)-(4).

[101] *Chodos v. Borman*, 227 Cal. App. 4th 76, 82, 101-102 (2014), *as modified on denial of reh'g* (July 9, 2014) (emphasis added).

[102] *See* 22 NYCRR 1200.0 rules 1.5 [b], [c].

[103] *Id.* (emphasis added).

[104] *See, e.g.*, *Missakian v. Amusement Indus., Inc.*, 69 Cal. App. 5th 630, 638 (2021) (holding that in-house attorney's oral contingency fee agreement was "unenforceable as a matter of law" because California law "requires contingency fee agreements to be in writing"); *In re Coudert Bros.*, 487 B.R. 375, 392  (S.D.N.Y. 2013) (finding that where a law firm did not mention non-legal services in its contingency fee agreement, the agreement "cannot be reasonably interpreted to encompass the omitted, non-legal services"; "[i]f [the law firm] had wanted to ensure that it would receive a contingency fee based on its lobbying work, it should have explicitly included a provision to that effect in the Agreement").

[105] The Committee notes that there are certain terms under the Plan that are unique to Mr. Agrawal and Mr. Edgett.  First, in connection with Mr. Agrawal's promotion to Chief Executive Officer as of November 29, 2021, he entered into a new agreement with the Company, which detailed, in part, certain changes



Administrator that the Claimants were Eligible Employees who terminated employment during the Change of Control Period.[106]

The question, then, is whether the Claimants' employment with the Company terminated as the result of an Involuntary Termination. The Claims Administrator concluded that the Claimants did not have an "Involuntary Termination" because they were terminated "for Cause," and therefore, are not entitled to benefits under the Plan. The Appeal argues that the Claims Administrator erred in determining that the Claimants were terminated for Cause and urges the Committee to conclude that the Claimants had an Involuntary Termination because they were either terminated for a reason other than Cause or because they resigned for Good Reason. These arguments are discussed in more detail below.

### A. Cause existed for the Claimants' terminations – they were not based on a pretext.

Approximately twenty-five pages (one third of the Appeal) is devoted to the Claimants' position that the Cause identified in their termination letters and further described in the Claim Responses was mere pretext and that the Claimants were really terminated for some other reason, such as to allow Mr. Musk to save money or to enable him to seek revenge on the Claimants for enforcing the terms of the Merger Agreement. The Committee disagrees with these assertions and has determined that the Claimants engaged in "gross negligence" and/or "willful misconduct" under the Plan. Accordingly, "Cause" for their terminations existed under the Plan.

More specifically, the Claimants assert that Mr. Musk did not terminate them because of the legal fees, potential violations of the Merger Agreement, wasteful spending, or any other issue identified as supporting the Cause determination by the Claims Administrator and that the Claims Administrator erred by failing to consider Mr. Musk's "true motivations."

---

to the Plan, as applicable to him. These changes included (i) expanding the duration of the Change in Control Period to include the three months prior to and the twelve months following a Change in Control, (ii) modifying the accelerated vesting of Mr. Agrawal's equity awards, (iii) modifying the "Good Reason" definition to provide that ceasing to report directly to the Board would trigger Good Reason, and (iv) revising the amendment provision to state that no amendment to the Plan that adversely affects Mr. Agrawal's rights may be made without his consent. Despite these differences in terms, substantively, the requirements for a "COC Qualified Termination" were the same for Mr. Agrawal and the other Claimants.

Second, as mentioned above, Mr. Edgett participated in the Change of Control Severance and Involuntary Termination Protection Policy, amended and restated as of February 22, 2017 (as opposed to the 2014 Plan in which the other Claimants participated). Unlike the 2014 Plan, which uses the term "involuntary termination" to define a Non-COC Qualified Termination, the 2017 Plan defines a Non-COC Qualified Termination in the context of a termination "other than for Cause, death, or Disability." The Committee understands this minor difference in definition to be non-material and that, functionally, Non-COC Qualified Terminations, in either instance, occur due to an involuntary termination from the Company outside of the Change of Control Period.

[106] *See* Agrawal Claim Response, Part II, Section 1(A)-(B); Edgett Claim Response, Part II, Section 1(A)-(B); Gadde Claim Response, Part II, Section 1(A)-(B); Segal Claim Response, Part II, Section 1(A)-(B). The foregoing Sections of the Claim Responses are hereby incorporated into the Appeal Response Letter. Additionally, the Committee notes, as the Claims Administrator did in the Claim Responses, it is "concerning" that Mr. Segal's Participation Agreement was executed during the Merger Period and that Ms. Gadde's Participation Agreement was executed "less than a month before the Transaction closed." *Id.* at p. 32; Gadde Response Letter at 32 (internal punctuation omitted).



First, the Appeal argues that Mr. Musk terminated the Claimants because he was angry that they took legal action to force him to purchase Twitter and wanted to "extract[] vengeance" on those who forced him to go forward with the deal.

Second, the Appeal argues that Mr. Musk could not have terminated the Claimants for the reasons described as Cause in the Claim Responses because Mr. Musk intended to terminate the executives long before the events purportedly constituting Cause took place.  To support this assertion, the Appeal points to Mr. Musk's alleged statements to and about the Claimants before the closing of the Acquisition (the "Closing"), his alleged direction to Mr. Agrawal to terminate Ms. Gadde before the Closing and the fallout of Mr. Agrawal's refusal, and his pre-Closing statements that he lacked confidence in the executive team.

Third, the Appeal argues that the Company's refusal to pay severance benefits to the Claimants is unrelated to any purported Cause and, instead, is part of a larger pattern and practice of Mr. Musk and the Company of refusing to comply with their legally binding obligations.  The Appeal lists numerous executives, non-executive employees, and other businesses that are involved in administrative proceedings and/or litigation against the Company and/or Mr. Musk, asserting that these disputes evidence Mr. Musk's pattern and practice of refusing to fulfill his obligations.  The Appeal summarizes: "Under Mr. Musk's leadership, Twitter has become a scofflaw, stiffing employees, landlords, vendors, and others. Put simply, the world's richest man does not pay his bills."

Fourth, the Appeal argues that it is not possible for Mr. Musk to have terminated the Claimants for Cause because Mr. Musk could not have seen the documents that the Claims Administrator determined was evidence of "Cause" to terminate the Claimants.  The Appeal further argues that the Claims Administrator's failure to conclude that the Claimants did not cooperate in good faith with a governmental or internal investigation (as described in the Claimants' termination letters) supports the conclusion that the termination letter included only pretextual bases for terminating the Claimants for Cause.[107]

Fifth, the Appeal argues that the real reason that the Company terminated the Claimants was to save money.  The Appeal argues that this is facially evident from Mr. Musk's own statements to his biographer.  To quote the Appeal at length (emphases in original):

> The closing of the Twitter deal had been scheduled for that Friday.  An orderly transition had been scripted for the opening of the stock market that morning.  The money would transfer, the stock would be delisted, and Musk would be in control.  That would permit Agrawal and his top Twitter deputies to collect severance and have their stock options vest.
>
> But Musk decided that he did not want that.  On the afternoon before the scheduled close **he methodically planned a jiu-jitsu maneuver: He would force a fast close that night. If his lawyers and bankers timed everything right, he could fire Agrawal and other top Twitter executives "for cause" before their stock options could vest.**
>
> It was audacious, even ruthless.  But it was justified in Musk's mind because of his conviction that Twitter's management had misled him.  **"There's a 200-million**

---

[107] The Committee does not agree that the Claims Administrator's failure to conclude that the Claimants did not cooperate in good faith with an investigation shows that the Claimants were terminated based on a mere pretext.  The Claims Administrator was required by law to make a decision based on the evidence presented to it and the inferences that can reasonably be drawn therefrom.  The Committee interprets the Claims Administrator's apparent determination that there was insufficient evidence for it to conclude that Claimants were terminated for a failure to cooperate with such an investigation as further evidence of the Plan Administrator's independence, not the Company's subjective intent at the time the Claimants were terminated.



**differential in the cookie jar between closing tonight and doing it tomorrow morning," he told me late Thursday afternoon in the war room as the plan unfolded.**

At 4:12 p.m. Pacific time, once they had confirmation that the money had transferred, Musk pulled the trigger to close the deal.  At precisely that moment, his assistant delivered letters of dismissal to Agrawal and his top three officers.  Six minutes later, Musk's top security officer came down to the second-floor conference room to say that all had been "exited" from the building and their access to email cut off.

The instant email cutoff was part of the plan.  Agrawal had his letter of resignation, citing the change of control, ready to send.  But when his Twitter email was cut off, it took him a few minutes to get the document into a Gmail message.  By that point, he had already been fired by Musk.

**"He tried to resign," Musk said.**

**"But we beat him," his gunslinging lawyer Alex Spiro replied.**

The Committee is not persuaded by these arguments.  As discussed at length in Section III.A of this Appeal Response Letter, the Committee interprets the Plan and applicable law to provide that the relevant question is whether the Claimants engaged in activity or omissions that satisfied the Cause definition under the Plan and not the Company's alleged motivation for terminating the Claimants.  As discussed at length in Section IV.B below, the Committee has determined independently that the Claimants engaged in conduct constituting Cause through their gross negligence and willful misconduct and were terminated "for" these reasons.

But even if the Committee were required to divine the subjective motivation of the Company when it terminated the Claimants (which, to be clear, the Committee is not required to do), the Committee would nevertheless conclude that the Claimants were terminated for Cause (i.e., that the "true motivation" of Mr. Musk when he terminated the Claimants was because they engaged in activity that rose to the level of Cause).  As an initial matter, the Company sent each of the Claimants a letter clearly indicating that they were being terminated for Cause, which contemporaneously documents that the Company believed that there was Cause to terminate the Claimants.  Moreover, from Mr. Musk's declaration, the Committee understands the following:

- that Mr. Musk became aware of these issues as his team worked to perform diligence of the Company and he learned of certain information showing the executives intended to make payments of legal fees, compensation expenses, and other expenses that were significantly higher than expected;
- that Mr. Musk became aware of the Company's reputation for exuberant, unnecessary spending as he performed diligence on the Company and that this was reinforced as personally observed how the Claimants were utilizing the Company's money;
- that Mr. Musk believed that the Claimants, in their various capacities, mismanaged the Company, were dishonest and unreliable, and were "planning to plunder the Company" through excessive bonuses to employees and by making egregious payments to bankers and lawyers; and
- that the Claimants had engaged in conduct that Mr. Musk believed constituted Cause when Mr. Musk informed them that they were being terminated for Cause and that this belief was further documented and supported as he gained additional access to Company data that the Claimants had not previously disclosed to Mr. Musk or Buyer in connection with the Acquisition.

Finally, the Committee notes that the Appeal itself includes quotes indicating that Mr. Musk believed that the Claimants "had misled him" and were "blockheads and idiots."  This only proves the point that Mr. Musk believes, and believed on October 27, 2022, that the Claimants were mismanaging the Company and fostering a culture of excessive and unnecessary spending, were causing the Company to flagrantly



violate the Merger Agreement and increase compensation to themselves and others, and were paying unnecessary and gratuitous fees knowing full well that it would be Mr. Musk that would ultimately pay the price of these fees.

### B.   The Committee has determined independently that the Claimants engaged in "gross negligence" and "willful misconduct" under the relevant facts and circumstances.

As explained in Section III.A, a participant is terminated "for Cause" under the Plan if "Cause" exists under the relevant facts and circumstances, regardless of whether the grounds constituting "Cause" are discovered or articulated post-termination.  As explained in Section III.C, the Committee has adopted the ordinary meaning of the terms "gross negligence" and "willful misconduct," as informed by the definitions of these terms in the Black's Law Dictionary, as informed by applicable case law discussed in Sections III.C.3 through III.C.5, and without the business judgment rule (see Section III.C.2).

To reiterate, the Black's Law Dictionary definitions are as follows, as explained by the Claims Administrator:

> Black's Law Dictionary defines "gross negligence" as "[a] lack of even slight diligence or care" and as "[a] conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party, who may typically recover exemplary damages."  It also indicates that "gross negligence" is also termed "willful negligence" or "advertent negligence," meaning "[n]egligence in which the actor is aware of the unreasonable risk that he or she is creating."

> Black's Law Dictionary defines "willful misconduct" as "[a] dereliction of duty; unlawful, dishonest, or improper behavior, esp. by someone in a position of authority or trust" that is "committed voluntarily and intentionally."  In the employment context, Black's Law Dictionary defines "willful misconduct of an employee" as "[t]he deliberate disregard by an employee of the employer's interests, including its work rules and standards of conduct, justifying a denial of unemployment compensation if the employee is terminated for the misconduct."

### 1.   The Claimants engaged in gross negligence and willful misconduct with respect to the payment of certain attorneys' fees incurred in connection with the acquisition and related litigation.

The Claimants caused the Company to pay nearly $100 million dollars in legal fees that it was not obligated to pay.  They failed to ensure that fees billed on an hourly basis and expenses were properly reviewed for compliance with the Billing Policy and allowed tens of millions of dollars to be paid for fees that were charged in clear violation of the engagement letters and Billing Policy.  They entered into, or allowed the Company to enter into, eleventh hour modifications to the law firms' engagement letters that caused the Company to pay nearly $80 million in excessive, gratuitous success fees.  These modifications were in clear violation of applicable law and ethical standards.

The degree to which the Claimants abandoned their posts as good stewards of the Company ███████ ███████████████████████████████ is staggering.  But it is not simply a matter of the Claimants failing to look at the bills or allowing members of their team to disregard existing policies and procedures designed to limit the payment of inappropriate fees and expenses.  The Claimants worked ███████████████, **over Mr. Musk's objections**, to change the terms of payment so that the Company would pay the law firms' fees and expenses before Buyer would have the opportunity to review them.  This was audacious and unsupportable.  From the Committee's perspective, it is no surprise that Mr. Musk terminated the Claimants for Cause at the first possible moment.



