1    David L. Anderson (SBN 149604)      Mark B. Blocker (*pro hac vice* forthcoming)
     dlanderson@sidley.com                 mblocker@sidley.com
2    Sheila A.G. Armbrust (SBN 265998)    SIDLEY AUSTIN LLP
     sarmbrust@sidley.com                  One South Dearborn
3    Nicole M. Ryan (SBN 175980)        Chicago, IL 60603
     nicole.ryan@sidley.com                Telephone: (312) 853-7000
4    Sarah E. Gallo (SBN 335544)
     sgallo@sidley.com
5    Chaddy Georges (SBN 335546)
     cgeorges@sidley.com
6    SIDLEY AUSTIN LLP
     555 California Street, Suite 2000
7    San Francisco, CA 94104
     Telephone: (415) 772-1200
8

9    *Attorneys for Plaintiffs Parag Agrawal,*
     *Ned Segal, Vijaya Gadde, and Sean Edgett*

10

11                  **UNITED STATES DISTRICT COURT**

12                  **NORTHERN DISTRICT OF CALIFORNIA**

13                  **SAN FRANCISCO/OAKLAND DIVISION**

14

15    PARAG AGRAWAL, NED SEGAL,        Case No. 3:24-cv-01304-MMC
     VIJAYA GADDE, and SEAN EDGETT,
16                                   **COMPLAINT FOR SEVERANCE**
                                      **BENEFITS, EQUITABLE RELIEF, AND**
17             Plaintiffs,               **STATUTORY PENALTIES (ERISA)**

18           vs.

19    ELON MUSK; X CORP., f/k/a TWITTER, INC.;
     TWITTER, INC. CHANGE OF CONTROL
20    AND INVOLUNTARY TERMINATION
     PROTECTION POLICY; TWITTER, INC.
21    CHANGE OF CONTROL SEVERANCE AND
     INVOLUNTARY TERMINATION
22    PROTECTION POLICY; LINDSAY
     CHAPMAN; BRIAN BJELDE; AND
23    DHRUV BATURA,

24           Defendants.

25

26

27

28

                                          COMPLAINT

# **INTRODUCTION**

1.      After Defendant Elon Musk definitively agreed to buy Twitter, Inc. for $44 billion, the stock market declined, and Musk tried to back out of the deal, despite having no legal or contractual justification to do so. Twitter sued Musk to enforce the deal, and over months of intensive litigation, each of Musk's baseless excuses was stripped away. On the eve of trial, Musk capitulated, and the deal closed at its original price.

2.      Defeated, but still determined to avoid his obligations, Musk then tried to recover some of what he paid by repeatedly refusing to honor other clear contractual commitments. Under Musk's control, Twitter has become a scofflaw, stiffing employees, landlords, vendors, and others. Musk doesn't pay his bills, believes the rules don't apply to him, and uses his wealth and power to run roughshod over anyone who disagrees with him.

3.      Musk has a special ire toward Plaintiffs Parag Agrawal, Ned Segal, Vijaya Gadde, and Sean Edgett. As the former Chief Executive Officer, Chief Financial Officer, Chief Legal Officer, and General Counsel, respectively, of Twitter, they appropriately and vigorously represented the interests of Twitter's public shareholders throughout Musk's wrongful attempt to renege on the deal. For their efforts, Musk vowed a lifetime of revenge.

4.      As he was closing the acquisition, Musk told his official biographer, Walter Isaacson, that he would "hunt every single one of" Twitter's executives and directors "till the day they die."[1] These statements were not the mere rantings of a self-centered billionaire surrounded by enablers unwilling to confront him with the legal consequences of his own choices. Musk bragged to Isaacson specifically how he planned to cheat Twitter's executives out of their severance benefits in order to save himself $200 million. Isaacson described the scene as follows:

> The closing of the Twitter deal had been scheduled for that Friday. An orderly transition had been scripted for the opening of the stock market that morning. The money would transfer, the stock would be delisted, and Musk would be in control. That would permit Agrawal and his top Twitter deputies to collect severance and have their stock options vest.
>
> But Musk decided that he did not want that. . . . He would force a fast close that night. If his lawyers and bankers timed everything right, he

---

[1] Walter Isaacson, *Elon Musk* 493 (Simon & Schuster, 2023) (quoting Musk).

could fire Agrawal and other top Twitter executives "for cause" before their stock options could vest. . . .

"There's a 200-million differential in the cookie jar between closing tonight and doing it tomorrow morning," he told me late Thursday afternoon in the war room as the plan unfolded.

At 4:12 p.m. Pacific time, once they had confirmation that the money had transferred, Musk pulled the trigger to close the deal. At precisely that moment, his assistant delivered letters of dismissal to Agrawal and his top three officers. Six minutes later, Musk's top security officer came down to the second-floor conference room to say that all had been "exited" from the building and their access to email cut off.

The instant email cutoff was part of the plan. Agrawal had his letter of resignation, citing the change of control, ready to send. But when his Twitter email was cut off, it took him a few minutes to get the document into a Gmail message. By that point, he had already been fired by Musk.

"He tried to resign," Musk said.

"But we beat him," his gunslinging lawyer Alex Spiro replied.[2]

5.       In fact, Musk and Spiro had not beaten anyone at anything. If anyone around Musk had been willing to tell him the truth, he would have learned that his scheme to deny Plaintiffs their contractual severance payments was a pointless effort that would not withstand legal scrutiny. ERISA protects Plaintiffs' severance benefits. Under Twitter's severance plans, if an eligible executive is terminated without cause following a change in control, they are entitled to severance benefits. Likewise, if an eligible executive resigns due to a change in their reporting structure, they are entitled to severance benefits. "Cause" under the severance plans is limited to extremely narrow circumstances, such as being convicted of a felony or committing "gross negligence" or "willful misconduct." "Cause" is not "Board-approved business decisions that Musk dislikes" from the time before he owned the Company.

6.       Severance plans are an important feature of modern corporate governance, aligning the economic interests of executives and shareholders in the face of a corporate takeover, especially one as contentious as Musk's acquisition of Twitter. Severance plans encourage

---

[2] Walter Isaacson, *The Real Story of Musk's Twitter Takeover*, Wall St. J. (Aug. 31, 2023), https://www.wsj.com/tech/elon-musk-x-twitter-takeover-5f553fa (quoting Musk and Spiro); *accord Elon Musk* 512-13.

everyone to work toward getting the deal done. For example, without severance plans, executives could have a financial incentive to oppose an acquisition even when that acquisition is in the best interests of shareholders. Executives could also have a professional incentive to leave the company before the closing, which could jeopardize the company's ability to close the transaction and the public shareholders' ability to get the control premium provided by the acquisition. Executives' severance benefits are designed to be legally resilient, as they must be, because severance payments are necessarily made by the acquired entity only after it passes into the hands of its acquiror. If executives could not count on getting their contractual severance, they would have no incentive to stay through the acquisition to run the business, oversee the acquisition process, and make sure the shareholders get paid.

7.      Because Musk decided he didn't want to pay Plaintiffs' severance benefits, he simply fired them without reason, then made up fake cause and appointed employees of his various companies to uphold his decision. He claimed in his termination letters that each Plaintiff committed "gross negligence" and "willful misconduct" without citing a single fact in support of this claim. Musk's employees then spent a year trying to come up with facts to support his pre-ordained conclusion, to no avail. Nonetheless, Defendants have persisted in their benefits denials over the past year, wrongfully withholding documents, needlessly prolonging any decisions, and generally playing out the ERISA administrative process for all it's worth. This is the Musk playbook: to keep the money he owes other people, and force them to sue him. Even in defeat, Musk can impose delay, hassle, and expense on others less able to afford it. Musk's conduct gives rise to claims for wrongful denial of benefits under ERISA Section 502(a)(1)(B); unlawful discharge to interfere with rights to benefits under ERISA Section 510; and failure to timely provide required materials under ERISA Section 502(c).

8.      Defendants have used the ERISA administrative process to advance the justification that Plaintiffs engaged in "gross negligence" and "willful misconduct" by carrying out the directives of Twitter's Board, primarily by paying Board-approved success fees to the law firms that represented Twitter in negotiating, litigating, and closing the acquisition in the face of Musk's stubborn and unjustified resistance. Although success fees are common following a successful

takeover defense, Defendants take the position that these particular payments were wrongful because Musk objects to them. Defendants also take the position that the payment decisions are not entitled to the benefits of the business judgment rule, which protects discretionary decisions from precisely this sort of post hoc attack. Defendants have no explanation for why Twitter's *executives* can be denied their ERISA benefits because Twitter's *Board* both authorized the attorneys' fees payments and directed the Company to make the payments. The same is true for Defendants' other manufactured assertions of "cause" regarding employee retention bonuses, purported corporate waste, and severance plan participants. All the decisions that Defendants now challenge were approved and directed by Twitter's Board at a time when the Board, not Musk, oversaw the Company. Defendants have issued claims denials that overlook these obvious problems and ignore that the terminations were pretextual.