### a.   Background on the legal fees.

In connection with the Acquisition and related litigation, the Company retained multiple law firms to provide legal services.  These firms included WSGR, who was retained as primary deal counsel for the Company, STB, who advised the Board with respect to the Acquisition and eventual litigation, Wachtell, who was retained as lead counsel for the litigation, and Kobre & Kim LLP ("Kobre"), who was retained as conflicts counsel in connection third-party discovery.  Collectively, WSGR, STB, and Wachtell are the "Primary Law Firms," and WSGR, STB, Wachtell and Kobre are referred to as the "Law Firms."  The Law Firms' engagement letters incorporated by reference the terms of the Billing Policy, which the Company had put in place to prevent the Company from paying excessive and unreasonable fees to its outside counsel.  The Billing Policy provides expressly that "[t]hese billing guidelines are considered an integral part of the engagement letter between your company and Twitter."

The Claim Responses[108] identified and discussed a number of issues with the law firm payments that the Claims Administrator concluded rose to the level of gross negligence and/or willful misconduct.  These included, but were not limited to, paying tens of millions of dollars in success fees that were not required under the terms of the Primary Law Firms' engagement letters, renegotiating engagement letters days before the Acquisition closed and after the litigation was stayed to permit the payment of success fees, failing to seriously negotiate fees (with a particularly glaring example of Mr. Edgett being asked to propose a fee, and Mr. Edgett intentionally proposing a high estimate, despite his duty to be a good steward of Company assets), failing to enforce the Primary Law Firms' engagement letters and the terms of the Billing Policy (including by paying millions of dollars for invoices with blank time entries), failing to even negotiate an engagement letter for WSGR's work with respect to the Acquisition until three days before Closing (and allowing this new engagement letter to eliminate retroactively the 10% discount that existed with respect to WSGR's other work for the Company), accelerating the payment of these fees in a manner that prevented Mr. Musk and Buyer from auditing them for compliance with the engagement letters and Billing Policy, and not properly keeping the Board apprised of these fees.

The Appeal disagrees with this conclusion and explains that the Claimants' actions with respect to the legal fees did not rise to the level of gross negligence or willful misconduct.  The Appeal argues that the Primary Law Firms delivered an "outstanding result" for the Company and its shareholders, that the Board was kept apprised of the legal fees and retained ultimate responsibility for determining whether they would get paid, that a success fee was contemplated with the Primary Law Firms but that it was not reflected in the relevant engagement letters because these engagement letters did not address the fees directly (and thus would not be expected to contemplate a success fee), that the fees paid to the Primary Law Firms were reasonable in the aggregate, that a diligent process was followed when retaining the Primary Law Firms and evaluating their fees,[109] and that accelerating the payment of the Primary Law Firms' legal fees on or before Closing was consistent with the Claimants' duties to follow the Board's

---

[108]  The Claim Responses include detailed factual discussions about the legal fees issue.  The facts described in the Claim Responses are hereby incorporated into this Appeal Response Letter.  For the avoidance of doubt, this includes the information described in Part I, Section 7. "Detailed Background – The Transaction and the Hiring of Certain Law Firms" of the Claim Responses.

[109]  Ms. Gadde and Mr. Edgett note that Mr. Edgett directed Ms. Colangelo (his subordinate) to review and negotiate down Kobre's fees.  The Committee notes that it has seen evidence reflecting that Ms. Colangelo attempted to negotiate certain discounts or write offs from the total fees to be charged by Kobre in late October 2022.  However, it is the Committee's view that, even in light of those efforts, the Claimants' failure to otherwise adhere to their fiduciary duties to ensure the Company did not incur excessive or unlawful legal fees and expenses.  It is also worth noting that, despite any supposed negotiations, the Estimated Expected Transaction Fees and Expenses report that Ms. Lane Fox attached to her declaration still shows Kobre receiving $18 million in legal fees.  The Committee has also not seen evidence that any of the Claimants or anyone on their behalf attempted to negotiate down any of the other fees charged by the law firms in question, and has not seen evidence that any such negotiations were communicated to the Board.



directives and was customary and appropriate, especially given concerns that Buyer would not be willing to pay the Primary Law Firms' fees.

In support of this position, the Claimants again cite to the Solomon Report, which, in summary, opines that the Claimants followed established custom and practice, conducted a review and research of comparable fee arrangements and performed diligence on those fee arrangements, and acted at the direction of the Board and Transactions Committee.  At a high level, the Solomon Report concludes that the Claimants acted appropriately with respect to the legal fees and that their actions did not amount to gross negligence or willful misconduct.

To assist it in evaluating the Solomon Report and the Claimants' activity, the Committee worked with counsel to retain Mr. Steven A. Tasher, Esq., an expert in the field of assessing and evaluating the reasonableness of attorneys' fees.  The Committee has reviewed Mr. Tasher's report, including exhibits (the "Tasher Report"), in its entirety.

The Tasher Report opines on Mr. Solomon's report and the actions of the Claimants.  It concludes that the Solomon Report is flawed for a number of reasons, including that it "rubber-stamps unjustifiable conduct" while opining on hourly fees that Mr. Solomon has never reviewed and ignoring the Company's contractual obligations to the law firms.  The Committee agrees with Mr. Tasher's description of the Solomon Report.  The Committee has determined that the Solomon Report utilizes a flawed methodology, does not take into consideration of all the relevant facts, and "rubber-stamps unjustifiable conduct." Accordingly, the Committee has determined that the Solomon Report is not persuasive and is not credible.

The Tasher Report also opines on the Claimants' conduct.  Its summary opinions with respect to the Claimants include the following:

> **Opinion III:** The hourly fees generated by the four law firms on Project Tundra were objectively excessive and unreasonable and were in flagrant disregard of the Twitter Billing Guidelines, such that no reasonable steward would have paid for the firms' hourly invoices.

> **Opinion IV:** No reasonable officer would have ratified or paid the success/project fees consistent with their duties of care, good faith, or loyalty. The success fees were unjustifiable and unwarranted based upon the agreements between the parties, the course of dealings between the parties, and based upon the work performed and risk undertaken by the firms. In addition, no reasonable officer or director would have paid these fees without consulting with independent and non-conflicted counsel to verify the Company's contractual obligations.

> **Opinion V:** Twitter's Officers acted inconsistently with corporate stewardship obligations and duties of care, loyalty, and good faith and unreasonably wasted over a hundred million dollars in corporate resources in at least four ways: (a) unjustifiably paying out excessive and unreasonable fees to the four law firms; (b) unjustifiably paying out unwarranted success/project fees to three law firms; (c) willfully disabling several corporate procedures and controls whose role is to prevent these unwarranted payments from being issued; and (d) failing to consult with independent and non-conflicted counsel to verify the Company's obligations. Based upon my experience, this misconduct by the Officers was necessarily willful.

The Committee finds the Tasher Report to be credible, persuasive, and agrees with its conclusions.  The Committee further concludes that the Tasher Report supports a conclusion that the Claimants engaged in conduct constituting "gross negligence" and "willful misconduct" under the Plan, and that the Solomon Report does not provide a justifiable explanation of the Claimants wrongdoing, for the reasons explained in the remainder of this Section IV.B.1.



**b.    The Claimants facilitated the payment of tens of millions of dollars in legal fees and expenses billed hourly in violation of the engagement letters and the Billing Policy.**

The Claimants failed to meaningfully review the Law Firms' invoices and/or failed to appropriately supervise members of their team who were tasked with reviewing the Law Firms' invoices. This caused the Company to pay tens of millions of dollars in legal fees to the Law Firms in clear violation of the Law Firms' engagement letters and the Billing Policy. To be clear: this was not a minor, one time error or the failure to review closely every single invoice with a fine-toothed comb. It was a failure to catch even the most obvious violations, which resulted in the Company paying tens of millions of dollars in excess of what was required under the engagement letters. The Committee believes that this type of failure would not have been possible if the Claimants had exercised even slight diligence or care. Moreover, the Committee believes that this failure only occurred because the Company accelerated payment of the legal fees over Mr. Musk's objections and outside of the ordinary course of business.

As discussed at length in the Tasher Report, the Company had put into place the Billing Policy as a customary, industry standard tool that was intended to prevent the Company from paying unreasonable and unnecessary expenses. Notwithstanding the fact that the Billing Policy was in place and incorporated by reference into each of the Law Firm's engagement letters, the Claimants failed to enforce the terms of this Policy and allowed for, or caused, the Company to pay tens of millions of dollars in fees that were billed in flagrant violation of the Billing Policy. The Committee agrees with the Tasher Report that this resulted from Claimants' dereliction of their responsibility to be good stewards of the Company's resources or their willful disabling of the protective mechanisms that the Company had put in place before it knew that it would be Mr. Musk who would ultimately end up paying these legal fees.

The payments that the Company made to the Law Firms, despite their clear violation of the Billing Policy, are shocking. Examples include:

- The payment of more than $2.7 million dollars to Wachtell for completely blank time entries,[110] notwithstanding the Billing Policy's clear statement that "Twitter will not pay for … [d]escriptions that lack specificity";
- The payment of a 25% premium on all hours billed with respect to the Acquisition by ▮▮, which was not provided for in the engagement letter (which required a discount of at least 15% on hourly fees) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮;
- The payment of amounts billed with respect to non-Company matters (e.g., amounts billed by Wachtell with respect to R. Skaggs, a defendant in the unrelated *Columbia Pipeline Group Inc. Merger Litigation* case);
- The payment of flagrant violations of the Company's prohibition on block billing and formula billing, including for example, 187 time entries (more than $2.7 million dollars in fees) billed by ▮▮▮ with the exact same description ("Attention to transaction"), with an average of 7.7 hours per entry and a timekeeper who billed multiple 24-hour, single entry days;
- Approximately $125,000 billed by Wachtell timekeepers for simply being "on call" or "standby" and otherwise not performing billable activity (e.g., "Was online to provide coverage/assistance for Twitter," "Weekend Coverage");
- Expenses charged for one timekeeper to stay in multiple hotel rooms in different cities on the same night;

---

[110] The Solomon Report indicates that, notwithstanding the terms of the Billing Policy's, which were incorporated by reference into Wachtell's engagement letter, billing millions of dollars for blank entries is "not unexpected or unusual." The Tasher Report opines that this statement is "incorrect and absurd." It further indicates that Mr. Tasher has "reviewed billions of dollars in legal bills in [his] career (including for Wachtell's peer firms) and never saw this."



- Expenses charged with no supporting documentation and for amounts far in excess of the Billing Policy's limit of $250 per night for hotels and $60 per person per day for meals (e.g., $1600 per night hotel rooms, individual meals that cost in excess of $300, multiple bar charges);
- Dramatic and consistent overstaffing by the Law Firms, highlighted by Kobre billing for thirty-four timekeepers to attend one internal meeting (in obvious violation of the Billing Policy's prohibition on charging for "Firm internal communications, meetings, or conferences") and fifteen to attend a deposition (despite its limited role as conflicts counsel), and Wachtell billing for no less than eleven timekeepers to attend a hearing, despite the Billing Policy prohibiting billing for multiple attendance;
- Top-heavy staffing by the Law Firms, highlighted by Wachtell utilizing only one lower-cost biller in its twelve core billers, resulting in the core billers having an average hourly rate of $1,360, ███ ████████████████████████████████████████████████████████████████████ ████████████████████████████████ despite the Billing Policy's mandates that staffing be "cost-effective";
- Regular and persistent billing of multiple attorneys on internal and external calls, in violation of the clear terms of the Billing Policy;
- Regular and persistent billing of multiple individuals who were not licensed attorneys or paralegals and for whom the Billing Policy clearly prohibits payment.

The Tasher Report includes a detailed analysis of these issues with examples that are too numerous to include in this Appeal Response Letter. The Committee incorporates these examples and findings by reference into this Appeal Response Letter. Additionally, the Committee has attached at Appendix A charts intended to highlight some examples of the egregious violations of the Billing Policy that the Claimants caused to be paid.

> **c.     The Claimants facilitated the payment of approximately $80 million in success fees that were unethical, not required under the terms of the relevant engagement letters, and agreed to in violation of law.**

Separate and apart from causing the Company to pay tens of millions of dollars billed by the Law Firms on an hourly basis in violation of the Law Firms' engagement letters or submitted as expenses in violation of these engagement letters, the Claimants caused the Company to pay approximately $80 million in success fees[111] that were not discussed in the engagement letters between the Company and the Law Firms.

As discussed at length in the Claim Responses, Mr. Musk and Buyer became aware of the Claimants' intent to pay these gratuitous success fees when the expected legal fees were disclosed to Buyer in connection with Buyer's counsels' requests for updates on the funds flow report. When Buyer continued to press for information on these fees, the Claimants met to discuss the Law Firm fees. Shortly after this meeting, and only days before the Acquisition closed, ████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████

As discussed at length in the Tasher Report, success fees (as contingency fees) are heavily regulated by state law. Here, Wachtell ██████████ fee agreements are governed by California law and ████ fee agreement is governed by New York law.[112] The Wachtell ██████████ fee agreements clearly did not

---

[111] Note that the Tasher Report characterizes the success fees as more than $100 million dollars, as discussed above.
[112] The applicable laws and rules were discussed in Section III.C.5 above.



contain the statutorily required provisions, including an explanation of the contingency fee rate.[113]  In addition, the success fees (as contingency fees) paid to Wachtell ████████ were not set forth in writing "**at the outset of the representation**," as required under applicable California law.[114]

█████████████████████████████████████████████████████████████████████
  ████ [115]
█████████████████████████████████████████████████████████████████████.  Case law in each jurisdiction indicates that a client (here, the Company) is not obligated to pay these legal fees (here, the success fees) that violate applicable law.[116]

█████████████████████████████████████████████████████████████ the Claimants caused the Company to pay the Primary Law Firms approximately $80 million in gratuitous success fees in violation of applicable law.  Moreover, the Claimants caused the Company to accelerate these payments, which prevented Buyer from determining whether it was required to pay these amounts.