9.     This is not an ERISA case where a professional administrator, fulfilling its obligations as a plan fiduciary, made objective benefits decisions according to a recognized framework. In this instance, Musk first made the decision to deny all benefits, and only thereafter brought in employees of his family office and his other companies to act out the ERISA administrative process. Although the Twitter severance plans provide for deference to the discretionary decisions of a properly-appointed and properly-functioning plan administrator, no deference is due here. In this case, the Court reviews the benefits denials de novo. Because those benefits denials cannot withstand de novo or even deferential review, the Court should order the payment of Plaintiffs' ERISA benefits claims and award attorneys' fees and interest.

## **PARTIES**

10.     Plaintiff Parag Agrawal is a resident of California. Agrawal worked at Twitter from 2011 until 2022. Agrawal was Twitter's Chief Executive Officer from November 29, 2021 until October 27, 2022, having taken over that role from Jack Dorsey, one of Twitter's founders. At all relevant times, Agrawal was a participant, as defined by ERISA Section 3(7), 29 U.S.C. § 1002(7), in the Twitter, Inc. Change of Control and Involuntary Termination Protection Policy, as amended and restated effective August 8, 2014 (the "2014 Plan").[3]

---

[3] A copy of the 2014 Plan is attached hereto as Exhibit A.

1

2     11.     Plaintiff Ned Segal is a resident of California. Segal was Twitter's Chief Financial

3     Officer from August 25, 2017 until October 27, 2022. At all relevant times, Segal was a

      participant, as defined by ERISA Section 3(7), 29 U.S.C. § 1002(7), in the 2014 Plan.

4     12.     Plaintiff Vijaya Gadde is a resident of California. Gadde is a lawyer, and worked at

5     Twitter from 2011 until October 27, 2022. She was General Counsel from August 2013 until her

6     promotion to Chief Legal Officer in February 2018. At all relevant times, Gadde was a

7     participant, as defined by ERISA Section 3(7), 29 U.S.C. § 1002(7), in the 2014 Plan.

8     13.     Plaintiff Sean Edgett is a resident of California. Edgett is a lawyer who worked in

9     Twitter's legal department from 2012 until October 27, 2022. From February 2018 until his

10    termination, Edgett was Twitter's General Counsel. At all relevant times, Edgett was a

11    participant, as defined by ERISA Section 3(7), 29 U.S.C. § 1002(7), in the Twitter, Inc. Change of

12    Control Severance and Involuntary Termination Protection Policy, as amended and restated,

13    effective February 22, 2017 (the "2017 Plan").[4]

14    14.     Defendant Elon Musk is the Chairman, Sole Director, Chief Technology Officer,

15    and controlling shareholder of X Corp., the entity into which he merged Twitter. At times relevant

16    to this Complaint, Musk also was and/or is the CEO of X Corp. and the Administrator[5] of the

17    Plans.

18    15.     Defendant X Corp. is a Nevada corporation with its headquarters in San Francisco,

19    California and is the successor in interest to Twitter, Inc., a Delaware corporation that was

20    headquartered in San Francisco, California.[6] X Corp. succeeded to all of Twitter's obligations

21    upon the October 27, 2022 closing of the merger transaction, including Twitter's obligations

22    under the Plans. X Corp. is the Plan Sponsor and funding source of the Plans.

23    16.     Upon Musk's acquisition of Twitter, there was and continues to be such unity of

24    interest and ownership between Twitter and Musk that there is no longer a separate corporate

25    status among Musk, Twitter, and Twitter's successor X Corp. Musk controls Twitter's decision-

26    ---
      [4] A copy of the 2017 Plan is attached hereto as Exhibit B. The 2014 Plan and the 2017 Plan are
27    hereafter collectively referred to as the "Plans" unless context dictates otherwise.
      [5] Unless otherwise stated, discussed, or defined herein, all capitalized terms have the meaning
      ascribed to them in the Plans.
28    [6] X Corp. and Twitter, Inc. are hereafter referred to as "Twitter," "X Corp.," or the "Company."

making and operations and disregards corporate formalities in conducting Twitter's operations subject to his personal whims or based on polls conducted from his personal Twitter account.

17.    Musk often employs and relies on Excession, LLC ("Excession"), his personal family office, and Excession employees to conduct X Corp. business. Musk also relies on other personal friends, family members, and longtime business associates and investors to provide services to Twitter. On information and belief, Musk brought in multiple family members to work at Twitter.

18.    Musk has commingled assets of his other companies with Twitter. On information and belief, Musk has allowed Twitter's assets to be used by his other companies, including Tesla and xAI. Additionally, Musk regularly uses employees of his other companies to conduct Twitter business and has granted them access to Twitter's systems and records. For instance, as the Delaware Court of Chancery recently found, Musk enlisted approximately fifty Tesla engineers to provide services to Twitter immediately following the acquisition, none of whom were hired, retained, or paid by Twitter for services they provided to Twitter. xAI employees also reportedly have been working out of Twitter's headquarters.

19.    On October 27, 2022, before the acquisition closed, Musk improperly sought to use Twitter's funds to buy Twitter. Musk's friend and business associate Antonio Gracias requested, on Musk's behalf, that Twitter wire $500 million to an account controlled by Musk. Twitter did not comply with Musk's improper request.

20.    It would be inequitable and unjust to prevent Plaintiffs from recovering benefits and other remedies from Musk, who is personally responsible for and will individually benefit from the acts of X Corp.

21.    Defendants Twitter, Inc. Change of Control and Involuntary Termination Protection Policy, as amended and restated effective August 8, 2014 (the 2014 Plan), and Twitter, Inc. Change of Control Severance and Involuntary Termination Protection Policy, as amended and restated, effective February 22, 2017 (the 2017 Plan) were, at all relevant times, employee welfare benefit plans within the meaning of ERISA Section 3(1), 29 U.S.C. § 1002(1).

22.     Defendant Lindsay Chapman is a Senior Director of Human Resources at SpaceX, a company controlled by Musk. Chapman purports to be the Administrator of the Plans and a member of the Twitter Severance Administration Committee (the "committee"), which purported to decide the administrative appeals that Plaintiffs submitted. Defendants Brian Bjelde, a Vice President of Human Resources at SpaceX, and Dhruv Batura, an employee now identified as working for X Corp. who previously worked at Tesla for nearly a decade, also purport to be members of the committee.

## JURISDICTION

23.     Plaintiffs bring this action for benefits, equitable relief, and penalties pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 (ERISA). This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

## VENUE

24.     Venue is proper in the Northern District of California pursuant to 29 U.S.C. § 1132(e)(2).

## DIVISIONAL ASSIGNMENT

25.     This action is subject to assignment to the San Francisco or Oakland division because a substantial part of the events giving rise to the claims occurred in San Francisco County.

## GENERAL FACTS AND ALLEGATIONS

I.   **THE PLANS**

A.   **Twitter's Severance Plans**

26.     To maintain continuity of leadership, and to align the economic incentives of executives and shareholders, public companies provide their executives with comprehensive, competitive pay packages that almost always include severance benefits if the executive is terminated, or suffers a significant change in their duties or reporting structure, in the event of a change in control.

27.    A large portion of an executive's compensation is typically provided in the form of restricted stock units that vest over time. In the normal course, these stock awards only have value if the executive remains at the company until they vest. When a change of control occurs, the new owners of the company often decide to replace the company's prior management. Accordingly, most public companies provide their executives with severance benefits that include the value of these unvested stock awards, as well as their salary and other benefits for a defined period of time, if they are terminated or constructively terminated following a change in control.

28.    Long before Musk's acquisition, Twitter, like many public companies, adopted severance plans that were intended to provide precisely this sort of protection to its senior executives to ensure that their interests were aligned with those of the Company's shareholders. In the case of a contentious situation such as Twitter's sale to Musk, this alignment is especially important to ensure that the most senior leaders of the Company support and oversee the involved and uncertain acquisition process, while continuing to run the Company's business throughout this period. This maximizes the likelihood that all closing conditions will be satisfied so the deal goes through and the public shareholders get paid, while also helping the Company continue as a successful stand-alone business in case the deal ultimately does not close.

29.    Twitter's severance plans provided its senior executives with severance benefits equal to one year's salary plus unvested stock awards valued at the acquisition price in the event their employment was negatively affected by a change in control.

30.    These provisions were well known and disclosed to Twitter's public shareholders – and Musk – before the acquisition. Indeed, Twitter's proxy statement identified the specific amounts that would become payable by Twitter to its executive officers if they were involuntarily terminated (including if they left on their own for good reason) following the acquisition. Twitter's public shareholders voted overwhelmingly to approve these change-of-control provisions and payments.

31.    The severance plans were not intended to be used by new management to deprive outgoing executives of their promised compensation. Instead, they were designed to ensure that the executives' interests were aligned with the shareholders' best interests, by incentivizing the

executives to remain at the Company and ensure the success of the business and the acquisition, even when it was clear that they were not part of Musk's plans for post-acquisition Twitter.

32.    Twitter adopted two severance plans that are relevant here: one that covered the Company's most senior officers (the 2014 Plan) and another that covered other key executives (the 2017 Plan).

**B.    The 2014 Plan (Plaintiffs Agrawal, Segal, and Gadde)**

33.    Twitter adopted the 2014 Plan "to provide certain protections to a select group of key Twitter employees if their employment is negatively affected by a change on control of Twitter." Ex. A at 1. The Plan states that it is governed by ERISA.