It is worth noting that the records submitted in connection with the Appeal show that the Company considered the payment of success fees to the Primary Law Firms to be completely optional until after the litigation was stayed and the Acquisition was on the verge of Closing.  For example, the Project Tundra Expenses file (a spreadsheet used by the Company to track expenses related to the Acquisition and related litigation) indicated that it was updated in October 2022 and noted that "Karen [Colangelo] confirmed that we no plan [sic] to issue a Success Fee to Wilson Sonsini.  Wachtell's Success fee is 'Optional.'"  It further estimated that, if success fees were provided to all of the Primary Law Firms, the success fees would total $35 million ($10 million for Wachtell, $15 million for WSGR, and $10 million for STB).  This was calculated based on 20% of Total Litigation Expenses.  It appears that, despite Wachtell and Kobre having functionally identical engagement letters, the Company never contemplated providing a success fee to Kobre.

The Claimants' declarations similarly support the conclusion that the success fees were considered optional under the terms of the engagement letters.  Mr. Agrawal's declaration indicates that he had no idea that a success fee would be paid "until a few days before the closing."  Similarly, Mr. Segal's declaration indicates that he "first heard about the possibility that the Company would pay success fees to outside counsel in the lead up to the close of the Transaction."  Moreover, when Mr. Savitt reached out regarding the payment of a success fee to Wachtell a few days before Closing, he referred to the fee as "whatever it is" and appeared to indicate that Wachtell would accept whatever number the Company offered.

Based on this, the Committee has determined that the Company did not agree to pay success fees as part of its original engagement of the Law Firms.  Instead, the Claimants worked ███████████████ ████ to amend or modify the existing engagement letters at the eleventh hour, in clear violation of applicable law and ethical standards, to cause the Company to pay the Primary Law Firms approximately $80 million in success fees that were entirely optional at that point and, simply, gratuitous.

Additionally, the Committee has determined that the fees charged by the Law Firms were facially unreasonable and deserved additional scrutiny and negotiation prior to payment.  While the Solomon Report opines that these fees "were reasonable, commensurate with the complexity and success of this matter, and in line with customary expectations," they were markedly different from the fees that the

---

[113] Cal. Bus. & Prof. Code, §§ 6147(a)(1)-(4).
[114] *Chodos*, 227 Cal. App. 4th at 82, 101-102 (emphasis added).
[115] 22 NYCRR 1200.0 rules 1.5 [b], [c].
[116] See Section III.C.4 above.



Company estimated it would pay during the month of Closing.[117]  Further, as discussed in the Tasher Report, the Solomon Report failed to identify tens of millions of dollars in improperly billed hourly fees. The Solomon Report concluded that the success fees were reasonable (based on the firm's hourly fee run rate) without examining whether the fees were consistent with the Billing Policy, Law Firm engagement letters, and legal ethics statutes and rules.  Additionally, the Committee notes that the Solomon Report does not contend that last minute changes to negotiated agreements in violation of applicable law are appropriate or consistent with market practice.

**d.**   **The Claimants accelerated these payments over Buyer's objections, which ensured that the Company would not be able to enforce the terms of the Law Firms' engagement letters.**

The Claimants accelerated the payment of both these hourly invoices and the success fees over the objection of Buyer and Mr. Musk.  This occurred despite the Company having built into the Law Firms' engagement letters a required payment schedule (generally sixty days following receipt of the invoice), which was intended to allow the Company sufficient time to review the expenses, and the fact that the Law Firms generally did not negotiate for a faster payment schedule.

The Claimants contend in the Appeal that this was not problematic or outside of the ordinary course for the Claimants to accelerate payment of these expenses.  They further contend that they did it because they were directed by the Board to accelerate these payments.  They point to the Solomon Report, which describes the acceleration of the payment to advisors at or prior to Closing as in the ordinary course of business ("just like a house closing with payments to brokers").

The Tasher Report disagrees with this assertion. ████████████████████████████████████
██████████████████████████████████████████████████████████████████████████
██████████.  Similarly, Mr. Tasher opined that it is not necessarily customary for litigation counsel to be paid at or prior to Closing and that all of the Law Firms were involved in the litigation in one way or another.  Mr. Tasher further opined that whether pre-Closing payment is expected is customarily specified in the relevant firm's engagement letter.  Here, however, no Law Firm contracted for payment on or before Closing until WSGR demanded it days before Closing.

The Committee agrees with the Tasher Report and has concluded that if the Law Firms expected to be paid on or before Closing, this is something that they would have included in their engagement letters, which purport to be the entire agreement between the parties.

For the reasons stated in Sections IV.1.g and IV.1.h below, the Committee rejects the Appeal's argument that the Claimants, being directed to pay the Law Firms by the Board, could not have committed "Cause" in so doing.

---

[117] The Project Tundra Expenses file appears to show an estimate of approximately $110.5 million in legal fees for the Law Firms, assuming that success fees are paid ($36,643,567 + $12,950,384 + $16,891,697 + $8,986,657 + $35,000,000).  The Committee understands that, in reality, approximately $152.3 million in legal fees was paid to the Law Firms.   This is approximately 38% more in legal fees to the Law Firms than what was estimated **as of the month of Closing**.  The Committee believes that if the Claimants had exercised even slight diligence or care, this dramatic increase would have prompted them to complete a more detailed review of the fees and/or to consult counsel or outside experts that could help them understand the amounts that the Company was obligated to pay.  Or, at a bare minimum, the Claimants could have withheld payment to Closing to enable Buyer and Mr. Musk to review the fees so that they could ensure that the fees paid were reasonable and consistent with the Company's obligations.



     **e.**    **Paying amounts that were not owed under the existing engagement letters, Billing Policy, and applicable law was not in the Company's interest.**

The Claimants argue in part that it was appropriate for them to pay these legal fees because of the tremendous amount of value that the Law Firms created for shareholders by causing the deal to close. Assuming that the Law Firms did create value for the Company and its shareholders by causing the Acquisition to close, the Committee does not agree that it was in the Company's best interest to (1) pay amounts in excess of those required under the relevant agreements and in violation of applicable law, or (2) pay these amounts outside of the normal course before Buyer could review them.[118] The Committee believes it is clear that the Company would have been better off had the Claimants negotiated down the legal fees to those amounts that were properly charged in accordance with the Billing Policy and otherwise required to be paid pursuant to the Company's written agreements with the Law Firms, as this would not have changed the result of the litigation. The Claimants failure to do this resulted in the Company paying approximately $100 million dollars in legal fees in excess of what it was obligated to pay under the relevant engagement letters. The Committee has determined that this was not in the Company's best interest, that it was gratuitous and unethical, and that the Claimants only allowed it to happen because it would ultimately be Mr. Musk and Buyer (the Claimants' adversary in the MAC litigation) that would bear the cost.[119]

     **f.**    **Facilitating these payments constitutes gross negligence and willful misconduct.**

Having considered the Claimants' conduct, as well as the Solomon Report and the Tasher Report, the Committee has determined that the Claimants engaged in gross negligence and willful misconduct with respect to the Law Firm payments.

The Claimants showed a "lack of even slight diligence or care" and "a conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party" when they failed to meaningfully review the hourly invoice (or to meaningfully supervise their subordinates in reviewing the hourly invoices). These invoices included facially obvious violations of the Billing Policy and engagement letters, including ███████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████ Consistent with the Tasher Report, the Committee concludes that this is only possible because the Claimants abdicated their responsibility and were derelict in their duties to the Company. The Claimants deliberately disregarded the Company's interests by allowing tens of millions of dollars in improperly billed hourly fees and expenses to be paid and appear to have intentionally disabled the corporate controls that the Company had put in place to ensure that only reasonable and necessary legal expenses were paid (e.g., the Billing Policy and payment terms of the engagement letters). The Committee has determined that this failure to

---

[118] Ms. Gadde's and Mr. Edgett's declarations both highlight how busy the Company's legal team was in preparing for the litigation. It appears that the legal teams, including Ms. Gadde and Mr. Edgett, may have been so busy that they simply neglected to meaningfully review the invoices charged by the Law Firms.

[119] Counsel to the Committee explained that companies sometimes justify the payment of success fees by reasoning that, much like a gratuity, the success fee will cause the law firm to be more likely to work with the company again and to promptly jump into action if needed by the company. The Committee notes that this justification would not apply here because the Company was not likely to use these law firms after the Acquisition (and it was Buyer's money that would ultimately pay the gratuitous success fee).



meaningfully review and negotiate the hourly legal fees and expenses rises to the level of gross negligence and willful misconduct.

Additionally, the Committee has determined that the payment of the gratuitous and unnecessary success fees without a legal obligation to do so at the outset of the engagement was (1) a conscious, voluntary act in reckless disregard of their legal duty to be good stewards of the Company's resources and the consequences to Buyer and Mr. Musk, and (2) unlawful, dishonest, or improper behavior by someone in a position of trust that was committed voluntarily and intentionally.  The Company had no obligation to make these payments at the outset of the engagement or even at the time that the litigation had been stayed pending the Closing.  And making these payments without a written obligation to do so clearly violated California and New York legal ethics statutes and rules.

Nevertheless, the Claimants allowed the engagement letters to be modified to permit these payments (in a manner that is clearly prohibited by applicable law) and proposed that the Board make these payments. The Claimants did not do this to benefit the Company or to fulfill a legal obligation; they did it because they knew that it would ultimately be Mr. Musk and Buyer who would bear these costs.  The Committee has determined that the Claimants' modification of the engagement letters to allow for the success fees, or their payment of success fees where there was nothing in the engagement letter regarding them, rises to the level of gross negligence and willful misconduct.

Lastly, the Committee has determined that the Claimants' acceleration of these payments over the objections of Mr. Musk and Buyer, without first verifying that only required amounts were being paid, also rose to the level of gross negligence and willful misconduct.  After failing to meaningfully review these fees or to consult an independent party as to whether they were required to be paid by the Company, the Claimants forced through the payment of these fees in a manner that violated the payment terms that had previously been negotiated (and which presumptively were in place to enable the Company to meaningfully audit and review the legal fees charged to it).

> **g.      The Board's uninformed approval and ratification of the legal fees did not cleanse the Claimants' gross negligence and willful misconduct.**

The Appeal and the Solomon Report assert that the Claimants were directed by the Board to cause the legal fees to the Law Firms to be paid on or before Closing.  However, as discussed in Section III.C.5, the Board's approval of ratification cannot cleanse a Claimant of gross negligence or willful misconduct under the Plan if the Board was not fully informed as to all material facts.

With respect to the Board's approval and ratification of the legal fee payments to the Law Firms, the Committee finds that the following information was "material": (1) tens of millions of dollars had been billed on an hourly basis by the Law Firms in a clear violation of their engagement letters and Billing Policy; (2) modifying the existing engagement letters to provide for the payment of success fees (or just paying the success fees absent language providing for these payments under the engagement letters) violated applicable legal ethics statutes and rules; and (3) for these reasons, the Company was not legally obligated to pay all or most of these amounts (collectively, the "Material Information").

The Committee further finds that, as a factual matter, the Board was not informed of the Material Information when it approved and ratified the payment of the legal fees.  The Committee makes this finding because it is aware of no records showing that the Board had this information.  There are several records concerning the Board approval process, yet none of them describe this Material Information being disclosed to the Board, or the Board mentioning this information or considering its implications (e.g., that the Company was not legally obligated to pay all or most of these amounts):

- Minutes for the October 27, 2022 Board meeting approving and ratifying the payment of professional fees;



- Letter dated August 31, 2023, from the Board's Transaction Committee (i.e., Martha Lane Fox, Patrick Pichette, Bret Taylor) to the Committee, regarding the Transaction Committee's approval of the payment of legal fees to the Law Firms;
- Ms. Martha Lane Fox's declaration, which includes as an attachment the Estimated Expected Transaction Fees and Expenses as of October 27, 2022; and
- The other declarations and offers of proof submitted in support of the Appeal.

If the Board had been informed of the Material Information, then it would have discussed the propriety of causing the Company to pay legal fees that violate the Billing Policy, the engagement letters, and applicable law, and would have discussed the fact that the Company was not legally obligated to pay these amounts in their entirety (particularly the success fees).  Any discussion of this sort should have been reflected in the applicable Board meeting minutes or some other record listed above—but that is not the case.  In this regard, neither the Appeal nor the Solomon Report alleges that the Board was aware of the Material Information or that any of the Claimants had provided this information to the Board.

Therefore, the Committee finds that the Board did not have access to the Material Information and that its approval and ratification of the payment of the Law Firms' legal fees did not cleanse the Claimants' "gross negligence" and "willful misconduct" under the Plan.

### h. The Claimants' failure to disclose material information to the Board and failure "act prudently" to filter only appropriate items for the Board's consideration rose to the level of gross negligence and willful misconduct.

As discussed in Section III.C.3.a, the Claimants had a duty to disclose material information—that the officer knew or should have known—to the Board.  This duty to disclose stems from an officer's fiduciary duty of care, which "requires that fiduciaries inform themselves of material information before making a business decision and act prudently in carrying out their duties."[120]  As discussed in Section III.C.3.b, the Claimants had a corollary duty to "act prudently" as a filter to the Board, by informing themselves of material information, identifying red flags, and presenting only appropriate items for the Board's consideration.