34.    The 2014 Plan provides that a participant is entitled to benefits if three conditions are satisfied: (1) they are an Eligible Employee, (2) their employment ended during the Change of Control Period, and (3) their employment ended as a result of an Involuntary Termination. If a participant meets these conditions, the 2014 Plan declares that their employment ended through a "COC Qualified Termination," and they are eligible to receive "the applicable Equity Vesting, Cash Severance and COBRA Benefit described herein and specified on [their] Participation Agreement." *Id.*

35.    The 2014 Plan provides that an Involuntary Termination can occur in either of two ways: (1) the employer terminates the employee without Cause; or (2) the employee has "Good Reason" to terminate their employment due to one of several conditions occurring, such as no longer reporting directly to the board of directors or chief executive officer of a publicly traded company.

36.    Agrawal, Segal, and Gadde meet all conditions for protection under the 2014 Plan, but as explained below, Twitter has created a frivolous dispute about whether their terminations were Involuntary Terminations.

**C.    The 2017 Plan (Plaintiff Edgett)**

37.    The 2017 Plan provides protections to additional senior employees "if their employment is negatively affected by a change on control of Twitter." Ex. B at 1. It likewise is "designed to be an 'employee welfare benefit plan,' as defined in Section 3(1) of ERISA." *Id.*

38.     Like the 2014 Plan, the 2017 Plan provides that a participant is entitled to benefits if three conditions are satisfied: (1) they are an Eligible Employee, (2) their employment ended during the Change of Control Period, and (3) their employment ended as a result of an Involuntary Termination. If a participant meets these conditions, the 2017 Plan declares that their employment ended through a "COC Qualified Termination," and they are eligible to receive "the applicable Equity Vesting, Cash Severance and COBRA Benefit described herein and specified on [their] Participation Agreement." *Id.* The definitions of these terms are the same as in the 2014 Plan.

39.     Edgett is a participant in the 2017 Plan and meets all conditions for protection under the 2017 Plan. However, as explained below, Twitter created a frivolous dispute about whether his termination was an Involuntary Termination.

### D.     <u>Exhaustion of Administrative Remedies</u>

40.     Both Plans provide that, before a participant can file a lawsuit, they must first follow the Plans' administrative claim process. All Plaintiffs exhausted their administrative remedies under the Plans, although, as explained below, Musk deprived Plaintiffs of any meaningful review in the administrative process.

41.     The administrative process generally requires two steps. First, a participant is required to submit a claim for benefits. In response, the Plan Administrator is supposed to determine in a neutral fashion whether the claim is approved or denied. Second, if the claim is denied, participants are permitted to submit an appeal, although the Plans do not say who is to rule on those appeals. If the appeal is denied, then a participant can file a lawsuit.

42.     All Plaintiffs followed this administrative process, had their initial claims denied, and then had their appeals denied. To understand why their claims (including their appeals) were wrongfully denied, it is helpful to understand Musk's October 2022 acquisition of Twitter, because the purported bases for denying the claims are mainly related to the acquisition.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.   MUSK'S ACQUISITION OF TWITTER

### A.   Musk's Agreement to Purchase Twitter

43.     Starting on January 31, 2022, Musk began purchasing Twitter stock. By March 14, 2022, he had secretly accumulated a substantial position – about 5% of the Company's outstanding shares. This 5% threshold is significant, because the Securities Exchange Act of 1934 requires purchasers of more than 5% of a public company's stock to file a public report disclosing their ownership amount and whether their investment is "active" or "passive." Apparently concluding that mandatory disclosure obligations do not apply to him, Musk did not file the required report. Instead Musk kept buying Twitter stock without revealing his ownership stake or intentions. On April 4, 2022, when Musk finally disclosed that he held 9.2% of Twitter's stock, Twitter's share price rose 27%. According to published reports, Musk saved himself more than $140 million by wrongfully delaying his mandatory disclosure. Moreover, when he did file his mandatory disclosure, he concealed his true intentions. Musk falsely claimed that he was a "passive" investor even as he was negotiating for a seat on Twitter's Board of Directors.

44.     On April 5, 2022, Musk initially accepted an offer to join Twitter's Board. On April 9, 2022, the day his appointment to the Board was to become effective, Musk notified the Company that he would not be joining the Board but instead would be making an offer to acquire the Company.

45.     On April 13, 2022, Musk offered to purchase Twitter at a price of $54.20 per share, a 38% premium over the stock's closing price on the day before his investment in Twitter was disclosed.

46.     On April 14, 2022, the Board established a Transactions Committee of the Twitter Board, known as the Transactions Committee, composed of three highly qualified independent directors, "[t]o assist the Twitter Board in its evaluation and negotiation of Musk's acquisition proposal and consideration of other strategic alternatives and to provide additional feedback and guidance to members of Twitter management." The full Board appointed the Chair of the Board, the Chair of the Audit Committee, and the Chair of the Nominating and Corporate Governance Committee as the members of the Transactions Committee.

47.     In April 2022, the Board approved the retention of the law firms Wilson Sonsini Goodrich & Rosati P.C. ("Wilson Sonsini") and Simpson Thacher & Bartlett LLP ("Simpson Thacher") to represent Twitter and the Board in the transaction. The Board authorized the executive officers of the Company to "pay any and all" of those firms' expenses and fees, as well as any other professional fees incurred by the Company in connection with the negotiation, execution, and performance of the Merger Agreement and related matters.

48.     On April 25, 2022, Twitter, Musk, and Musk's wholly-owned entities X Holdings I, Inc. and X Holdings II, Inc. entered into the Merger Agreement. Musk, through X Holdings I, Inc. and X Holdings II, Inc., agreed to buy Twitter for $54.20 per share in cash, for a total of $44 billion, with no financing contingencies and no due diligence conditions, and with Musk bearing the risk of any downturn in the market.

**B.      After Multiple Attempts to Back Out of the Deal, Musk Was Forced to Purchase Twitter Through the Efforts of Twitter's Board, Officers, and Outside Counsel.**

49.     Shortly after the ink was dry on the Merger Agreement, the stock market began to decline and Musk changed his mind about buying Twitter. For the next five months, Musk tried everything he could to create an excuse to back out of the deal.

50.     On May 13, 2022, to the surprise of Twitter's leadership and shareholders, Musk tweeted that the deal was "temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users." Musk's business manager and lawyer "desperately urged him to walk back the declaration," telling him that it was "legally perilous for him to be announcing his desire" to "wriggle out of the deal."[7] But in the weeks that followed, Musk and his team began to manufacture a false narrative about Twitter's site integrity, and specifically the number of "spam bots" on the platform. Then, on June 6, 2022, Musk, through his lawyer Mike Ringler of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), sent a letter to Gadde stating that Musk had the "right not to consummate" his acquisition of Twitter and a "right to terminate the Merger Agreement."

---

[7] *Elon Musk* 464.

51.     When it became apparent that Musk was trying to renege on the deal, Twitter recognized that it might need to file a lawsuit to enforce the deal and protect its shareholders' best interests. Twitter searched for and interviewed law firms. In June 2022, after interviewing several prominent law firms, the Company retained Wachtell Lipton Rosen & Katz ("Wachtell"), one of the nation's most skilled firms in corporate deal litigation. Wachtell's retention was presented to and authorized by the Transactions Committee. When Wachtell was retained, Twitter and Wachtell contemplated that Wachtell's fees would ultimately depend on the success that Wachtell achieved. It was impossible to know up front whether there would even need to be litigation, or how involved or successful the litigation would be. Thus, Twitter and Wachtell agreed that Twitter would consider a success fee payment to Wachtell if it achieved a favorable result for the Company, with the fact and amount of any fee to be determined at the conclusion of the dispute.

52.     On July 8, 2022, Musk delivered a notice to Twitter improperly purporting to terminate the Merger Agreement. Within days of that notice, Twitter filed a lawsuit against Musk in the Delaware Court of Chancery seeking to force him to proceed with the deal (the "Merger Litigation").

53.     Musk was represented in the Merger Litigation by several law firms, including Skadden and Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel").

54.     The Merger Litigation, which was described in one academic article as the "trial of the century" because of the enormous stakes and the prominent people involved, was litigated on an expedited basis and was extremely hard fought, fast paced, time consuming, and all encompassing. In the 126 days between the filing of the initial complaint and the case's dismissal, there were 1,569 docket entries, 101 attorneys made formal appearances, 190 subpoenas were issued, at least 47 depositions were taken, and the parties made at least 22 motions. Musk's legal team asserted myriad, ever-evolving factual and legal reasons for voiding the deal. They served exceptionally broad discovery requests, seeking to require Twitter to produce "trillions upon trillions of data points reflecting all of the data Twitter might possibly store for each of the approximately 200 million accounts included in its mDAU [monetizable daily active users] count

every day for nearly three years."[8] The court held that Musk's data requests were so "absurdly broad" that "no one in their right mind" could even undertake to quantify the burden of responding.[9]

55.   The Company ultimately prevailed entirely. After several months of intensive, round-the-clock litigation, just days before the trial date, and on the eve of Musk's deposition, Musk capitulated: he agreed to close the deal on its original terms, without any reduction in the purchase price.

56.   The merger transaction closed on October 27, 2022. Twitter received 100% of the relief sought in the Merger Litigation, requiring Musk to purchase the Company at the originally agreed purchase price of $44 billion. In other words, the litigation was a complete success for Twitter and its public shareholders.