The Committee finds that, as a factual matter:

- The Claimants knew or should have known the Material Information, and hence had a duty to disclose the Material Information to the Board.  This is particularly true for the two lawyers—Ms. Gadde and Mr. Edgett—who clearly should have known the applicable legal ethics requirements and the implication that payment of the success fees would violate these requirements.  But, given the amount of the Law Firm payments, it is also true for Mr. Agrawal and Mr. Edgett, who were responsible for Company expenditures of this magnitude.

- None of the Claimants informed the Board of the Material Information, for the reasons stated in Section IV.B.1.h above, and because the Committee is aware of no records showing that any of the Claimant informed the Board of the Material Information.  In this regard, neither the Appeal nor the Solomon Report alleges that any Claimant provided any Material Information to the Board.

In short, the Claimants sought Board approval and ratification of an inappropriate item—payment of the excess legal fees—without disclosing the accompanying red flags (i.e., the Material Information).  Accordingly, the Committee determines that the Claimants violated their duty to disclose material information to the Board, and their duty to "act prudently" as a filter to the Board.

---

[120] *See United Food*, 262 A.3d at 1049-50; *see also McDonald's*, 289 A.3d at 365.



2. **The Claimants engaged in gross negligence and willful misconduct when they caused and/or allowed the Company to flagrantly violate the Merger Agreement and increase compensation for members of their teams and other executives.**

Section 6.1(e) of the Merger Agreement provides in pertinent part that "the Company shall not … except as required pursuant to existing Company Benefit Plans, (i) increase the compensation payable to or to become payable or benefits provided or to be provided to any Company Service Provider except for increases in cash compensation or benefits to Company Service Providers in the ordinary course of business consistent with past practice . . ."

Notwithstanding their awareness of this provision in the Merger Agreement, the Claimants caused, or allowed, the Company to increase materially the compensation of Company employees in a manner that was not in the ordinary course and consistent with past practice.  The Claimants engaged in these actions knowingly and in clear violation of Section 6.1 of the Merger Agreement, and their actions rose to the level of gross negligence and willful misconduct, as discussed below.[121]

a. **Over Buyer's objections, the Claimants dramatically increased the retention bonuses awarded by the Company in the Merger Period in a manner that was not in the ordinary course and consistent with past practice.**

As discussed at length in the Claim Responses, the Claimants approved retention bonuses during the Merger Period that were far in excess of the amount approved by the Company in 2021.  This was done despite the fact that the Company had specifically requested approval from Mr. Musk to engage in a retention bonus program and Mr. Musk had refused to grant consent for this program.  The Committee interprets the Claimants' decision to dramatically increase the retention bonuses that they approved for members of their respective teams during the Merger Period as an obvious "work around" following Mr. Musk's refusal to grant consent for an increased retention bonus program.  The Committee has further determined that the Claimants' attempt to circumvent the terms of the Merger Agreement and Mr. Musk's refusal to grant consent for an increased retention bonus program constitutes gross negligence and/or willful misconduct as those terms are defined under the Plan.

The Appeal appears to concede that the Claimants granted retention bonuses as a "work around" to Mr. Musk's refusal to consent to a broader retention bonus program.  Specifically, the Appeal explains that "since Mr. Musk declined to agree to that broader program, the Company did not adopt it.  Instead, the Company [i.e., the Claimants and other executives] continued its past practice and worked within its approved budget to make retention payments in the ordinary course of business."  However, the Claimants did not just continue their past practice of granting retention bonuses to certain key personnel that they wished to retain.  Instead, the Claimants dramatically accelerated the frequency and magnitude at which they approved retention bonuses and/or brough new retention bonuses to the Compensation Committee for approval.[122]  This resulted in the Company approving a much larger amount of retention bonuses during the six-month Merger Period than the amount granted during all of the preceding year.

---

[121] The Committee notes that the Appeal argues that the Company cannot now enforce the terms of the Merger Agreement against individuals.  The Committee thinks this assertion is irrelevant.  Neither the Company nor the Committee is seeking to enforce the terms of the Merger Agreement against the Claimants here.  Instead, as part of this administrative process, the Committee is tasked with evaluating the Claimants' conduct as employees.  Knowingly violating, or allowing the Company to violate, the Merger Agreement speaks directly to the Claimants conduct as employees and whether they engaged in gross negligence or willful misconduct.

[122] The Appeal notes that the approximately $1 million dollars in RSUs approved by Mr. Edgett as a retention bonus the day before Closing was approved by the Compensation Committee of the Board.  The



The Appeal argues that this dramatic increase was not inappropriate because the Claimants consulted outside counsel and worked with the Company's Total Rewards and Executive Compensation Team when they approved and/or facilitated these retention bonuses.  The Appeal further argues that even if there was a marked departure from retention bonuses granted in prior years, the amount of retention bonuses has always been determined based on the need; **not** based on the amount of retention bonuses granted in the past.  Similarly, the Appeal argues that the Merger Agreement in effect required them to increase the amount of retention bonuses because it obligated the Company to use commercially reasonable efforts to conduct the business of the Company in the ordinary course and to preserve the material components of the current business organization.

The Committee disagrees.  Standstill provisions (like Section 6.1(e)) are commonly included in merger agreements to prevent an acquisition target's leadership team from dissipating the target's assets and to counteract the moral hazard that can develop when this leadership team realizes that it will be Buyer that is responsible for bearing the costs of the leadership team's actions.  The Claimants were aware of the standstill provision and nevertheless dramatically increased the compensation paid to members of their team.  The Committee notes that the Claimants thought this was questionable enough to seek advice from outside counsel but never asked Buyer or Mr. Musk whether they would approve increasing the retention bonuses granted under the Company's existing program.  The Committee believes this is because the Claimants knew they were circumventing Mr. Musk's wishes and that Mr. Musk would refuse to consent to this increase and would describe it as a violation of the Merger Agreement's standstill provision.

Consistent with this determination, the Committee has concluded that the Claimants engaged in gross negligence by personally approving retention bonuses that were a dramatic departure from the Company's past practice and allowed the Company to move forward with this "work around," despite being aware of the Merger Agreement's standstill provision and Mr. Musk's refusal to consent to an increased retention bonus program.  This was a conscious, voluntary act or omission that the Claimants took in reckless disregard of their legal duty to cause the Company to comply with the Merger Agreement.  This act or omission resulted in Buyer bearing the costs of millions of dollars in retention bonuses that it would not have approved.  Claimants were also aware that a negligent or intentional violation of the Merger Agreement (such as allowing increases in compensation in violation of the standstill provision) created an unreasonable risk to the Company (i.e., that the Acquisition would not close).

The Committee further concludes that the Claimants engaged in willful misconduct when they personally approved retention bonuses that were a dramatic departure from the Company's past practice and allowed the Company to move forward with this "work around," despite being aware of the Merger Agreement's standstill provision and Mr. Musk's refusal to consent to an increased retention bonus program.  The Claimants deliberately disregarded the Company's interests (i.e., its desire to comply with the Merger Agreement and see that the Acquisition closed, and its broader desire to control costs).  The Company could have terminated the Claimants for knowingly violating the Merger Agreement and causing the Company to spend millions of dollars in violation of its contractual agreements.

> **b.**    **Despite the terms of the Merger Agreement, the Claimants did not stop other executives from urging the Compensation Committee to add new participants to the Plan in a manner that**

---

Committee agrees that this retention bonus was approved but has determined that the Claimants as a whole, and Mr. Edgett specifically, acted recklessly by allowing or causing the Company to dramatically increase the amount of retention bonuses granted during the Merger Period in knowing violation of the Merger Agreement's standstill provision.



**was not in the ordinary course and consistent with past practice.**

In reviewing the materials submitted by the Claimants and various other participants by the Plan with respect to the initial claims for benefit under the Plan, the Claims Administrator expressed skepticism and concern regarding the number of participation agreements that had been signed during the weeks leading up to the Closing. While employees of the Company had initially indicated that this was done because the Company had lost various executives' signed participation agreements, the Company has subsequently determined that new executives began participating in the Plan **after** the Merger Agreement was signed and the standstill provision became effective. This appears to have increased the potential compensation of these executives—the Claimants colleagues—by more than $50 million dollars.[123]

Specifically, the Committee has reviewed minutes for the May 25, 2022, Regular Meeting of the Compensation Committee of the Board of Directors of Twitter, Inc. (the "Minutes"). These Minutes indicate that, at the May 25, 2022 meeting, Ms. ██████████ proposed adding new executives as participants in the Plan. Shockingly, these executives include Ms. ██████ **herself**, as well as Mr. ██████████, ████████████████████████. Participation in the Plan increased the compensation payable to these executives by a massive amount (i.e., if each of these executives had COC Qualified Terminations, the Company would have been obligated to pay more than $50 million in additional severance benefits).

The Committee has determined that this was a flagrant violation of the Merger Agreement's standstill provision. These executives had worked for the Company for years and had never participated in the Plan. It was only after the Acquisition was announced and the Merger Agreement entered into that the Company's executive team proposed adding these individuals to the Plan. This caused the Company to pay millions of dollars in severance to Mr. ██████ and exposes the Company to claims that it owes tens of millions of dollars in severance benefits to ████████████████████████ replacement (██████████).

While it is hard to imagine something more shocking than the Claimants allowing an executive to propose adding herself to the Plan (and increasing her potential severance benefits by approximately $15 million) after the standstill provision was entered into, it is even more surprising that the Claimants allowed Ms. Brand to propose adding Mr. ██████ to the Plan on May 25, 2022. This was **after** the Company had begun the process of firing Mr. ██████ and weeks after he announced that he would be leaving the Company after more than seven years and explained that "[t]he truth is that this isn't how and when I imagined leaving Twitter, and this wasn't my decision . . . Parag asked me to leave after letting me know that he wants to take the team in a different direction."[124] If Mr. ██████ had a COC Qualified Termination, the Committee understands that he would have been entitled to millions of dollars in severance benefits under the Plan.

The Committee believes that the only reason that the Claimants would have allowed Ms. ██████ to propose adding new participants to the Plan at this stage is because the Merger Agreement had already been entered into and it would be Mr. Musk and Buyer who would ultimately bear the cost of providing

---

[123] The Committee notes that this figure is an estimate based on the materials presented to it (identifying unvested equity, COBRA premiums, and salary potentially owed in the event of a COC Qualified Termination). The actual amount may vary slightly but the value of expected Plan benefits to the newly added executives is significant.

[124] ██████████████████████████████████████████████████████████ *see also* Ex. F to Decl. of Parag Agrawal.



these benefits.  Otherwise, the Committee can see no reason that the Claimants – the highest level of officers and legal counsel at the Company – would have allowed Ms. ███ to move forward with this proposal, despite the legally binding standstill provision in the Merger Agreement.  With respect to Mr. ███████, the Committee believes that he was added to the Plan at this stage to better position the Company to allow his replacement to participate in the Plan (in effect double dipping on the Plan's generous severance benefit at Buyer's expense).

Consistent with this determination, the Committee concludes that Mr. Agrawal, Ms. Gadde, and Mr. Edgett engaged in gross negligence when they allowed Ms. ███ to propose adding new participants (including herself and an individual that the Company was actively firing) to the Plan, thereby increasing the expected compensation to certain executives by more than $50 million dollars.  Their refusal to step in and prevent Ms. ███ from bringing this to the Compensation Committee was a conscious, voluntary act or omission that was taken in reckless disregard of their legal duty to cause the Company to comply with the Merger Agreement.  This act or omission resulted in Buyer bearing the costs of millions of dollars in severance benefits paid to Mr. ████████ and may result in Buyer paying more than $50 million in additional severance benefits to ██████████████████[125] and replacement (████████) (not to mention the millions in severance that the Company already paid to Mr. ████████).  Claimants were also aware that a negligent or intentional violation of the Merger Agreement (such as allowing massive increases in executive compensation in violation of the standstill provision) created an unreasonable risk to the Company (i.e., that the Acquisition would not close).

The Committee further concludes that Mr. Agrawal, Ms. Gadde, and Mr. Edgett engaged in willful misconduct when they allowed Ms. ███ to propose adding new participants (including herself and an individual that the Company was in the process of terminating) to the Plan, thereby increasing the expected compensation of these individuals by more than $50 million.  In allowing Ms. ███████ to make this proposal, Mr. Agrawal, Ms. Gadde, and Mr. Edgett deliberately disregarded the Company's interests (i.e., its desire to comply with the Merger Agreement and see that the Acquisition closed, and its broader desire to control costs).  Had Mr. Agrawal, Ms. Gadde, and Mr. Edgett been terminated for knowingly violating the Merger Agreement and obligating the Company to provide tens of millions of dollars in violation of its contractual obligations, this would have justified the denial of unemployment compensation.

### 3.   The Claimants engaged in gross negligence and willful misconduct by fostering a culture of excess and engaging in wasteful spending.

The Claimants fostered a culture of excessive spending while leading the Company.  Despite failing to be profitable and continuing to miss growth and revenue projections, the Claimants allowed the Company to spend money in a way that put the Company into a precarious financial situation that it is still trying to rectify.  By failing to fulfill their obligations as executives of the Company and members of Staff to right the ship, the Claimants engaged in gross negligence and/or willful misconduct.

The Company had an operating loss of approximately $493 million dollars in 2021.[126]  During the first six months of 2022, under Claimants' watch, the Company had an operating loss of approximately $472 million dollars (nearly the entirety of the operating loss experienced by the Company in 2021).[127]  These losses were driven by a dramatic increase in expenses, which was recognized by market analysts.  For

---

[125] The Committee understands that Ms. Personette previously participated in the Plan as a Tier Two executive but became a Tier One executive during the Merger Period.

[126] Twitter, Inc., Annual Report (Form 10-K) (February 16, 2022) available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001418091/000141809122000029/twtr-20211231.htm.