57.   Closing the deal on the original terms of the Merger Agreement was a remarkable result for the Company's shareholders. This is particularly true given that the most common outcome by far in deals challenged by litigation is that the transaction is either terminated or completed at a reduced price. Even Twitter's stockholders did not expect the deal to close at the $54.20 price, as reflected by Twitter's much lower stock price during the summer and fall of 2022. The collective economic benefit to Twitter shareholders of closing the deal at $54.20 per share was at least $11.4 billion – calculated as the difference between $54.20 and the price of Twitter shares on April 1, 2024, the last full trading day before Musk's disclosure that he had purchased more than a 9% stake in the Company.

58.   Musk admits that he closed the deal only because he was legally obligated to do so and his lawyers told him that they would lose at trial. On April 11, 2023, Musk gave an interview to BBC reporter James Clayton on Twitter Spaces. In the interview, Musk stated that he surrendered in the litigation and went forward with the Merger Agreement because his lawyers advised him that a court would eventually order him to close. Musk's biographer similarly writes

---

[8] Letter Decision Resolving Defs.' Second Discovery Motion at 2-3, *Twitter v. Musk*, Case No. 2022-0613-KSJM, Dkt. 632 (Del. Ch. Aug. 25, 2022).
[9] *Id.*

that Musk's "lawyers finally convinced him at the end of September that he would lose the case if they took it to trial."[10]

**III.     MUSK'S MANUFACTURED TERMINATIONS OF PLAINTIFFS**

59.    In the days leading up to the closing, Musk was aware that Plaintiffs and several other executives would be entitled to payments under the two Plans totaling around $200 million. Musk had no intention of paying those amounts because he was furious that Twitter's Board and executives had defeated him and forced him to close the deal.

60.    As a result, Musk talked with his lawyer, Alex Spiro of Quinn Emanuel, about how to avoid making the payments owed under the Plans. He hatched a plan to accelerate the closing, manufacture fake "cause" for Plaintiffs' terminations, cut off Plaintiffs' email access, and send Plaintiffs termination letters before they could resign and claim their benefits.

61.    Musk then put this plan into action. On October 27, 2022, at approximately 3:50 p.m. Pacific Time, Gadde released her signature on the certificate of merger to complete the transaction. Minutes later, at about 4:00 p.m. Pacific Time and before the merger became effective, Plaintiffs each received emails containing termination letters signed by Musk on behalf of Twitter, sent by an employee of Musk's family office from her Excession email account. Edgett, who was present at Twitter headquarters at the time of closing, was also informed of his termination by Musk's security team, who had been instructed to escort him off the premises.

62.    In the termination letters, Musk falsely asserted that Plaintiffs were being terminated "for cause," which he believed would allow him to deprive Plaintiffs of receiving benefits under the Plans.

63.    Plaintiffs' termination letters specifically mentioned the Plans and made clear that the purpose of the letters was to deprive Plaintiffs of their severance benefits. Each Plaintiff received a letter claiming that they were being terminated for "cause" under subsection (e) in the Plans: "gross negligence or willful misconduct in the performance of [their] duties." The letters to Agrawal, Gadde, and Edgett also claimed that they were being terminated for "cause" under subsection (g): "failure to cooperate in good faith with a governmental or internal investigation of

[10] *Elon Musk* 493.

COMPLAINT

the Company or its directors, officers or employees, if the Company has requested [their] cooperation." The letters did not identify any facts purportedly supporting a finding under either subsection (e) or (g). Indeed, the letters provided no factual basis for Plaintiffs' terminations at all. Musk planned to manufacture cause later, but believed it was important to act before Plaintiffs had a chance to resign.

64.    Musk was wrong about timing, but right that Plaintiffs Agrawal, Segal, and Gadde could resign and still receive benefits under the Plans as a result of the change in control. The Plans contained standard "Good Reason" provisions that allowed Plaintiffs to treat certain conditions as a constructive termination that triggered a right to benefits. One of those conditions occurred because Twitter became a privately-held company, and thus Agrawal no longer reported to the board of directors of a publicly traded entity, and Segal and Gadde no longer reported to the CEO of a publicly traded entity.

65.    Therefore, on the day of closing, Agrawal, Segal, and Gadde sent letters to the Company indicating that their employment circumstances constituted Good Reason within the meaning of the 2014 Plan (the "Good Reason letters"). The fact that Musk purported to fire them for cause before their letters arrived has no bearing on the reality that Good Reason existed. Twitter had 30 days from the date of their Good Reason letters to cure the circumstances identified in the Good Reason letters, but did not do so.

**IV.    PLAINTIFFS SUBMIT CLAIMS FOR BENEFITS**

66.    On November 29, 2022, each Plaintiff submitted a Claim to the "Administrator" of the Plans requesting payment of the benefits to which they are entitled under the Plans, pursuant to the Plans' Claims Procedure.

67.    The Claims demonstrated that each Plaintiff is entitled to benefits because they satisfy the conditions of the applicable Plan: (1) they are an Eligible Employee; (2) their employment ended during the Change of Control Period; and (3) their employment ended as a result of an Involuntary Termination.

68.    Plaintiffs were not able to respond to any claim of "cause" for their terminations because their termination letters set forth no factual basis supporting the assertion that there was

cause under subsection (e) ("gross negligence or willful misconduct") or subsection (g) ("failure to cooperate in good faith with a governmental or internal investigation"). As a result, Plaintiffs represented that they knew of no basis for a finding of gross negligence or willful misconduct or failure to cooperate with any investigation. As the Claims noted, the Company's assertion of cause without any factual basis was a transparent attempt to prevent Plaintiffs from attaining the benefits to which they are entitled under the Plans, in violation of Section 510 of ERISA, 29 U.S.C. § 1140.

69.     Agrawal, Segal, and Gadde's Claims also explained that they incurred an Involuntary Termination under the 2014 Plan for the additional reason that their employment circumstances constituted Good Reason within the meaning of the Plan. The Company had 30 days from the date of their Good Reason letters to cure the circumstances identified in those letters, but did not do so. If the Company had not already terminated Plaintiffs, the Plan would have required them to submit subsequent resignation letters. In light of their terminations, they were not holding any positions with the Company from which they could resign. Nevertheless, to the extent a formal resignation letter was requested, Plaintiffs represented that their Claims served as resignation letters. Thus, for this additional reason, Agrawal, Segal, and Gadde incurred an Involuntary Termination within the meaning of the 2014 Plan.

## V.     THE DENIALS OF PLAINTIFFS' CLAIMS

70.     The Plans require that the Plan Administrator decide whether to approve Plaintiffs' Claims within 90 days, unless "special circumstances require an extension of time (up to 90 days)." Exs. A & B at 6. The Plans further require that if a claim is denied, the claimant must be provided "a written notice explaining the specific reasons for the denial and referring to the provisions of the Policy on which the denial is based." *Id.*

71.     On February 16, 2023, almost 90 days after Plaintiffs submitted their Claims, Plaintiffs received a letter from Lindsay Chapman, who identified herself as working for Twitter's Human Resources Department. Chapman's letter stated that she had been appointed as the Administrator of the Plans and that she was granting herself a 90-day extension of time to respond to the Claims.

72.     On May 26, 2023, six months after Plaintiffs submitted their Claims, Chapman sent letters to each Plaintiff denying their Claims. Chapman acknowledged that Plaintiffs were Eligible Employees whose employment ended during the Change of Control Period. However, she concluded that Plaintiffs did not incur Involuntary Terminations because there was "cause" for their terminations, although not for any reason that Musk provided in the termination letters.

73.     The sole basis for Chapman's "cause" finding was that Plaintiffs purportedly committed "gross negligence and willful misconduct" within the meaning of subsection (e), primarily because Twitter paid success fees to Wachtell, Wilson Sonsini, and Simpson Thacher for their work in negotiating, litigating, and closing the acquisition. Chapman also made the brief and conclusory claim that Plaintiffs committed gross negligence and willful misconduct by paying retention bonuses to Twitter employees, and made the brief and conclusory claim that Agrawal, Segal, and Gadde committed gross negligence due to the Company's alleged corporate waste. Chapman's denial letters made no attempt to address Musk's claim in the termination letters that some of the Plaintiffs had failed to cooperate with an investigation within the meaning of subsection (g).

## VI.     PLAINTIFFS SUBMIT THEIR ADMINISTRATIVE APPEAL.

74.     On September 15, 2023, Chapman emailed Plaintiffs stating that a committee, called the Twitter Severance Administration Committee, had been appointed to hear Plaintiffs' appeals and directing Plaintiffs to submit any appeal to that committee. Later that day, Plaintiffs timely appealed Chapman's rulings pursuant to the Plans' Appeal Procedure.[11] Pursuant to Chapman's instructions, Plaintiffs directed their appeal to the committee, which purportedly was created by Musk and consists of Chapman, now identified as working for SpaceX, Brian Bjelde, another SpaceX employee, and Dhruv Batura, a former long-term Tesla employee now identified as working for X Corp.

---

[11] Defendants extended Plaintiffs' appeal deadline to September 18, 2023 due to the Company's delay in producing documents reviewed and relied upon in evaluating the Claims.