[127] Twitter, Inc. Quarterly Report (Form 10-Q) (July 26, 2022) available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001418091/000141809122000147/twtr-20220630.htm.



example, Brent Thill, of Jefferies, explained in his July 24, 2022 analyst report that the Company showed limited operational discipline and further explained that, for Q2 of 2022, the Company had increased its expenses by 26% year-over-year (i.e., Twitter's expenses increased by 26% from July 2021 to July 2022).[128]  Mr. Thill stated:

> 26% y/y expense growth (ex-SBC) was 12% of our ests and shows limited operational discipline. One of the more noteworthy items from Q2 was the rapid growth in expenses, in particular the 46% y/y growth in R&D expense. Given the imbalance of slowing rev growth and elevated expense growth, TWTR recorded a $344M op. loss (vs. our $72M loss). The ongoing losses remain a consistent trend with TWTR seeing declining op. income for three straight years ('18-21).[129]

Similarly, Dough Anmuth, of J.P. Morgan, in his January 25, 2022 analyst report, stated:

> As mentioned, we are raising our 2022 total expenses [projections for Twitter] to reflect the end of 2021 cost structure and further investment.  Given the 30%+ headcount growth expected in 2021 coupled with annual merit increases and other investments, [management] has suggested expenses are likely to grow in the mid-20%'s in 2022 *prior* to any additional investments/hiring.[130]

This publicly reported information is consistent with the determinations in the Claim Responses that the Claimants were engaged in wasteful spending.  While not an exhaustive list, the Committee agrees with the Claims Administrator that the following excessive and wasteful spending practices contributed to the Company's precarious financial position:

- Unreasonable headcount growth (56% growth between fiscal year 2019 and fiscal year 2021 (4800 to 7500), with a goal to nearly double headcount (91% growth, from 4800 to 9168) by the end of fiscal year 2022);
- Unnecessary contractors and consultants (despite this rapid growth in headcount, at Closing, the Company had a total of 383 active Flex Contractors and 5,840 active service providers/consultants, which reflected a substantial cost to the Company);
- An expansive real estate footprint (35 offices located in prime, high rent locations with top of market prices; after Closing the Company had remaining lease commitments of at least $774 million with annual rent obligations of at least $135 million);
- Massive expenses on infrastructure and underutilized infrastructure (for example, in 2021, the Company spent approximately $908 million in on-premises infrastructure costs and third-party hosting (cloud) costs, in addition to approximately $727 million in capital expenditures for on premises infrastructure;
- Over the top #OneTeam events, which brought Company employees together from around the world, at the cost of tens of millions of dollars (e.g., approximately $18 million in 2018, approximately $28 million in 2020); and
- Lavish perks and fringe benefits, including seven in-office employee-only restaurants and a juice bar in Twitter HQ, all of which were available to employees at no cost.

These examples are mere symptoms of the fundamentally flawed buying culture fostered by the Claimants.  This culture is evidenced by the role that the Company's procurement team played in negotiating purchase agreements for the Company prior to acquisition.  As an initial matter, the Company regularly entered into new agreements without involving the Company's procurement and sourcing team.

---

[128] Brent Thill, *Twitter Q2 Earnings & Legal Expert Recaps; Expect Significant Challenges Ahead*, Jefferies Equity Research (July 24, 2022).
[129] *Id.*
[130] Doug Anmuth, *Twitter, Inc. Updating Estimates for Higher '22 Expenses; Reduce PT to $58 & Maintain OW*, J.P. Morgan North America Equity Research (January 25, 2022).



Moreover, while procurement at most companies is focused on, and rewarded for, controlling costs and negotiating the best possible terms, the Company rewarded procurement practices based on how quickly a team could get an agreement signed (the metric was referred to as "time to resolution" or "TTR").

The Committee recognizes that Silicon Valley is not always known for fiscal discipline and that many tech companies offer lavish perks to attract and retain talent, while investing in new infrastructure that will allow them to iterate and grow rapidly.  But this does not mean that it was appropriate for the Claimants to spend (and spend and spend) in the face of growing operating losses, and to foster a culture where employees could bind the Company to new obligations without allowing the Company's procurement team to provide input or oversight, when they knew that the Company was not profitable and was failing to meet its growth and revenue projections.

The Committee has determined that the Claimants engaged in gross negligence and willful misconduct by fostering a culture of excessive and wasteful spending and by failing to meaningfully reduce expenses when it became clear that the Company was not meeting its growth targets and was suffering from growing operating losses.  The Committee has concluded that continuing this lavish spend despite the Company's increasingly dire financial position was negligent and that Claimants were aware of the unreasonable risk they were creating for the Company by failing to curb spending and locking in massive long-term obligations.  The Committee has also concluded that fostering this culture and allowing it to go unchecked rises to the level of voluntary and intentional dereliction of the Claimants' duties (as executives, employees, and members of Staff).

### 4. The totality of the circumstances show that the Claimants engaged in gross negligence and willful misconduct.

As discussed above, the Committee has determined that the Claimants engaged in a number of acts or omissions that, standing alone, constitute gross negligence and/or willful misconduct.  However, these acts and omissions did not arise in a vacuum and the Committee has further determined that the totality of the circumstances rise to the level of gross negligence and willful misconduct by the Claimants, regardless of whether each individual act constitutes gross negligence or willful misconduct.

### C. The Committee was permitted to continue to investigate the officers' conduct after they were terminated.

The Appeal argues that the Company is not permitted to continue evaluating the Claimants' conduct after their termination of employment.  As discussed at length in Section III.A. of this Appeal Response Letter, the Committee disagrees.  In fulfilling its obligation to determine independently whether the Claimants were terminated for Cause, applicable law indicates that the Committee should consider evidence that was identified after the Claimants were terminated.  If not, the Claimants could have been rewarded by concealing wrongdoing in advance of their termination.[131]

### D. The purported resignations for Good Reason were not yet effective when Mr. Agrawal, Mr. Segal, and Ms. Gadde were terminated for Cause.

The Appeal argues that Mr. Agrawal, Mr. Segal, and Ms. Gadde are entitled to benefits under the Plan because they submitted letters indicating that they were resigning for Good Reason (the "Good Reason Letters") on October 27, 2022, and therefore had an Involuntary Termination at the end of the 30-day cure period, notwithstanding their purported termination for Cause.  The Appeal argues that because the Company did not cure the purported Good Reason within the 30-day cure period, the resignations for

---

[131] *See Berg*, 2006 WL 273541, at *13 (explaining that if ERISA plan fiduciaries could not consider after-acquired evidence, "wrongdoers [could] collect benefits in perpetuity so long as they could successfully cover their tracks until after they had left [employment]" (internal quotation marks omitted)).



Good Reason became effective and the Claimants had an Involuntary Termination within the meaning of the Plan.

The Appeal recognizes that the initial claims for benefits of Mr. Agrawal, Mr. Segal, and Ms. Gadde made the same argument and that the Claims Administrator rejected it.  The Appeal argues that the Claims Administrator's decision in the Claim Responses has no basis in the language of the Plan and that the Claims Administrator "appears to be taking the position that the Company could simply declare a Cause termination, and then look for factual support after the fact.  But the Good Reason terminations were effective before the Company ever provided any factual basis for a finding of Cause.  Under the Administrator's interpretation, the Good Reason provisions would be meaningless and could be trumped by a simple declaration of Cause."[132]

The Committee does not agree with this argument.  As an initial matter, Mr. Agrawal, Mr. Segal, and Ms. Gadde submitted their Good Reason Letters **after** the Company fired them for Cause, as evidenced by the fact that their employment was terminated effective on Closing and their Good Reason Letters refer to Closing as having already occurred.  The Committee agrees with the Claims Administrator that one cannot resign (for Good Reason or otherwise) from a position after one has been terminated from that position.  Similarly, the Committee agrees with the Claims Administrator that these employees were terminated long before their resignation would have become effective (i.e., after the expiration of the 30-day cure period that began when the Claimants provided their Good Reason Letters).[133]  As one cannot resign a position from which they have already been fired, the Committee has determined that the Claimants would not have been capable of resigning for Good Reason at the end of the 30-day cure period (because they would have had no position from which they could resign).

The Appeal argues that this interpretation of the Plan's Good Reason provisions would render them meaningless and that they could be trumped by a simple declaration that the participant was being terminated for Cause.  The Committee does not agree.  If the Company had terminated a participant for a reason other than Cause during the 30-day cure period, that participant would have had an Involuntary Termination and would be entitled to benefits.  This would be true even if the Company stated that the participant was terminated for Cause but the Administrator determined that Cause did not exist.  As discussed at length in Section IV.B of this Appeal Response Letter, however, the Claimants were in fact terminated for Cause because they engaged in activity that rose to the level of gross negligence and willful misconduct.

The Committee notes that the results sought in the Appeal are not consistent with the terms of the Plan.  In effect, the Appeal appears to be arguing that once an individual provides notice that they will be resigning for Good Reason, the Company becomes prohibited from terminating them for Cause, no matter what they do or did, unless the Company provides a factual basis to support this termination.  As

---

[132] The Appeal also states that the Claims Administrator "[did] not dispute that the Good Reason provisions of the Policies were triggered . . . ."  This is not accurate.  With respect to Mr. Agrawal's, Ms. Gadde's, and Mr. Segal's Claim Denials, the Claims Administrator stated "[h]ad Claimant's employment not been terminated by the Company, [they] would not have ceased reporting directly to the CEO of a publicly traded company until the Company was de-listed from the NYSE on November 8, 2022, or, at the earliest, when Mr. Musk dissolved the Company.  In either circumstance, the Claimant was terminated from employment by the Company effective immediately upon close and, therefore, contemporaneous with or before the purported Good Reason occurred."  The Committee agrees with the Claims Administrator's determination that Good Reason had not occurred when Mr. Agrawal, Ms. Gadde, and Mr. Segal submitted their respective Good Reason Letters because the Company had not yet been delisted from the NYSE when the Good Reason Letters were submitted.

[133] For example, the Good Reason Letter indicates that "The transactions … contemplated [by the Merger Agreement] **were consummated** effective as of October 27, 2022" (emphasis added). The Claims Administrator interpreted this to mean that the Good Reason Letters were provided and intended to provide notice **after** the Acquisition closed.



discussed at length in Section III.A.2 of this Appeal Response Letter, the Committee does not interpret the Plan to impose such a requirement for terminations attributable to gross negligence or willful misconduct.

## V. ADDITIONAL DETERMINATIONS

### A. The Board clarified that vesting in PSUs would be subject to the Claimants' continued service with Buyer and its affiliates through the applicable vesting dates and the Claimants never provided service to Buyer.

In 2021, the Company granted certain Value Creation Awards ("VCAs") to the Claimants that included very aggressive share price targets ($100 per share, $125 per share, $150 per share).  After these targets are met, the VCA agreements provide that the awards would vest in tranches over the four quarters following the quarter in which the price target is achieved.  The VCA agreements provide in pertinent part (emphasis added):

> Notwithstanding the foregoing, **the vesting of the Performance-Based Restricted Stock Units shall be subject to any vesting acceleration provisions applicable to these Performance Based Restricted Stock Units contained in** the Plan, the Award Agreement and/or any employment or service agreement, offer letter, **change in control severance agreement or policy**, or any other agreement or policy that, prior to and effective as of the date of this Agreement, has been entered into or agreed upon, as the case may be, between Participant and the Company or any parent or subsidiary corporation of the Company (such agreement or policy, a "Separate Agreement") to the extent not otherwise duplicative of the vesting terms described above (by way of example, if a Separate Agreement provides for different acceleration of vesting provisions for all of Participant's Performance-Based Restricted Stock Units upon a termination of Participant as a Service Provider for "good reason" that is defined differently, and the Participant's status as a Service Provider terminates in a manner that would trigger "good reason" under the Separate Agreement but not under this Agreement, the Participant would remain entitled to the acceleration of vesting under the Separate Agreement).

In connection with the signing of the Merger Agreement, the Company's Board (including Mr. Agrawal) issued a resolution providing as follows (emphases added, emphasis in original removed):

> WHEREAS, the Board desires to clarify the treatment of Company PSUs, subject to and contingent upon the consummation of the Merger, to provide that, **notwithstanding anything to the contrary in the applicable Company Stock Plan, any award agreement governing a Company PSU, or any other plan, policy, or agreement maintained by the Company**, each Company PSU that is outstanding immediately prior to the Effective Time (including, for the avoidance of doubt, any Value Creation Company PSUs granted on or about July 2021 for which the performance conditions have not yet been satisfied (the "VCAs"), shall be treated as set forth in Section 3.6(b) of the Merger Agreement, including that with respect to any Unvested Company PSUs that performance metrics shall be deemed achieved at target level of performance (the "Company PSU Clarification").

> NOW, THEREFORE, BE IT

> RESOLVED, that the Company PSU Clarification is hereby approved.

> RESOLVED, that, effective as of immediately prior to the Effective Time, but contingent upon the Effective Time, the Company PSU Clarification **shall supersede and replace any contrary provision upon treatment of "change in control" under the award agreement memorializing the VCAs.**



> RESOLVED, that the executive officers of the Company are authorized to execute all
> documents consistent with the foregoing resolutions as such officers, by execution
> thereof approve, and to take all actions necessary or advisable to carry out the intent of
> these resolutions, and any and all prior actions taken by such officers in connection
> therewith are hereby ratified and approved.

In short, the Company PSU Clarification provides that the $100, $125, and $150 price targets are deemed met as of, and contingent upon, the close of the Transaction.  The Company PSU Clarification further provides that Section 3.6(b) of the Merger Agreement shall govern the vesting of unvested Company PSUs "notwithstanding anything to the contrary in the applicable Company Stock Plan, any award agreement governing a Company PSU, or any other plan, policy, or agreement maintained by the Company" and further clarifies that the provisions of this Clarification "shall supersede and replace any contrary provision upon treatment of 'change in control' under the award agreement memorializing the VCAs."