1     75.     Because Musk's termination letters had not provided any details about the factual

2   basis for the claimed "cause" that existed, the appeal was the first time that Plaintiffs were able to

3   present evidence to respond to Defendants' newly-invented basis for cause.

4     76.     Plaintiffs submitted a seventy-four page appeal and extensive evidence, including

5   their declarations, other percipient witness declarations and letters, including from members of the

6   Board and Transactions Committee, deposition testimony, documents, and an expert report by a

7   distinguished corporate governance expert, showing that Plaintiffs did not commit gross

8   negligence or willful misconduct and therefore are entitled to benefits under the Plans. Among

9   other things, Plaintiffs showed that Chapman ignored the corporate governance principles that

10  applied to Plaintiffs' conduct as officers and executives of Twitter. They showed that the

11  Company's claimed reasons for terminating Plaintiffs are pretextual and insupportable, and that

12  the Company cannot rely on these pretextual reasons to withhold Plaintiffs' severance benefits.

13  They also showed that, even on her own terms, Chapman's decisions cannot be upheld.

14     77.     Among other things, Plaintiffs demonstrated that the facts on which Chapman relied

15  do not support a claim of wrongdoing by Plaintiffs in connection with the payment of attorneys'

16  fees to the law firms, and submitted additional evidence that not only refuted her conclusion but

17  that showed that her decision was arbitrary and capricious. The process for determining these fees

18  was set by the Board, the ultimate fee amounts were decided by the Board, and the Board directed

19  Plaintiffs to pay these fees.

20     78.     Plaintiffs presented evidence showing that the Company followed a careful and

21  robust process to ensure an appropriate decision as to the law firms' fees. Plaintiffs Gadde and

22  Edgett, Twitter's top lawyers, assisted the Board with its attorneys' fees decisions by collecting

23  fee information from the law firms and others in consultation with the Board Chair. Plaintiffs

24  contributed to the process by expressing their own views about the fees and by confirming that the

25  payments were made as directed by the Board. Plaintiffs met repeatedly with the Transactions

26  Committee members about the fees, conducted and shared their due diligence about the fees, and

27  provided fee information to the full Board.

28

79.     On the morning of October 27, 2022, the Company's full Board met. The Transactions Committee members presented their views to the full Board regarding the proposed attorneys' fees, and explained why they believed the fees were appropriate. One of the directors noted that it was the largest stockholder value creation by a legal team that he had ever seen. ███████████████████████████████████████ ████████████████████ The Chair of the Board and the Transactions Committee explained the breakdown between success fees they recommended and hourly fees and explained that the Transactions Committee recommended approving the fees as presented. The full Board deliberated and decided to approve the fees.

80.     The Board unanimously approved the attorneys' fees and other expenses and directed Plaintiffs to pay those specific amounts on or before the closing. Thus, Plaintiffs were not only authorized to make the payments, they were required to do so to comply with their fiduciary duties to the Company. This alone refutes any claim that Plaintiffs' actions constitute gross negligence or willful misconduct.

81.     Moreover, the Company shared the transaction expenses, including the attorneys' fees to be paid to the law firms, with Musk prior to the closing. If Musk felt that the attorneys' fees payments, or any other payments, were improper, his remedy was to seek to terminate the deal – not to withhold executives' severance payments after the deal closed. Musk did not do this because he knew he would lose.

82.     Musk chose to buy Twitter. He proposed and signed a Merger Agreement that did not give him the right to withdraw from the deal based on market conditions deteriorating, new learnings or theories about the Company after signing, disagreements with the Company's business decisions, or simply changing his mind. The Merger Agreement both allowed and required Twitter to use commercially reasonable efforts to operate "in the ordinary course of business" until the acquisition closed.

83.     Twitter's Board and officers had full authority to run the Company pre-closing, subject only to the covenants in the Merger Agreement. Musk had no authority or remedy outside the confines of the Merger Agreement. If Musk thought that the covenants in the Merger

Agreement were violated, which they were not, his remedy was to refuse to complete the transaction. Instead, he chose to close the deal and thus represented that all closing conditions were met or waived.

84.     Musk repeatedly tried to tell Twitter what to do before the closing, including asking Plaintiffs not to make payments to third parties in the days before the closing. However, Musk did not own the Company and had no right to control its operations or payments. The Board rightly decided what payments and other decisions to make, consistent with the terms of the Merger Agreement, based on the best interests of the Company and its shareholders, not Musk's whims, and Plaintiffs fully complied with the Board's directives.

85.     As just one example of the deficiencies in Chapman's position, Chapman mischaracterized an email from a Board member to falsely claim that Plaintiffs "kept the Board in the dark on the legal fee issues." In connection with their appeal, Plaintiffs submitted a sworn declaration from that Board member which affirmed that the Board was kept fully apprised of the attorneys' fees discussions and approved those fees.

86.     Plaintiffs also showed that the facts Chapman pointed to did not support a claim of wrongdoing in connection with the payment of employee retention bonuses, and submitted additional evidence refuting the claim. The retention bonuses were consistent with past practice, necessary to retain key employees during the turbulent and uncertain merger period, made under Twitter's preexisting policies approved by the Board's Compensation Committee, and permitted under the Merger Agreement. Indeed, Plaintiffs sought legal advice from the Company's outside counsel to ensure that the bonuses complied with the Merger Agreement.

87.     Although Musk both created retention risk and opposed any effort to address it, the incumbent Board and officers had authority to award normal course retention bonuses, consistent with past practice, and did so. Indeed, the Merger Agreement required the Company to operate "in the ordinary course of business" and to "preserve substantially intact the material components of its current business operation." Preserving the material components of the "current business organization" necessarily required retaining key Twitter employees.

88.     Plaintiffs also showed that the other facts Chapman cited did not support a claim that Plaintiffs committed gross negligence by causing corporate waste, and submitted additional evidence refuting the claim. Plaintiffs showed that the challenged expenditures were carried out pursuant to, and consistent with, the Board's strategy and budgetary plan, and are precisely the types of judgmental decisions protected by the business judgment rule. Plaintiffs also presented evidence showing that at all times through the closing, Plaintiffs acted as responsible stewards of Twitter's resources. While the Board directly determined the fees for Wachtell, Wilson Sonsini, and Simpson Thacher, Plaintiffs undertook to manage other expenses with other vendors, saving the Company tens of millions of dollars. After Agrawal became CEO in November 2021, he, in conjunction with Segal and other management, developed and began implementing a strategy to streamline Twitter's operations and reduce expenditures. As part of this strategy, in April 2022, Agrawal proposed and the Board approved a revised budget that contemplated reduced spending, and in May 2022, Agrawal informed Twitter employees that the Company was pausing most hiring and further reducing operating expenses. Plaintiffs continued to focus on conserving costs throughout the litigation period, within the bounds of the Merger Agreement.

89.     In short, there is no support for Defendants' manufactured, post hoc claim of gross negligence and willful misconduct set forth in the claims denials. At all times, Plaintiffs acted in good faith, and with due care, in what they believed to be Twitter's and its stockholders' best interests, under the directives and approvals of the Board.

90.     Plaintiffs' management of the Company made Twitter extremely valuable, such that it was worth $44 billion. In contrast, under Musk's leadership since the acquisition, Twitter's value has fallen precipitously. Musk admitted in March 2023 that Twitter's value had fallen to about $20 billion. And by the end of May 2023, Fidelity, which owns an equity stake in Twitter, had lowered its valuation of the Company to $15 billion, approximately a third of the Company's prior value when Plaintiffs held their leadership positions at the Company. By the end of 2023, Fidelity lowered its valuation of the Company even further, to about $12.5 billion, approximately 28% of the Company's prior value.

91.     The Board and officers fully complied with the Merger Agreement and acted in the best interests of Twitter and its shareholders. Musk cannot second-guess the judgment of a fully independent and operational board that approved and directed the actions that he now claims are the basis for "cause" to avoid paying Plaintiffs their contractual severance benefits.

## VII.     THE DENIAL OF PLAINTIFFS' ADMINISTRATIVE APPEALS

92.     The Plans require that any appeals of claims denials be ruled on within 60 days, unless "special circumstances" require an extension of time (up to 60 days). Exs. A & B at 6.

93.     Predictably, on November 13, 2023, Plaintiffs received a letter from Chapman, on behalf of the committee, stating that the committee had granted itself a 60-day extension of time to rule on the appeal.

94.     On January 12, 2024, four months after Plaintiffs submitted their appeal, Chapman sent Plaintiffs' counsel a letter from the committee stating that the committee had decided to deny the appeal.

95.     Unable to refute Plaintiffs' showing that Chapman's benefits denials were erroneous, the committee ignored much of Plaintiffs' evidence, switched tacks yet again, and purported to rely on new, but equally insufficient, bases and materials to find cause for Plaintiffs' terminations, in violation of ERISA and the Plans. For instance, the committee purported to deny the appeal on an entirely new and incorrect basis which Plaintiffs never had the chance to address – that Plaintiffs purportedly committed gross negligence and wrongful misconduct because they "did not stop other executives from urging the Compensation Committee [of the Twitter Board] to add new participants to the Plan" in May 2022. Once again, Defendants wrongly sought to second-guess and hold Plaintiffs liable for the discretionary determinations of Twitter's Board.