The Committee interprets the Company PSU Clarification to mean that Section 3.6(b) of the Merger Agreement supersedes the language in the VCA agreements clarifying that the VCAs shall be subject to any vesting acceleration provisions included in a change in control severance agreement or policy.  The Committee further interprets the Company PSU Clarification to provide that the terms of Section 3.6(b) of the Merger Agreement will apply even if there is language in any other plan, policy, or agreement maintained by the Company to the contrary.

Section 3.6(b)(ii) of the Merger Agreement provides as follows (emphasis added, emphasis in original removed):

> As of the Effective Time, each Company PSU that is outstanding immediately
> prior thereto and that is not a Vested Company PSU (each, an "Unvested Company PSU") shall
> be canceled and converted into the right to receive an amount in cash, without interest,
> equal to the product of (i) the total number of shares of Company Common Stock subject
> to such Unvested Company PSU based on the achievement of the applicable performance
> metrics at the target level of performance and (ii) the Merger Consideration (the
> "Unvested PSU Consideration"). **Subject to the holder's continued service with [X
> Holdings I, Inc.] and its Affiliates (including the Surviving Corporation and its
> Subsidiaries) through the applicable vesting dates**, such Unvested PSU
> Consideration will vest and become payable at the same time as the Unvested Company
> PSU from which such Unvested PSU Consideration was converted would have vested and
> been payable pursuant to its terms and shall otherwise remain subject to the same terms
> and conditions as were applicable to the underlying Unvested Company PSU immediately
> prior to the Effective Time (except that performance-based vesting metrics and criteria
> shall not apply from and after the Effective Time).

Consistent with the Claims Administrator's analysis, the Committee interprets the phrase "[s]ubject to the holder's continued service with [X Holdings I, Inc.] and its affiliates … through the applicable vesting dates" to be a condition precedent for post-Closing vesting of Unvested PSU Consideration (including the VCAs).  Based on the language in the Company PSU Clarification, the Committee interprets the "continued service" requirement in Section 3.6(b)(ii) to (1) "supersede and replace" the language in the VCA award agreements indicating that accelerated vesting of the VCAs could occur pursuant to "a change in control severance agreement or policy" and (2) apply "notwithstanding anything to the contrary in … any other plan, policy, or agreement maintained by the Company" (i.e., the Plan).

The Committee notes that the "continued service" requirement only requires service "through the applicable vesting dates."  Consistent with the ordinary use of this phrase in the context of equity awards, the Committee interprets "the applicable vesting dates" to mean the quarterly service-based vesting dates that would have applied after the date that the performance goals were met (or, as here,



deemed met).  Thus, the Committee interprets the Plan, as modified through the Company PSU Clarification, to provide that even if the Claimants had not been terminated for Cause, the Claimants would not have vested in their VCAs because they did not engage in continued service with Buyer through the applicable vesting dates (i.e., the quarterly service-based vesting dates).

The Appeal[134] argues that this interpretation (which is the same interpretation adopted by the Claims Administrator) is not appropriate because the Company PSU Clarification did not result in the elimination of accelerated vesting of PSUs under the Plan.  The Appeal explains that the Claims Administrator's interpretation is nonsensical because the purpose of the Plan was to provide specified benefits in the event of a COC Qualified Termination, and a COC Qualified Termination cannot occur if the individual is engaged in continued service.  The Appeal further argues that this interpretation of the Company PSU Clarification would not be consistent with the Company's June 23, 2022 Policy FAQ or the Company's July 26, 2022 Proxy Statement.

The Committee disagrees.  The VCA agreements include language that specifically allows for accelerated vesting based on the terms of other Company plans, like the Plan.[135]  The Company PSU Clarification appears to have recognized this and expressly provides that Section 3.6(b) shall "supersede and replace any contrary provision" in the VCA agreement.  The Committee interprets this to mean that the language in the VCA agreements providing that "the vesting of the [PSUs] shall be subject to any vesting acceleration provisions applicable to these [PSUs] contained in … [the] change in control severance agreement or policy" is superseded and replaced with the language in Section 3.6(b)(ii) of the Merger Agreement making vesting subject to continued service with Buyer through the applicable vesting dates.  Consistent with the Company PSU clarification, the Committee interprets this requirement to apply "notwithstanding anything to the contrary in … any other plan, policy, or agreement maintained by the Company" (including the Plan).  Thus, rather than being nonsensical, this interpretation appears to be the only interpretation that would give meaning to the provisions of the Company PSU clarification and Section 3.6(b)(ii).

The Committee notes that it is not bound by the description of the Plan in the pre-Closing proxy statement or the Policy FAQs.  Instead, the Committee is obligated to interpret the Plan and related documents in accordance with their terms, and their terms require that the Claimants engage in continued service with Buyer through the applicable vesting dates in order to continue to vest in unvested PSUs.  The Committee also notes that, notwithstanding the arguments in the Appeal to the contrary, the Committee has determined that the Company PSU Clarification, the VCA Agreements, the Equity Plan, and the Merger Agreement are "related documents" as that term is defined under the Plan.

### B. The Plan's 280G provisions apply to the Claimants and could result in a reduction to their benefits if they were not terminated for Cause.

Footnote 319 of the Appeal asserts that "the Administrator has not made any determination that Code section 280G would be triggered by any benefits received by the Officers pursuant to the Policies, and it would not be."  The Appeal does not provide any support for this statement and the Committee does not agree with it.  In the Claim Responses, the Claims Administrator determined that the Plan's 280G provisions apply to the Claimants. Accordingly, if a court were to determine that the Claimants were not terminated for Cause, their benefits may be reduced consistent with the terms of the Plan.

---

[134] The Appeal does not argue that the Board was prohibited from amending the Plan without the Claimants' written consent, or with respect to Mr. Agrawal, that he did not provide his written consent when he signed the Company PSU Clarification.  The Committee agrees with the Claims Administrator's conclusion with respect to these matters in the Claim Denials and hereby adopts them.

[135] The Committee interprets the inclusion of this language in the VCA agreements to evidence the fact that the drafters did not believe that the Plan would have applied to the VCAs but for the inclusion of this language specifically allowing for the accelerated vesting under other plans.



The Committee has determined that the Claimants are not entitled to any benefits under the Plan because they were terminated for Cause.  However, if the Claimants were entitled to a benefit under the Plan, the Committee, consistent with the Claims Administrator's determination in the Claim Responses, has determined that the "Parachute Payments" section of the Plan applies to the Claimants and may result in a reduction to their benefits.  The Committee notes that this interpretation of the Plan is consistent with the plain language of the "Parachute Payments" section of the Plan, as well as the preliminary proxy statement cited in the Appeal, which provides that "[i]n the event that payments to an executive officer under the severance policy would be subject to excise taxes under Section 280G and 4999 of the Internal Revenue Code, such payments will be reduced if and to the extent such reduction would result in a better result to the executive officer taking into account applicable taxes."

  **C.**    **The Administrator has provided to the Claimants the documents to which they are entitled under law.**

The Claimants assert that the Company has sought to deprive the Claimants with their ability to obtain and submit information in connection with the Appeal.  The Committee understands that the Claimants have received voluminous materials, including all documents that were "relevant" to their respective claims for benefits, as that term is defined under ERISA, and that the Claims Administrator extended the Claimants' deadline for submitting the Appeal in order to enable the Claimants to have an opportunity to review and consider these materials prior to submitting any Appeal.  Accordingly, the Committee does not believe that the Company or Administrator has deprived the Claimants of documents to which they are legally entitled for purposes of the Appeal or that their rights under ERISA have in any way been unduly inhibited or hampered.

## VI. CONCLUSION

For the reasons discussed in detail above, the Appeal is hereby denied.

## VII. CIVIL ACTION

This is the final administrative appeal available under the Plan's claim procedures and is binding on all parties.  The Claimants have the right to bring a civil action under Section 502(a) of ERISA.  The Claimants also have the right to receive, upon request and free of charge, copies of all documents, records, and other information relevant (as that term is defined under applicable regulations) to their claims for benefits and this Appeal.

Sincerely,


The Twitter Severance Administration Committee



**APPENDIX A**

**BILLING POLICY VIOLATIONS**

The below highlights some of the most egregious violations of the Twitter (the "Company") Legal Billing Guidelines (the "Billing Policy") by the Law Firms identified in the Report of Steven A. Tasher (the "Tasher Report"). The Tasher Report includes numerous other examples and additional information.

1. **The Billing Policy provides that the company requires outside legal partners to bill no more than eight hours per day, without pre-approval. Included below are some instances in which greater than eight hours were billed per day:**

| Date | Narrative | Hours | Rate | Fees |
|------|-----------|-------|------|------|
| | | | | |
| 4/24/2022 | Attention to transaction | 24.00 | $1,890.00 | $45,360.00 |
| 4/25/2022 | Attention to transaction | 24.00 | $1,890.00 | $45,360.00 |
| 4/21/2022 | Attention to transaction | 19.00 | $1,890.00 | $35,910.00 |
| 4/20/2022 | Attention to transaction | 18.00 | $1,890.00 | $34,020.00 |
| 4/23/2022 | Attention to transaction | 18.00 | $1,890.00 | $34,020.00 |
| 4/26/2022 | Attention to transaction | 18.00 | $1,890.00 | $34,020.00 |
| 5/4/2022 | Attention to transaction | 18.00 | $1,890.00 | $34,020.00 |
| 4/24/2022 | Attention to transaction | 18.00 | $1,160.00 | $20,880.00 |
| **Wachtell** | | | | |
| 08/31/2022 | Emmy prep; team correspondence | 22.00 | $825.00 | $18,150.00 |
| 08/28/2022 | attention to discovery | 20.40 | $1,250.00 | $25,500.00 |
| 08/29/2022 | attention to discovery | 20.00 | $1,250.00 | $25,000.00 |
| 07/28/2022 | work on defensive discovery components of litigation; review of rolling production materials; review of question privilege and responsiveness calls; coordinate review process and document/data intake; creation of key document chronology and hot documents collection for team review; review and comment on correspondence with opposing counsel and positions taken therein; calls with client; work with search terms and custodians and evaluation of hit counts; overview and identification of collected materials and materials elevated for review; preparation and finalize first production; team meetings and calls with team members | 19.60 | $1,025.00 | $20,090.00 |
| 08/02/2022 | attention to answer to counterclaims; team meetings; draft letter to court re public version filing | 19.08 | $1,500.00 | $28,620.00 |
| 08/25/2022 | Trial prep | 19.00 | $825.00 | $15,675.00 |



| 08/30/2022 | prepare witness for deposition; attention to briefing; attention to expert reports; meetings and calls re same | 18.81 | $1,500.00 | $28,215.00 |
|---|---|---|---|---|
| 08/25/2022 | attention to discovery | 18.60 | $1,250.00 | $23,250.00 |
| 08/30/2022 | attention to discovery | 18.50 | $1,250.00 | $23,125.00 |
| 08/25/2022 | Strategy | 18.50 | $1,175.00 | $21,737.50 |
| 08/16/2022 | work on MTC response; prep for & conduct Emmy session; calls w/client & WDS | 18.50 | $1,600.00 | $29,600.00 |
| 08/29/2022 | Emmy prep; depo team meeting; full team meeting; client call; travel to Toronto; team correspondence | 18.00 | $825.00 | $14,850.00 |

2. **Further, the Billing Policy provides that the Company will not pay for: (i) billing descriptions that lack specificity, (ii) support services (including overtime and time spent routing filing and maintenance that the Company considers to be part of outside counsel's normal overhead costs), (iii) legal research that exceeds two hours, except for litigation-related matters, and (iv) firm internal communications. Additionally, the Billing Policy provides that block billing and formula billing will not be accepted by the Company. Included below are some instances of violations of these standards:**

| Date | Narrative | Hours | Rate | Fees |
|---|---|---|---|---|
| | **Wachtell[136]** | | | |
| 08/25/2022 | Trial prep | 19.00 | $825.00 | $15,675.00 |
| 08/25/2022 | Trial prep | 19.00 | $825.00 | $15,675.00 |
| 08/26/2022 | Trial prep | 17.50 | $825.00 | $14,437.50 |
| 08/31/2022 | various litigation workstreams | 17.20 | $1,325.00 | $22,790.00 |
| 08/16/2022 | strategy | 17.00 | $1,175.00 | $19,975.00 |
| 08/15/2022 | Trial prep | 17.00 | $825.00 | $14,025.00 |
| 08/11/2022 | attention to discovery | 16.90 | $1,250.00 | $21,125.00 |
| 07/31/2022 | attention to discovery | 16.80 | $1,250.00 | $21,000.00 |
| 08/18/2022 | attention to discovery | 16.70 | $1,250.00 | $20,875.00 |
| 08/21/2022 | attention to discovery | 16.70 | $1,250.00 | $20,875.00 |
| 08/08/2022 | attention to discovery | 16.60 | $1,250.00 | $20,750.00 |

---

[136] Similar time entries are shown in the ERISA Exhibits attachment to the Tasher Report.