96.     Defendants also presented a new declaration from Musk, in which Musk claimed that he had a good faith basis to terminate Plaintiffs "for cause" for reasons *other* than those Defendants relied on in their benefits determinations, including that he had once believed that some of the Plaintiffs lied about Twitter's spam accounts. These are the same false justifications that Musk asserted in the Merger Litigation to try to get out of the deal – and gave up on when he

decided to close. Even Chapman and the committee members did not find these bases to constitute "cause" under the Plans.

97.    In addition, Defendants presented a new report from a purported legal services expert who examined and criticized individual billing entries in Wachtell's, Wilson Sonsini's, Simpson Thacher's, and a fourth law firm's invoices – invoices that Chapman had *refused* to provide to Plaintiffs in response to their specific request – to wrongly claim that Plaintiffs committed gross negligence and willful misconduct by allowing the attorneys' fees to be paid.

98.    Defendants' ever-changing theories of cause reflect the weakness of their position. They also show that, far from acting as a neutral arbiter, Defendants' objective throughout has been to try to find reasons to deny Plaintiffs their rightful severance payments.

99.    With the denial of their appeal, Plaintiffs have fully exhausted any and all administrative remedies under the Plans.

100.   In attempting to obtain payment of the benefits due to them under the Plans, Plaintiffs have been required to incur, and will continue to incur, attorneys' fees and costs which they are entitled to recover.

## VIII.   DEFENDANTS TERMINATED PLAINTIFFS AND MANUFACTURED CAUSE FOR THE PURPOSE OF INTERFERING WITH THEIR ERISA RIGHTS.

101.   Defendants' purported termination of Plaintiffs "for cause" was a sham designed to deprive Plaintiffs of their severance benefits.

### A.   Musk Admitted that He Terminated Plaintiffs for the Purpose of Interfering with Their Right to Benefits Under the ERISA Plans.

102.   Musk's own words show that he made up cause and terminated Plaintiffs to avoid paying them the benefits they are owed under the Plans. As quoted above, Musk admitted his plan to his biographer Isaacson as it was happening. Musk orchestrated the closing and termination plan as a pretext to cut off Plaintiffs' severance, exact vengeance, and save himself money. He terminated Plaintiffs and manufactured cause for the specific purpose of interfering with their right to benefits under the Plans.

**B.** **Musk Denied Plaintiffs Their Contractually-Entitled Benefits as Retaliation for the Company Enforcing the Merger Agreement.**

103.   Musk was angry that, after multiple attempts to back out of the Twitter acquisition, Twitter had sued him and was forcing him to go through with the deal. He took his anger out on anyone involved with the Merger Litigation.

104.   In September 2022, Musk had his lawyers repeatedly threaten Twitter's Board. On September 11, 2022, Twitter's outside counsel, the Board's outside counsel, and Musk's counsel discussed Musk's request to renegotiate the per-share purchase price in the Merger Agreement. During these calls, Spiro threatened that Musk would pursue the Board until "the end of time" if the Board did not agree to a lower deal price. Musk was thus attempting to intimidate the Board into effectively transferring money from Twitter's public shareholders to himself.

105.   The following day, the lawyers spoke again by phone. In this call, Spiro repeated his threat, stating that Musk would pursue the directors until the end of time and would put into his will that his heirs should do the same if the Board did not agree to reduce the deal price, even though the Board had a fiduciary obligation to the public shareholders to uphold the terms of the Merger Agreement.

106.   On September 14, 2022, Musk's attorney Mike Ringler threatened that it would be like "World War III until the end of time" if Musk had to complete the deal at the original price. On September 15 and 16, 2022, Ringler and Spiro reiterated their previous threats.

107.   Although Musk's anger was directed broadly at the group that successfully represented Twitter on behalf of its public shareholders, Musk found an immediate outlet for this anger by wrongfully withholding Plaintiffs' severance payments as the acquisition closed.

108.   After the closing, Musk also sought to fire all of Twitter's in-house attorneys who worked on the Merger Litigation. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████

**C.**   **Musk Wanted Plaintiffs Fired Long Before They Paid the Law Firms' Fees in October 2022, Confirming that the Board's Decision to Authorize Payment of Those Fees Was Not the Reason for Their Termination.**

109.   Musk wanted Plaintiffs fired long before the Board authorized payment of the law firms' fees in October 2022, showing that Defendants' manufactured, post hoc rationale is not the true reason for their termination.

110.   As early as April 2022, shortly after signing the Merger Agreement, but before he owned the company, Musk wanted Agrawal to terminate Gadde. On or about April 27, 2022, Musk, Agrawal, and former Twitter CEO Jack Dorsey joined a FaceTime call. Agrawal's intention for the call was to discuss Musk's vision for Twitter, and how they could align so that Agrawal could lead with an awareness of that vision over the next few months prior to the closing, while shareholder and regulatory approval was pending. Musk had no such intention. Within minutes of the start of the call, Musk directed Agrawal to terminate Gadde immediately. When Agrawal refused, Musk gave him a day to comply, telling him to text Musk confirmation of her firing.

111.   Agrawal said that he would take what Musk had asked under consideration, but as CEO, he made his own decisions. Musk became aggressive and angrily repeated his orders. When Agrawal refused to fire Gadde, Musk told him that "we can't work together" as a result.

112.   Following the call, Musk texted Dorsey about his frustration over Agrawal's refusal to fire Gadde. Dorsey wrote, "at least it became clear that you can't work together [with Agrawal]. That was clarifying." Musk agreed, responding "Yeah."

113.   On April 27, 2022, Musk also tweeted a meme about Twitter's alleged left-wing bias featuring Gadde's face.

114.   Musk's attempt to have Gadde fired months before the closing not only demonstrates his pretextual reason for denying benefits, but was also illegal "gun jumping" under Section 7A of the Clayton Act, 15 U.S.C. § 18a.

115.   Musk failed to provide any cause-related reason for his request that Agrawal terminate Gadde, but Musk had a history of publicly criticizing her. As Chief Legal Officer, Gadde led the Trust and Safety team, which made several content moderation decisions, approved

26

1  by the CEO, with which Musk publicly disagreed, including the removal of former President

2  Donald Trump and the refusal to take down the @ElonJet Twitter account, which tracked the

3  movements of Musk's private plane using publicly available information.

4      116.   In addition, in March 2022, Gadde advised Musk's lawyer about his failure to

5  comply with Securities and Exchange Commission ("SEC") regulations with respect to his

6  accumulation of more than 5% of Twitter's stock prior to signing the Merger Agreement. When

7  Gadde learned that Musk claimed to own 7.5% of Twitter's stock, she raised the legal disclosure

8  issues with his attorney Spiro and pointed out that Musk had not filed the appropriate form with

9  the SEC (a Schedule 13D). She also explained that Musk had not filed the necessary Hart-Scott-

10  Rodino Act form with the FTC given his accumulation of Twitter stock and negotiations to join

11  Twitter's Board of Directors. Musk's disclosure failures ultimately led to investigations by the

12  SEC and the FTC.

13      117.   On April 4, 2022, Musk filed a Schedule 13G (a form that can be used only by

14  passive investors who have no intent to influence a company), in which he publicly disclosed for

15  the first time his ownership stake in Twitter. That same day, the SEC sent Musk a letter

16  questioning both his failure to make an earlier disclosure of his holdings and his filing of a

17  Schedule 13G rather than a Schedule 13D. The next day, Musk filed a Schedule 13D. Soon

18  thereafter, the SEC contacted Twitter about Musk's disclosure failures, and Gadde and Edgett

19  oversaw the Company's compliance with the SEC's requests and investigation into Musk. In May

20  2022, the SEC publicly confirmed it was investigating Musk, and Musk and the Company were

21  later subpoenaed in connection with the SEC's investigation. Agrawal and Segal gave testimony

22  to the SEC in connection with that investigation, and Agrawal was interviewed by the FTC in

23  connection with its investigation.

24      118.   On information and belief, Musk was so angry about a prior SEC investigation into

25  his conduct that he tried to get his company's outside counsel, Cooley, to fire one of its attorneys

26  solely because that attorney previously worked on an SEC investigation into Musk's conduct. On

27  information and belief, when Cooley refused, Musk fired Cooley. Here, Musk took out his anger

28

1   by trying to get Gadde fired in late April 2022, and then by pretextually terminating Gadde and

2   the other Plaintiffs in October 2022 and refusing to pay their severance.

3       119.   Musk simply disagreed with the business judgments Plaintiffs and the Board made

4   about how to run Twitter. He spoke openly about his disagreement with their decisions and intent

5   to terminate Plaintiffs. He had completely different plans for how to run the Company after the

6   acquisition. He was angry that Plaintiffs and the Board made him go through with the deal and did

7   not acquiesce to his demands for a lower price, and he desperately wanted to avoid his obligation

8   to pay Plaintiffs' severance benefits. These reasons, which do not constitute Cause, are the real

9   reasons he fired them, not Defendants' manufactured post hoc rationale.

10      **D.    The Circumstances of Plaintiffs' Terminations Further Show that Defendants'**
        **Post Hoc Justifications Are Not the Reason Plaintiffs Were Fired.**

11

12      120.   The details of Plaintiffs' terminations also belie that any cause existed and show

13  that Defendants manufactured claims of cause in order to deny Plaintiffs severance.