| 08/23/2022 | attention to discovery | 16.50 | $1,250.00 | $20,625.00 |
|---|---|---|---|---|
| 08/15/2022 | attention to discovery | 16.30 | $1,250.00 | $20,375.00 |
| 08/07/2022 | attention to discovery | 16.20 | $1,250.00 | $20,250.00 |
| 08/04/2022 | attention to discovery | 16.10 | $1,250.00 | $20,125.00 |
| 08/10/2022 | Trial prep | 16.00 | $825.00 | $13,200.00 |
| 08/12/2022 | Trial prep | 16.00 | $825.00 | $13,200.00 |
| 08/16/2022 | Trial prep | 16.00 | $825.00 | $13,200.00 |
| 08/24/2022 | Trial prep | 16.00 | $825.00 | $13,200.00 |
| 08/24/2022 | attention to discovery | 15.90 | $1,250.00 | $19,875.00 |
| 08/09/2022 | attention to discovery | 15.70 | $1,250.00 | $19,625.00 |
| 08/14/2022 | attention to discovery | 15.50 | $1,250.00 | $19,375.00 |
| 08/11/2022 | Trial prep | 15.50 | $825.00 | $12,787.50 |
| 08/14/2022 | Trial prep | 15.50 | $825.00 | $12,787.50 |
| 08/10/2022 | attention to discovery | 15.40 | $1,250.00 | $19,250.00 |
| 08/15/2022 | Strategy | 15.33 | $1,175.00 | $18,012.75 |
| 08/03/2022 | attention to discovery | 15.20 | $1,250.00 | $19,000.00 |
| 08/17/2022 | attention to discovery | 15.20 | $1,250.00 | $19,000.00 |
| 08/12/2022 | Trial prep | 16.00 | $825.00 | $13,200.00 |
| 08/16/2022 | Trial prep | 16.00 | $825.00 | $13,200.00 |
| 07/06/2022 | Strategy | 15.00 | $1,175.00 | $17,625.00 |
| 08/01/2022 | strategy | 15.00 | $1,175.00 | $17,625.00 |
| 08/09/2022 | Strategy | 15.00 | $1,175.00 | $17,625.00 |
| 08/11/2022 | Strategy | 15.00 | $1,175.00 | $17,625.00 |
| 08/17/2022 | Strategy | 15.00 | $1,175.00 | $17,625.00 |
| 08/18/2022 | Strategy | 15.00 | $1,175.00 | $17,625.00 |
| 08/24/2022 | strategy | 15.00 | $1,175.00 | $17,625.00 |
| 08/08/2022 | Trial prep | 15.00 | $825.00 | $12,375.00 |
| 08/28/2022 | Trial prep | 15.00 | $825.00 | $12,375.00 |



| 08/02/2022 | attention to discovery | 14.80 | $1,250.00 | $18,500.00 |
|---|---|---|---|---|
| 08/25/2022 | various litigation workstreams | 14.60 | $1,325.00 | $19,345.00 |
| 08/14/2022 | Strategy | 14.50 | $1,175.00 | $17,037.50 |
| 08/29/2022 | strategy | 14.50 | $1,175.00 | $17,037.50 |
| 08/07/2022 | Trial prep | 14.50 | $825.00 | $11,962.50 |
| 07/21/2022 | attention to discovery | 14.30 | $1,250.00 | $17,875.00 |
| 08/22/2022 | attention to discovery | 14.20 | $1,250.00 | $17,750.00 |
| 07/28/2022 | attention to discovery | 14.10 | $1,250.00 | $17,625.00 |
| 07/26/2022 | attention to discovery | 14.00 | $1,250.00 | $17,500.00 |
| 08/08/2022 | strategy | 14.00 | $1,175.00 | $16,450.00 |
| 08/26/2022 | strategy | 14.00 | $1,175.00 | $16,450.00 |
| 08/23/2022 | various litigation workstreams | 14.00 | $1,325.00 | $18,550.00 |
| 08/18/2022 | Trial prep | 14.00 | $825.00 | $11,550.00 |
| 08/22/2022 | Trial prep | 14.00 | $825.00 | $11,550.00 |
| 08/16/2022 | attention to discovery | 13.80 | $1,250.00 | $17,250.00 |
| 07/27/2022 | attention to discovery | 13.70 | $1,250.00 | $17,125.00 |
| 07/18/2022 | strategy | 13.60 | $1,175.00 | $15,980.00 |
| 08/10/2022 | Strategy | 13.50 | $1,175.00 | $15,862.50 |
| 08/19/2022 | Strategy | 13.50 | $1,175.00 | $15,862.50 |
| 08/20/2022 | Strategy | 13.50 | $1,175.00 | $15,862.50 |
| 08/23/2022 | strategy | 13.50 | $1,175.00 | $15,862.50 |
| 08/19/2022 | Trial prep | 13.50 | $825.00 | $11,137.50 |
| 08/22/2022 | various litigation workstreams | 13.10 | $1,325.00 | $17,357.50 |
| 07/08/2022 | strategy | 13.06 | $1,175.36 | $15,350.20 |
| 07/09/2022 | strategy | 13.00 | $1,175.00 | $15,275.00 |
| 08/02/2022 | strategy | 13.00 | $1,175.00 | $15,275.00 |
| 07/09/2022 | various requests, coordinating | 13.00 | $425.00 | $5,525.00 |
| 08/15/2022 | various litigation workstreams | 12.90 | $1,325.00 | $17,092.50 |



| 08/29/2022 | various litigation workstreams | 12.80 | $1,325.00 | $16,960.00 |
| 08/16/2022 | various litigation workstreams | 12.60 | $1,325.00 | $16,695.00 |
| 08/30/2022 | strategy | 12.50 | $1,175.00 | $14,687.50 |
| 08/28/2022 | various litigation workstreams | 12.50 | $1,325.00 | $16,562.50 |
| 07/08/2022 | Various requests | 12.50 | $425.00 | $5,312.50 |
| 07/24/2022 | attention to discovery | 12.40 | $1,250.00 | $15,500.00 |
| 06/24/2022 | strategy | 12.40 | $1,175.00 | $14,570.00 |
| 06/27/2022 | strategy | 12.40 | $1,175.00 | $14,570.00 |
| 08/22/2022 | strategy | 12.25 | $1,175.00 | $14,393.75 |
| 08/19/2022 | various litigation workstreams | 12.20 | $1,325.00 | $16,165.00 |
| 08/30/2022 | various litigation workstreams | 12.10 | $1,325.00 | $16,032.50 |
| 06/30/2022 | Strategy | 12.00 | $1,175.00 | $14,100.00 |
| 08/18/2022 | various litigation workstreams | 12.00 | $1,325.00 | $15,900.00 |
| 08/24/2022 | various litigation workstreams | 12.00 | $1,325.00 | $15,900.00 |
| 08/06/2022 | offensive discovery | 11.80 | $1,325.00 | $15,635.00 |
| 08/17/2022 | various atty requests | 11.75 | $425.00 | $4,993.75 |
| 07/11/2022 | strategy | 11.73 | $1,174.80 | $13,780.40 |
| 08/01/2022 | attention to discovery | 11.70 | $1,250.00 | $14,625.00 |
| 07/10/2022 | strategy | 11.66 | $1,175.40 | $13,705.20 |
| 08/26/2022 | various litigation workstreams | 11.60 | $1,325.00 | $15,370.00 |
| 07/17/2022 | strategy | 11.54 | $1,174.59 | $13,554.80 |
| 08/28/2022 | strategy | 11.50 | $1,175.00 | $13,512.50 |
| 06/22/2022 | Strategy | 11.26 | $1,175.42 | $13,235.20 |
| 06/19/2022 | Strategy | 11.00 | $1,175.00 | $12,925.00 |
| 07/03/2022 | strategy | 11.00 | $1,175.00 | $12,925.00 |
| 08/07/2022 | strategy | 11.00 | $1,175.00 | $12,925.00 |
| 07/26/2022 | Atty requests | 11.00 | $425.00 | $4,675.00 |
| 08/23/2022 | atty requests | 11.00 | $425.00 | $4,675.00 |



| 08/05/2022 | attention to discovery | 10.80 | $1,250.00 | $13,500.00 |
|---|---|---|---|---|
| 08/19/2022 | attention to discovery | 10.80 | $1,250.00 | $13,500.00 |
| 07/04/2022 | strategy | 10.80 | $1,175.00 | $12,690.00 |
| 07/16/2022 | strategy | 10.40 | $1,175.00 | $12,220.00 |
| 07/22/2022 | Strategy | 10.40 | $1,175.00 | $12,220.00 |
| 07/20/2022 | strategy | 10.20 | $1,175.00 | $11,985.00 |
| 07/21/2022 | Strategy | 10.20 | $1,175.00 | $11,985.00 |
| 07/25/2022 | Strategy | 10.20 | $1,175.00 | $11,985.00 |
| 08/04/2022 | strategy | 10.00 | $1,175.00 | $11,750.00 |
| 08/21/2022 | Strategy | 10.00 | $1,175.00 | $11,750.00 |
| 08/20/2022 | Atty requests | 10.00 | $425.00 | $4,250.00 |
| 08/20/2022 | Atty requests | 10.00 | $425.00 | $4,250.00 |
| 08/07/2022 | various litigation workstreams | 9.80 | $1,325.00 | $12,985.00 |
| 08/18/2022 | various atty requests | 9.75 | $425.00 | $4,143.75 |
| 07/05/2022 | Strategy | 9.60 | $1,175.00 | $11,280.00 |
| 08/05/2022 | strategy | 9.50 | $1,175.00 | $11,162.50 |
| 08/31/2022 | strategy | 9.50 | $1,175.00 | $11,162.50 |
| 06/28/2022 | Strategy | 9.26 | $1,175.51 | $10,885.20 |
| 07/31/2022 | Strategy | 9.26 | $1,175.51 | $10,885.20 |
| 07/27/2022 | Strategy | 9.22 | $1,174.60 | $10,829.80 |
| 07/01/2022 | strategy | 9.20 | $1,175.00 | $10,810.00 |
| 07/29/2022 | Strategy | 9.20 | $1,175.00 | $10,810.00 |
| 07/28/2022 | Strategy | 9.06 | $1,175.52 | $10,650.20 |
| 08/27/2022 | strategy | 9.00 | $1,175.00 | $10,575.00 |
| 08/03/2022 | strategy | 8.83 | $1,175.00 | $10,375.25 |
| 08/06/2022 | strategy | 8.50 | $1,175.00 | $9,987.50 |
| 07/21/2022 | Atty requests | 8.50 | $425.00 | $3,612.50 |
| 08/02/2022 | atty requests | 8.50 | $425.00 | $3,612.50 |



| 08/21/2022 | various litigation workstreams | 8.30 | $1,325.00 | $10,997.50 |
| 06/21/2022 | Strategy | 8.06 | $1,175.58 | $9,475.20 |
| 06/17/2022 | Factual analysis | 8.00 | $1,175.00 | $9,400.00 |
| 07/12/2022 | strategy | 8.00 | $1,175.00 | $9,400.00 |
| 07/23/2022 | Strategy | 8.00 | $1,175.00 | $9,400.00 |
| 07/22/2022 | legal research | 8.00 | $1,500.00 | $12,000.00 |
| 07/02/2022 | strategy | 7.80 | $1,175.00 | $9,165.00 |
| 08/16/2022 | atty requests | 7.75 | $425.00 | $3,293.75 |
| 08/13/2022 | various litigation workstreams | 7.50 | $1,325.00 | $9,937.50 |
| 07/27/2022 | Attorney requests | 7.50 | $425.00 | $3,187.50 |
| 08/14/2022 | various litigation workstreams | 7.30 | $1,325.00 | $9,672.50 |
| 07/21/2022 | Calls; research. | 7.20 | $1,025.00 | $7,380.00 |
| 07/22/2022 | Research; calls. | 7.10 | $1,025.00 | $7,277.50 |
| 07/26/2022 | Strategy | 7.06 | $1,175.67 | $8,300.20 |
| 07/25/2022 | Atty requests[137] | 7.00 | $425.00 | $2,975.00 |
| 07/25/2022 | Atty requests | 7.00 | $425.00 | $2,975.00 |
| 07/25/2022 | Atty requests | 7.00 | $425.00 | $2,975.00 |
| 07/25/2022 | Atty requests | 7.00 | $425.00 | $2,975.00 |
| 07/25/2022 | Atty requests | 7.00 | $425.00 | $2,975.00 |
| 06/23/2022 | Strategy | 6.34 | $1,174.26 | $7,444.80 |
| 07/10/2022 | Complaint. | 6.30 | $1,025.00 | $6,457.50 |
| 08/20/2022 | various litigation workstreams | 6.20 | $1,325.00 | $8,215.00 |
| 07/31/2022 | Research. | 6.00 | $1,025.00 | $6,150.00 |
| 08/12/2022 | Strategy | 6.00 | $1,175.00 | $7,050.00 |
| 07/13/2022 | strategy | 5.46 | $1,175.86 | $6,420.20 |
| 08/28/2022 | atty requests | 5.25 | $425.00 | $2,231.25 |
| 07/30/2022 | Strategy | 5.20 | $1,175.00 | $6,110.00 |

---

[137] Note that on July 25, 2022, multiple Wachtell attorneys entered the same time entry ("atty requests") for the same period of time (seven hours).