14      121.   Musk terminated Plaintiffs on October 27, 2022, effective immediately upon the

15  closing, before he could have seen the documents that Defendants now claim demonstrate

16  Plaintiffs' gross negligence and willful misconduct.

17      122.   Moreover, Musk provided no factual basis for his terminations of Plaintiffs in their

18  October 27, 2022 termination letters – because he had none. Musk knew the amounts of the

19  attorneys' fees payments before the closing, but never mentioned the fees in his termination

20  letters, showing that he only later decided to use that as a purported justification for the

21  terminations.

22      123.   The fact that the termination letters even mention the Plans only underscores that

23  Musk's intention was to deprive Plaintiffs of their severance benefits. There was no reason for

24  those letters to mention the Plans. If there had been a valid factual basis for cause, it would have

25  been explained in the letters, and without reference to the Plans. Because the termination letters

26  were specifically intended to deprive Plaintiffs of their severance benefits, the letters invoke the

27  Plans without explaining any basis for cause.

28

124.   Defendants' post hoc, manufactured approach to Plaintiffs' purported "for cause" terminations is also apparent in the discrepancy between Plaintiffs' termination letters and the denials of their benefits claims. The termination letters to Agrawal, Gadde, and Edgett all reference their purported failure to cooperate with an investigation as a basis for their termination (under subsection (g) of the Plans), yet no such grounds were ever advanced at any point during the administrative claim process. This omission shows that Musk made allegations first and only later searched for a basis to support those excuses for non-payment.

125.   Moreover, in a separate lawsuit relating to Wachtell's fees, X Corp. stated that it only learned of Plaintiffs' alleged wrongdoing after an investigation conducted "following the closing of the merger."[12] Thus, at the time Musk purportedly terminated Plaintiffs "for cause," he admittedly had no cause. He did not know the facts that he now claims constitute cause – further confirming that all of his purported reasons for cause were a mere pretext to deprive Plaintiffs of their severance.

126.   The timing of Defendants' response to each of Plaintiffs' Claims further reinforces this point. Plaintiffs' claim letters were just three pages long. Even though the Plans gave the Administrator 90 days to rule on those claims, Defendants claimed that there were exceptional circumstances that required an additional 90 days to address. But even after spending six months investigating Plaintiffs' conduct in an attempt to find a basis to claim wrongdoing, all Defendants could come up with was the meritless claim that Plaintiffs committed gross negligence and willful misconduct by paying attorneys' fees that the Board expressly approved and directed be paid, the lion's share of which was necessitated only by Musk's improper refusal to close a transaction to which he was contractually bound.

**E.**   **Musk's Denial of Plaintiffs' Benefits Is Part of a Pattern of Refusing to Pay Severance and Other Compensation to Eligible Employees.**

127.   Musk's refusal to pay Plaintiffs their benefits is part of a larger pattern of refusing to pay Twitter's former employees the benefits and other compensation they are due.

---

[12] *X Corp. v. Wachtell*, No. CGC-23-607461, Complaint ¶ 768, Dkt. 1 (Cal. Super. Ct., S.F. Cty., July 5, 2023).

128.   On information and belief, none of Twitter's former executives have received severance or other benefits following Musk's acquisition of the Company. Ten former Twitter executives, including Plaintiffs, have submitted claims for benefits under the Plans, which have all been denied, all on the grounds that the executives purportedly were terminated for cause and therefore ineligible for benefits.

129.   This pattern and practice of Defendants refusing to pay benefits to the Company's former executives is further evidence that Defendants are manufacturing cause after the fact simply to avoid paying Plaintiffs what they are owed.

130.   There are also thousands of non-executive former employees whom Musk terminated and is now refusing to pay severance and other benefits. They have sued in droves. The Company and Musk are facing numerous lawsuits and arbitrations brought by former employees that stem from the Company's refusal to pay money owed in the aftermath of Musk's acquisition.

**F.      Musk's Refusal to Pay Plaintiffs Their Severance Benefits Is Part of a Pattern and Practice of Refusing to Pay His Bills.**

131.   Musk's refusal to pay Plaintiffs is part of a larger pattern and practice of failing to comply with his payment obligations. His repeated failure to pay those to whom he owes money is well-documented and has been on full public display since his acquisition of Twitter.

132.   The Company has faced a staggering number of lawsuits from its vendors and service providers across a range of industries, all seeking money they are owed for bills that Musk refuses to pay. These include lawsuits from software vendors, landlords, consultants, and office custodial workers, among many other groups. Consistent with the cavalier attitude he has demonstrated towards his financial obligations, Musk's attitude in response to these mounting lawsuits has reportedly been to "let them sue."

133.   In addition, the Company refused or delayed payment for Plaintiffs' attorneys' fees incurred in connection with government investigations, congressional testimony, and private lawsuits arising from their work at Twitter – despite being obligated to pay these fees under the Company's bylaws, indemnification agreements, and Delaware law. Only after Plaintiffs filed suit

in Delaware Chancery Court did X Corp. pay some of Plaintiffs' attorneys' fees. And only after the Court granted Plaintiffs' motion for summary judgment and ordered X Corp. to pay the fees did X Corp. pay the rest of the fees.

134.   Musk's reputation for not paying his bills is so widespread that there was a website dedicated to tracking his non-payments since taking over Twitter: https://www.plainsite.org/tags/twitter-vendor-nonpayment/. Notably, Twitter suspended the Twitter accounts of PlainSite and its founder, Aaron Greenspan, on June 13, 2023.

135.   It is no surprise, then, that when faced with the obligation to pay Plaintiffs the amounts owed to them under the Plans, Musk has done what he is known to do: simply refuse to pay.

## IX.   DEFENDANTS' FAILURE TO PRODUCE DOCUMENTS AND OTHER ATTEMPTS TO DEPRIVE PLAINTIFFS OF A FULL AND FAIR OPPORTUNITY TO PRESENT THEIR CLAIMS

136.   From the beginning, Defendants X Corp., Musk, Chapman, Bjelde, and Batura have withheld documents and taken other actions designed to inhibit Plaintiffs' presentation of their claims. Defendants have sought at every opportunity to deprive Plaintiffs of a full and fair opportunity to present their claims by seeking to block their efforts to obtain information supporting those claims. As a result, Defendants have administered the Plans' claim procedures in a way that unduly inhibits and hampers the initiation or processing of a claim for benefits.

137.   For instance, Defendants did not even produce the specific documents they identified as having reviewed in the course of making their benefits determinations. Defendants delayed producing all these documents, and entirely refused to produce some of the documents.

138.   On May 26, 2023, Chapman issued a claim denial letter for each Plaintiff, denying each Plaintiff's Claim for benefits under the Plans. Each letter attaches an "Appendix A" that lists the documents purportedly reviewed in making the claim determination.

139.   On May 30, 2023, Plaintiffs sent a letter requesting copies of all of those documents and other materials to which they are entitled under 29 C.F.R. § 2560.503-1(h)(2)(iii) and 29 C.F.R. § 2560.503-1(m)(8).

140.   After several requests, on June 12, 2023, Plaintiffs' counsel reached out by phone to Defendants' counsel, who advised for the first time that no documents would be produced because Defendants claimed some were confidential. Defendants then insisted that Plaintiffs enter into a confidentiality agreement before they would produce any documents they deemed confidential.

141.   On June 22, 2023, Defendants made a partial production of non-confidential documents listed in Appendix A to the claims denial letters.

142.   Incredibly, Defendants withheld from this production as confidential several documents that X Corp. *publicly disclosed* as exhibits to the Complaint it filed on July 5, 2023 in *X Corp. v. Wachtell*.

143.   On July 20, 2023, Defendants purported to complete their production of the documents listed in Appendix A to the claims denial letters.

144.   However, Defendants did not produce all the documents listed in Appendix A and still have not produced all the documents listed in Appendix A. Chapman improperly refused to produce some of the Appendix A documents, and redacted nearly the entirety of others, claiming that they are privileged, even though Plaintiffs were the authors or recipients of those documents and Chapman specifically considered and relied on them for her denials of Plaintiffs' Claims.

145.   As a particularly egregious example, Chapman withheld in its entirety one of the documents that she quotes from, and specifically points to, in the claims denial letters as purported support for her denial of Plaintiffs' Claims – an October 23, 2022 email from Agrawal stating that his "radar is up."

146.   Moreover, Chapman failed to produce the transactions expenses spreadsheet circulated to the Board for its consideration on October 27, 2022, despite Plaintiffs' specific request for that document and Chapman's representation that it had been produced. Chapman produced the October 27, 2022 cover email from Edgett to the Board but withheld the attached spreadsheet, misrepresenting that it was produced. Plaintiffs were only able to obtain the document from a former Board member, whose sworn declaration attaching the spreadsheet Plaintiffs submitted in connection with their appeal.

147.   On June 28, 2023, Plaintiffs' counsel sent an email to Defendants' counsel requesting documents that were not produced but are relevant to Plaintiffs' claims under 29 C.F.R. § 2560.503-1(m)(8). Because the basis for the denial of Plaintiffs' claims relates to fees that Twitter paid to various law firms, Plaintiffs requested documents related to the negotiation and payment of attorneys' fees to the law firms involved in Musk's acquisition of Twitter, including the firms' invoices and several specific documents that Plaintiffs remember receiving or writing while employed by Twitter that refute Chapman's conclusions that they committed gross negligence or willful misconduct. As an alternative, Plaintiffs proposed that Defendants allow those firms to provide Plaintiffs with documents and correspondence relating to the negotiation or payment of the attorneys' fees.