| 07/13/2022 | Research. | 5.00 | $1,025.00 | $5,125.00 |
|---|---|---|---|---|
| 06/25/2022 | strategy | 4.80 | $1,175.00 | $5,640.00 |
| 07/24/2022 | Research. | 4.50 | $1,025.00 | $4,612.50 |
| 07/04/2022 | Analysis. | 4.32 | $1,025.00 | $4,428.00 |
| 07/24/2022 | Strategy | 4.00 | $1,175.00 | $4,700.00 |
| 08/06/2022 | Trial prep | 4.00 | $825.00 | $3,300.00 |
| 08/20/2022 | Trial prep | 4.00 | $825.00 | $3,300.00 |
| 07/02/2022 | Research. | 3.78 | $1,025.00 | $3,874.50 |
| 07/23/2022 | Research. | 3.70 | $1,025.00 | $3,792.50 |
| 07/28/2022 | Calls; research. | 3.60 | $1,025.00 | $3,690.00 |
| 06/24/2022 | Meetings; research. | 3.50 | $1,025.00 | $3,587.50 |
| 07/20/2022 | Calls; research. | 3.50 | $1,025.00 | $3,587.50 |
| 07/30/2022 | Research. | 3.23 | $1,025.00 | $3,310.75 |
| 06/27/2022 | Meetings. | 3.22 | $1,025.00 | $3,300.50 |
| 06/26/2022 | Research. | 3.20 | $1,025.00 | $3,280.00 |
| 07/03/2022 | Calls. | 3.20 | $1,025.00 | $3,280.00 |
| 07/19/2022 | Calls; letters. | 3.20 | $1,025.00 | $3,280.00 |
| 07/27/2022 | Calls. | 3.20 | $1,025.00 | $3,280.00 |
| 07/29/2022 | Calls; research. | 2.80 | $1,025.00 | $2,870.00 |
| 06/18/2022 | Strategy | 2.80 | $1,175.00 | $3,290.00 |
| 08/06/2022 | attention to discovery | 2.70 | $1,250.00 | $3,375.00 |
| 06/14/2022 | Background. | 2.50 | $1,025.00 | $2,562.50 |
| 06/18/2022 | Meeting. | 2.50 | $1,025.00 | $2,562.50 |
| 07/26/2022 | Research. | 2.50 | $1,025.00 | $2,562.50 |
| 07/16/2022 | Internal meeting; research. | 2.30 | $1,025.00 | $2,357.50 |
| 07/25/2022 | Calls. | 2.30 | $1,025.00 | $2,357.50 |
| 07/23/2022 | attention to discovery | 2.20 | $1,250.00 | $2,750.00 |
| 07/18/2022 | Calls. | 2.15 | $1,025.00 | $2,203.75 |



| 06/16/2022 | Meeting. | 2.12 | $1,025.00 | $2,173.00 |
|---|---|---|---|---|
| 06/27/2022 | Research. | 2.10 | $1,025.00 | $2,152.50 |
| 06/28/2022 | Meetings. | 2.10 | $1,025.00 | $2,152.50 |
| 08/13/2022 | Strategy | 2.00 | $1,175.00 | $2,350.00 |
| 06/23/2022 | Calls. | 1.90 | $1,025.00 | $1,947.50 |
| 06/17/2022 | Meeting. | 1.88 | $1,025.00 | $1,927.00 |
| 06/19/2022 | Meeting. | 1.50 | $1,025.00 | $1,537.50 |
| 06/20/2022 | Meetings. | 1.50 | $1,025.00 | $1,537.50 |
| 07/07/2022 | Calls. | 1.40 | $1,025.00 | $1,435.00 |
| 07/05/2022 | Calls. | 1.34 | $1,025.00 | $1,373.50 |
| 06/29/2022 | Meeting. | 1.30 | $1,025.00 | $1,332.50 |
| 06/13/2022 | Background. | 1.20 | $1,025.00 | $1,230.00 |
| 06/15/2022 | Background. | 1.20 | $1,025.00 | $1,230.00 |
| 07/06/2022 | Calls. | 1.20 | $1,025.00 | $1,230.00 |
| 07/14/2022 | Review case related materials | 0.95 | $1,100.00 | $1,045.00 |
| 07/14/2022 | strategy | 0.80 | $1,175.00 | $ 940.00 |
| 07/15/2022 | strategy | 0.80 | $1,175.00 | $940.00 |
| 07/16/2022 | Various requests, emails re same. | 0.75 | $425.00 | $318.75 |
| **Additional Examples** | | | | |
| 08/07/2022 | Weekend coverage | 13.00 | $325.00 | $4,225.00 |
| 08/13/2022 | Weekend Coverage | 10.00 | $325.00 | $3,250.00 |
| 08/21/2022 | Weekend coverage | 10.00 | $325.00 | $3,250.00 |
| 08/27/2022 | Weekend coverage | 10.00 | $325.00 | $3,250.00 |
| 07/09/2022 | Small tasks, and on general standby for this client specifically | 9.25 | $325.00 | $3,006.25 |
| 08/06/2022 | Twitter Weekend Coverage | 8.50 | $325.00 | $2,762.50 |
| 07/23/2022 | Coverage, per ███. | 8.20 | $325.00 | $2,665.00 |
| 07/23/2022 | On standby per █████ request. | 8.00 | $325.00 | $2,600.00 |
| 07/24/2022 | Matter coverage | 6.25 | $325.00 | $2,031.25 |



| 07/28/2022 | Litigation overtime coverage. | 6.00 | $325.00 | $1,950.00 |
|---|---|---|---|---|
| 07/10/2022 | Ready on standby and renamed files | 5.50 | $325.00 | $1,787.50 |
| 08/20/2022 | Weekend Coverage | 5.00 | $325.00 | $1,625.00 |
| 07/10/2022 | Standby per ▉▉▉▉ and ▉▉▉▉ request. | 5.00 | $325.00 | $1,625.00 |
| 08/01/2022 | On standby/saving documents/miscellaneous tasks | 5.00 | $325.00 | $1,625.00 |
| 08/02/2022 | On standby/saving documents/miscellaneous tasks | 5.00 | $325.00 | $1,625.00 |
| 08/03/2022 | On standby/saving documents/miscellaneous tasks | 5.00 | $325.00 | $1,625.00 |
| 08/04/2022 | On standby/saving documents/miscellaneous tasks | 5.00 | $325.00 | $1,625.00 |
| 08/08/2022 | On standby/saving documents/miscellaneous tasks | 5.00 | $325.00 | $1,625.00 |
| 08/09/2022 | On standby/saving documents/miscellaneous tasks | 5.00 | $325.00 | $1,625.00 |
| 08/10/2022 | On standby/saving documents/miscellaneous tasks | 5.00 | $325.00 | $1,625.00 |
| 08/11/2022 | On standby/saving documents/miscellaneous tasks | 5.00 | $325.00 | $1,625.00 |
| 08/12/2022 | On standby/saving documents/miscellaneous tasks | 5.00 | $325.00 | $1,625.00 |
| 08/15/2022 | On standby/saving documents/miscellaneous tasks | 5.00 | $325.00 | $1,625.00 |
| 08/16/2022 | On standby/saving documents/miscellaneous tasks | 5.00 | $325.00 | $1,625.00 |
| 08/17/2022 | On standby/saving documents/miscellaneous tasks | 5.00 | $325.00 | $1,625.00 |
| 08/18/2022 | On standby/saving documents/miscellaneous tasks | 5.00 | $325.00 | $1,625.00 |
| 08/19/2022 | On standby/saving documents/miscellaneous tasks | 5.00 | $325.00 | $1,625.00 |
| 08/22/2022 | On standby/saving documents/miscellaneous tasks | 5.00 | $325.00 | $1,625.00 |
| 08/23/2022 | On standby/saving documents/miscellaneous tasks | 5.00 | $325.00 | $1,625.00 |
| 08/24/2022 | On standby/saving documents/miscellaneous tasks | 5.00 | $325.00 | $1,625.00 |
| 08/05/2022 | On standby/saving documents/miscellaneous tasks | 4.50 | $325.00 | $1,462.50 |
| 07/09/2022 | Standby and upload news articles to iManage | 4.40 | $325.00 | $1,430.00 |
| 07/10/2022 | Was online to provide coverage/assistance for Twitter. | 4.00 | $325.00 | $1,300.00 |
| 08/13/2022 | iManage updates, twitter coverage | 4.00 | $325.00 | $1,300.00 |
| 08/27/2022 | Twitter coverage | 4.00 | $400.00 | $1,600.00 |
| 08/02/2022 | Coverage and training | 3.00 | $325.00 | $975.00 |
| 08/04/2022 | Coverage | 3.00 | $325.00 | $975.00 |



| 08/14/2022 | Weekend Coverage | 3.00 | $325.00 | $975.00 |
|---|---|---|---|---|
| 08/15/2022 | Coverage, per ███. | 2.90 | $325.00 | $942.50 |
| 08/03/2022 | Twitter coverage, indices, | 2.50 | $325.00 | $812.50 |
| 08/24/2022 | Coverage, per ███. | 2.50 | $325.00 | $812.50 |
| 07/09/2022 | On standby per ███████ and ███████ request for paralegal support. | 2.50 | $325.00 | $812.50 |
| 08/31/2022 | Stood by as per ██████ | 2.50 | $325.00 | $812.50 |
| 08/16/2022 | Coverage, per ███. | 2.20 | $325.00 | $715.00 |
| 08/05/2022 | Coverage | 2.00 | $325.00 | $650.00 |
| 08/07/2022 | Weekend coverage | 2.00 | $325.00 | $650.00 |
| 08/08/2022 | Coverage | 2.00 | $325.00 | $650.00 |
| 08/11/2022 | Coverage, discovery folder updates | 2.00 | $325.00 | $650.00 |
| 08/15/2022 | coverage, imanage updates | 2.00 | $325.00 | $650.00 |
| 08/18/2022 | Coverage, per ███. | 2.00 | $325.00 | $650.00 |
| 08/30/2022 | Case coverage | 1.50 | $425.00 | $637.50 |
| 08/30/2022 | Evening Standby Support | 1.50 | $325.00 | $487.50 |
| 08/17/2022 | coverage, imange updates | 1.00 | $325.00 | $325.00 |
| 08/22/2022 | Coverage, per ███. | 1.00 | $325.00 | $325.00 |
| 08/12/2022 | Coverage | 0.50 | $325.00 | $162.50 |
| 07/23/2022 | Correspondence re weekend coverage | 0.25 | $325.00 | $81.25 |



**APPENDIX B**

**DOCUMENTS REVIEWED IN DECIDING THE APPEAL**

1. **Claim Response Letters**
   **a.** Claim Response Letter to Parag Agrawal and documents referred to in Exhibit A thereof.
   **b.** Claim Response Letter to Ned Segal and documents referred to in Exhibit A thereof.
   **c.** Claim Response Letter to Vijaya Gadde and documents referred to in Exhibit A thereof.
   **d.** Claim Response Letter to Sean Edgett and documents referred to in Exhibit A thereof.
2. **Consolidated Appeal of Agrawal, Segal, Gadde, and Edgett, and related materials provided by Sidley Austin in connection with the Appeal.**
3. **Declarations.**
   **a.** Declaration of Martin O'Neill, dated January 10, 2024.
   **b.** Declaration of Elon R. Musk, dated January 10, 2024.
4. **Documents Provided by the Company.**
   **a.** Board Minutes and Unanimous Written Consents, dated 2018 through 2022.
   **b.** Compensation Committee and Unanimous Written Consents Minutes, dated 2018 through 2022.
   **c.** Email correspondence between William Savitt and Karen Colangelo, dated October 25, 2022, regarding Kobre & Kim fees.
   **d.** Email correspondence between Karen Colangelo and Danielle Rose, dated October 25, 2022, regarding Kobre & Kim fees.
   **e.** Employee Invention Assignment and Confidentiality Agreement for Ned Segal, dated July, 10, 2017.
   **f.** Employee Invention Assignment and Confidentiality Agreement for Sean Edgett, dated August 27, 2012.
   **g.** Employee Invention Assignment and Confidentiality Agreement for Vijaya Gadde, dated July 25, 2011.
   **h.** Offer Letter and Employee Inventions Assignment and Confidentiality Agreement (Combined Document) for Parag Agrawal, dated May 12, 2011 and May 4, 2011, respectively.
   **i.** Grant agreements awarded to ████████████ (various dates).
   **j.** Grant agreements awarded to ████████████ (various dates).
   **k.** Grant agreements awarded to Ned Segal (various dates).
   **l.** Grant agreements awarded to ████████████ (various dates).
   **m.** Grant agreements awarded to Parag Agrawal (various dates).
   **n.** Grant agreements awarded to ████████████ (various dates).
   **o.** Grant agreements awarded to Sean Edgett (various dates).
   **p.** Grant agreements awarded to Vijaya Gadde (various dates).
   **q.** Tweep Security and Privacy Policy.
5. **Expert Reports.**
   **a.** Expert Report of Steven A. Tasher (with exhibits) and documents cited therein.
   **b.** Expert Report of Jonathan F. Foster (with appendices) and documents cited therein.
6. **Other.**
   **a.** Analyst Report from Brent Thill, titled "*Twitter Q2 Earnings & Legal Expert Recaps; Expect Significant Challenges Ahead,*" dated July 24, 2022.
   **b.** Analyst Report from Doug Anmuth, titled "*Twitter, Inc. Updating Estimates for Higher '22 Expenses; Reduce PT to $58 & Maintain OW,*" dated January 25, 2022.
   **c.** Change of Control Qualified Termination Severance Analysis (████████████, ████████).



**d.** Memorandum from Craig Bitman and Melissa Hill to the Appeals Committee re: Summary of Administrative Appeals.

**e.** Memorandum from Craig A. Bitman and Melissa D. Hill to the Appeals Committee dated January 4, 2024, re: Summary of Additional Information for Appeals of Parag Agrawal, Ned Segal, Vijaya Gadde, and Sean Edgett

**f.** Memorandum from Craig Bitman, Melissa Hill, and Michael Gorman re: Summary of Key Legal Issues – Sidley Appeal (Agrawal, Segal, Gadde, Edgett), dated January 5, 2024.

**g.** Twitter, Inc., Annual Report (Form 10-K), dated February 16, 2022.

**h.** Twitter, Inc. Quarterly Report (Form 10-Q), dated July 26, 2022.

**i.** Updated Memorandum from Craig Bitman, Melissa Hill, and Michael Gorman re: Summary of Key Legal Issues – Sidley Appeal (Agrawal, Segal, Gadde, Edgett), dated January 11, 2024.