148.   On July 21, 2023, Defendants' counsel responded to Plaintiffs' May 30, 2023 and June 28, 2023 requests for materials required by 29 C.F.R. § 2560.503-1(m)(8). Defendants took the unsupportable position that Appendix A is inclusive of all documents relevant to Plaintiffs' claims. Defendants also refused to produce the law firms' invoices and other specific documents that Plaintiffs requested related to the negotiation and payment of attorneys' fees and refused to allow the firms involved to provide them to Plaintiffs, thereby depriving Plaintiffs of additional factual support for their claims.

149.   On January 12, 2024, the committee issued its letter denying Plaintiffs' appeal. The committee's letter includes an "Appendix B," listing documents purportedly reviewed in deciding the appeal. Defendants failed to provide these documents to Plaintiffs with the denial letter.

150.   On January 16, 2024, Plaintiffs made a written request for the documents in Appendix B and any other documents required under 29 C.F.R. § 2560.503-1.

151.   On January 24, 2024, Defendants made a partial production of documents listed in Appendix B. In this partial production, Defendants again improperly designated as confidential multiple documents that were publicly filed in *X Corp. v. Wachtell* or *Twitter v. Musk*.

152.   On February 7, 2024, Defendants made another partial production of the Appendix B documents. Defendants wrongfully withheld and refused to produce two of the documents listed on Appendix B, memoranda prepared by outside counsel for the committee regarding

factual and legal issues related to Plaintiffs' appeal, on the purported basis of attorney-client privilege. Because these memoranda were provided to the committee to assist it in its benefits determination, they are subject to the fiduciary exception and therefore are not privileged.

153.   Defendants' repeated withholding of documents violates 29 C.F.R. § 2560.503-1, which requires that claimants be provided, upon request, all documents relevant to their claim for benefits, including documents "relied upon in making the benefit determination" and documents "submitted, considered, or generated in the course of making the benefit determination."

154.   Defendants' withholding of such documents also renders their claims procedures inadequate and unfair under 29 C.F.R. § 2560.503-1(h)(2)(iii).

155.   Defendants have taken other actions to prevent Plaintiffs from securing additional factual support for their claims, including by embedding terms in the separation agreements of key employees that purport to bar them from voluntarily cooperating with Plaintiffs' efforts to gather evidence.

156.   Moreover, by virtue of their dual roles in evaluating and funding claims, Defendants are biased and operated under a conflict of interest in adjudicating Plaintiffs' claims for benefits. This conflict was exacerbated by the fact that Musk appointed employees of his companies who are beholden to him to evaluate the claims.

## FIRST CAUSE OF ACTION

**Claim for Benefits**
**Pursuant to ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)**
**by Plaintiff Parag Agrawal Against All Defendants**

157.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

158.   ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan, and/or to clarify his rights to future benefits under the terms of a plan.

159.   Plaintiff Agrawal is entitled to severance benefits under the 2014 Plan, in the amount of $57,361,399.80. This amount is equal to one-year's salary of $1,000,000 plus 327,847

Restricted Stock Units ("RSUs"), 470,354 Performance Share Units ("PSUs"), and 241,508 Granted Special Performance-Based Value Creation Awards ("VCAs"), all valued at the acquisition price of $54.20 per share, and $9,172 in COBRA health insurance premiums.

160.   By denying Plaintiff's claims for benefits under the 2014 Plan, and by related acts and omissions, Defendants have violated, and continue to violate, the terms of the Plan and Plaintiff's rights thereunder.

## SECOND CAUSE OF ACTION

**Claim for Benefits**
**Pursuant to ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)**
**by Plaintiff Ned Segal Against All Defendants**

161.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

162.   ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan, and/or to clarify his rights to future benefits under the terms of a plan.

163.   Plaintiff Segal is entitled to severance benefits under the 2014 Plan, in the amount of $44,468,148. This amount is equal to one-year's salary of $600,000 plus 310,069 RSUs, 257,213 PSUs, and 241,508 VCAs, all valued at the acquisition price of $54.20 per share, and $31,730 in COBRA health insurance premiums.

164.   By denying Plaintiff's claims for benefits under the 2014 Plan, and by related acts and omissions, Defendants have violated, and continue to violate, the terms of the Plan and Plaintiff's rights thereunder.

## THIRD CAUSE OF ACTION

**Claim for Benefits**
**Pursuant to ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)**
**by Plaintiff Vijaya Gadde Against All Defendants**

165.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

COMPLAINT

166.   ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to her under the terms of a plan, to enforce her rights under the terms of a plan, and/or to clarify her rights to future benefits under the terms of a plan.

167.   Plaintiff Gadde is entitled to severance benefits under the 2014 Plan, in the amount of $20,012,782.80. This amount is equal to one year's salary of $600,000 plus 50% of 269,354 RSUs, 50% of 204,306 PSUs, and 50% of 241,508 VCAs, all valued at the acquisition price of $54.20 per share, and $31,730 in COBRA health insurance premiums.

168.   By denying Plaintiff's claims for benefits under the 2014 Plan, and by related acts and omissions, Defendants have violated, and continue to violate, the terms of the Plan and Plaintiff's rights thereunder.

## FOURTH CAUSE OF ACTION

**Claim for Benefits**
**Pursuant to ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)**
**by Plaintiff Sean Edgett Against All Defendants**

169.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

170.   ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan, and/or to clarify his rights to future benefits under the terms of a plan.

171.   Plaintiff Edgett is entitled to severance benefits under the 2017 Plan, in the amount of $6,765,356.68. This amount is equal to one-year's salary of $510,000 plus 50% of 230,032 RSUs, valued at the acquisition price of $54.20 per share, and $21,489.48 in COBRA health insurance premiums.

172.   By denying Plaintiff's claims for benefits under the 2017 Plan, and by related acts and omissions, Defendants have violated, and continue to violate, the terms of the Plan and Plaintiff's rights thereunder.

## FIFTH CAUSE OF ACTION

**Unlawful Discharge to Interfere with Right to Benefits**
**Pursuant to ERISA Section 510, 29 U.S.C. § 1140**
**by All Plaintiffs Against Defendants Elon Musk and X Corp.**

173.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

174.   ERISA Section 510, 29 U.S.C. § 1140, makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan."

175.   Defendants Musk and X Corp. discharged Plaintiffs and falsely claimed that the termination was for "cause" for the specific purpose of interfering with their attainment of severance benefits under the Plans, in violation of ERISA Section 510, 29 U.S.C. § 1140.

176.   Plaintiffs are entitled to appropriate equitable relief to remedy Defendants' violation of Section 510.

## SIXTH CAUSE OF ACTION

**Failure to Timely Provide Required Materials**
**Pursuant to ERISA Section 502(c), 29 U.S.C. § 1132(c)**
**by All Plaintiffs Against Defendants Elon Musk and Lindsay Chapman**

177.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

178.   On November 29, 2022, Plaintiffs made a written request for documents under Section 104(b)(4) of ERISA, 29 U.S.C. § 1024(b)(4).

179.   ERISA Section 502(c), 29 U.S.C. § 1132(c), requires a Plan Administrator to provide, within 30 days, all documents required under ERISA to be maintained and provided to participants. Thus, Defendants had until December 29, 2022 to respond.

180.   Defendants did not comply with Plaintiffs' Section 104(b) request within 30 days as required by Section 502. Defendants responded to that request on April 11, 2023 and, even then, did not provide a complete response. Defendants produced additional documents later, and still have not produced certain documents.

181.   In addition, Defendants did not comply with Plaintiffs' requests for the documents required by 29 C.F.R. § 2560.503-1(m)(8) within 30 days as required by Section 502.

182.   By failing to timely provide Plaintiffs with a copy of all documents required to be maintained and provided to participants, Defendants violated ERISA Section 502(c), 29 U.S.C. § 1132(c).

183.   Thus, each Plaintiff is entitled to a penalty of $110 per day, running from the 30th day following their written request for such materials, until the materials are provided.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant the following relief:

A.    Declare that Defendants have violated the terms of the Plans by failing to pay Plaintiffs benefits in accordance with the terms of the Plans;

B.    Order Defendants to pay benefits to Plaintiffs pursuant to the terms of the Plans;

C.    Award equitable relief to Plaintiffs, including front pay and/or equitable surcharge;

D.    Order Defendants to pay each Plaintiff a penalty of $110 per day from December 29, 2022 to the day that Defendants provide Plaintiffs with all documents required to be provided under ERISA Sections 104(b) and 502(c)(1), 29 U.S.C. §§ 1024(b), 1132(c)(1), and 29 C.F.R. § 2560.503-1(m)(8);

E.    Award Plaintiffs pre-judgment and post-judgment interest;

F.    Award Plaintiffs' reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g); and

G.    Provide such other relief as the Court deems just and proper.

Date: March 4, 2024                    SIDLEY AUSTIN LLP


                                       By: */s/ David L. Anderson*
                                           David L. Anderson

                                       *Attorneys for Plaintiffs Parag Agrawal,*
                                       *Ned Segal, Vijaya Gadde, and Sean Edgett*

38
COMPLAINT