# Exhibit I

Marc Dworsky (SBN 157413)
**REID COLLINS & TSAI LLP**
920 Camino Viejo
Santa Barbara, CA 93108
Telephone: (626) 437-3117
Email: mdworsky@reidcollins.com

William T. Reid, IV*
Joshua J. Bruckerhoff*
Scott D. Saldaña*
Aaron Brown*
Julia Di Fiore*
**REID COLLINS & TSAI LLP**
1301 S. Capital of Texas Hwy, Ste. C300
Austin, TX 78746
Telephone: (512) 647-6100
Email: wreid@reidcollins.com
     jbruckerhoff@reidcollins.com
     ssaldana@reidcollins.com
     abrown@reidcollins.com
     jdifiore@reidcollins.com

* *Pro hac vice* application forthcoming

*Counsel for Plaintiff X Corp.*

ELECTRONICALLY

**F I L E D**

*Superior Court of California,*
*County of San Francisco*

**07/05/2023**
**Clerk of the Court**
BY: MARK UDAN
       Deputy Clerk

**CGC-23-607461**

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN FRANCISCO

| | |
|---|---|
| X CORP.,<br><br>        Plaintiff,<br><br>      v.<br><br>WACHTELL, LIPTON, ROSEN & KATZ,<br><br>        Defendant. | Case No. _____<br><br>**COMPLAINT FOR**<br><br>**(1) RESTITUTION (UNJUST ENRICHMENT)**<br>**(2) BREACH OF FIDUCIARY DUTY**<br>**(3) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**<br>**(4) VIOLATION OF CAL. BUS. & PROF. CODE § 17200** |

Plaintiff X Corp., the successor-in-interest to Twitter, Inc. ("**Twitter**"), files this Original Complaint against Wachtell, Lipton, Rosen & Katz ("**Wachtell**"), and alleges as follows:

## NATURE OF THE ACTION

1.      This action for equitable relief arises out of an effort by Wachtell to fundamentally alter its fee arrangement as litigation counsel in the twilight of its representation of Twitter to obtain an improper bonus payment in violation of its fiduciary and ethical obligations to its client. Wachtell exploited a corporate client left unprotected by lame duck fiduciaries who had lost their motivation to act in Twitter's best interest pending its imminent sale to Elon Musk and his entities, X Holdings I, Inc. and X Holdings II, Inc. (together, the "**Musk Parties**").

2.      In the days and hours leading up to the closing of the sale of Twitter on October 27, 2022, Wachtell and its litigation department led by Bill Savitt were at the center of a spending spree by Twitter's departing executives who ran up the tab at Twitter by, among other things, facilitating the improper payment of substantial gifts to preferred law firms like Wachtell on top of the firms' full hourly billings by designating tens of millions of dollars in handouts to the firms as "success" or "project" fees. Despite having previously agreed to work on an hourly fee basis and subsequently charging millions in hourly fees under that arrangement, Wachtell disregarded both California law and its ethical and fiduciary duties in the final days of its four-month Twitter engagement to improperly solicit an unspecified—but clearly gargantuan—success fee, as part of a **_$90 million_** "total" fee that also purported to satisfy Wachtell's earlier invoices that totaled $17,943,567.49. The $90 million fee collected from Twitter for a few months of work on a single matter represented nearly 10% of Wachtell's gross revenue in 2022, and over $1 million per Wachtell partner.

3.      Mere hours before the October 27 closing, Twitter's Chief Legal Officer Vijaya Gadde signed a new letter agreement that Wachtell had drafted (the "**Closing Day Letter Agreement**"), which purported to award Wachtell the success fee and required payment of the balance of the $90 million total fee on incredibly accelerated terms prior to closing. Fully aware that nobody with an economic interest in Twitter's financial well-being was minding the store, Wachtell arranged to effectively line its pockets with funds from the company cash register while the keys were being handed over to the Musk Parties. By this action, Twitter's successor-in-interest, X Corp., seeks to void the unconscionable Closing Day

---

1
COMPLAINT

Letter Agreement and disgorge the excess fees paid to Wachtell under the unenforceable contract and in violation of Wachtell's, and Twitter's then-leadership's, fiduciary duties and California law.

4.    Back on June 21, 2022, Wachtell had signed a binding engagement letter (the "**June 21 Engagement Letter**") and agreed to represent Twitter on an hourly fee basis in a litigation to compel specific performance of the Musk Parties' acquisition of Twitter pursuant to an Agreement and Plan of Merger dated April 25, 2022 (the "**Merger Agreement**"). In negotiating the terms of its engagement with Twitter, Wachtell sought and secured an exemption from Twitter's standard application of a 15% discount on outside counsel hourly fees. The June 21 Engagement Letter contained no mention whatsoever of any additional success fees or other fees tied to results procured for Twitter. Both California law and the applicable rules of professional conduct required that Wachtell procure a written agreement for any success fee at the outset of the engagement if it hoped to receive a fee tied to results obtained for its client Twitter in the litigation against the Musk Parties. At no point did Wachtell ever obtain a valid success fee agreement that complied with California law or the rules of professional conduct.

5.    During the first few months of its engagement, Wachtell submitted massive invoices to Twitter that included millions of dollars in hourly billings by Wachtell partners with *completely blank* time entry descriptions. Despite knowing that Wachtell's multimillion-dollar invoices did not comply with Twitter's policies, Twitter's former executives—with reckless disregard for Twitter's interests—ostensibly approved the two invoices that totaled nearly $18 million, including approximately $15.6 million in hourly fees for only a few months of work.

6.    Then, on the eve of the October 27, 2022 merger closing, with the firm's work on the merger litigation in the Delaware Chancery Court already concluded, and without any foreseeable need for Twitter to utilize its services again, Wachtell and Savitt saw an opportunity to further exploit their vulnerable client with the assistance of Twitter's lame duck fiduciaries. Wachtell and Twitter's directors and officers understood that because Twitter's then-shareholders were already locked in at the $54.20 per-share purchase price under the Merger Agreement, the Musk Parties acquiring Twitter would ultimately foot any fee paid to Wachtell. Wachtell and Twitter's directors and officers also knew that the Merger Agreement contained a provision that, in the words of an expert retained by Wachtell in

connection with the merger litigation, was drafted to prohibit Twitter executives from agreeing to certain expenses prior to closing "outside the ordinary course of business in a manner that might ultimately harm the acquiror." And, finally, Wachtell fully expected that the Twitter executives who could funnel gratuitous payments to the firms would soon be terminated, and thus would have little to no motivation to look out for Twitter's interests only hours before their anticipated departure.

7.      Notwithstanding all this knowledge, Wachtell proposed to fundamentally alter its arrangement with Twitter solely to secure compensation beyond the hourly-fee terms that had governed throughout the engagement. In breach of its fiduciary duties and ethical obligation to its client, and despite having failed to negotiate a written agreement for a success fee at the outset of its engagement, Wachtell pressured Twitter's fiduciaries to sign the Closing Day Letter Agreement and agree to pay Wachtell an unsubstantiated $90 million total fee that included an unspecified but enormous success fee.

8.      In other words, Wachtell sought and obtained a success fee that resulted in a total fee nearly six times its $15.6 million in invoiced hourly fees for a few months' work, even though (1) it was not called for by any prior agreement with Twitter, and (2) the litigation in which Wachtell represented Twitter had been stayed for weeks in anticipation of dismissal following the closing.

9.      A typical contingency fee compensates a lawyer for the risk of agreeing at the outset of an engagement to accept less than their normal hourly rates, with any compensation beyond those reduced guaranteed payments tied to the outcome for the client in the underlying matter. By contrast, Wachtell had negotiated at the outset of its engagement by Twitter to be compensated at Wachtell's full hourly rates regardless of the outcome in the merger litigation and therefore undertook absolutely no risk in obtaining its mammoth success fee—instead, the fee was entirely gratuitous. Additionally, a typical contingent success fee agreement states a specific formula or percentage by which the contingency fee amount is determined. The Closing Day Letter Agreement does not even specify the amount of the success fee, let alone any formula or percentage used to arrive at that figure.

10.      What is more, on the morning of the October 27 closing, but *before* Wachtell's fee engagement was modified to add its gratuitous bonus, the Musk Parties, as Twitter's residual claimants, directed Twitter to suspend all outbound payments to third parties in anticipation of the imminent merger. Nonetheless, Twitter's former executives presented Wachtell's proposed new fee agreement to Twitter's

outgoing board of directors later that morning at their final board meeting. At that point, Twitter board members had already signed their resignation letters, which were being held pending the closing later that day.

11.     In the middle of the board's final October 27 meeting, former Twitter general counsel Sean Edgett sent the chart of fees that the Twitter board was meeting to approve. Upon seeing the magnitude of the fees being presented for the board's approval, one former Twitter director immediately exclaimed in an email reply to Edgett:

O

My

Freaking

God

Despite any initial shock, Twitter's lame duck board members voted to approve Wachtell's excessive and unconscionable fee.

12.     Immediately following the Twitter board's rubber-stamp approval, Gadde signed Wachtell's letter agreement. Then, to ensure that the eleventh-hour fee payment went through before the Musk Parties (Twitter's new owners) could learn about the massive gift included in that fee, Edgett expedited the wire payment on the invoice for the balance ($84,294,962.97) of the $90 million total fee that Wachtell had submitted to Twitter the day before. Twitter's $84 million wire to Wachtell was posted only ten minutes before Gadde and Edgett were terminated upon the closing of the merger.

13.     In sum, having previously negotiated and signed an engagement letter for an hourly fee representation and having failed to obtain a written agreement for any fee tied to the results of the underlying case, Wachtell apparently believed that it—unlike other law firms bound by ethical and fiduciary obligations—was free to solicit a handout, aid and abet corporate waste by former Twitter executives in the death throes of their fiduciary roles, and walk away with a total fee that made it $90 million richer. To the contrary, Twitter is entitled to restitution and disgorgement of fees charged by Wachtell under the void Closing Day Letter Agreement for the reasons set forth below.

**THE PARTIES**

14.    Plaintiff X Corp. is the successor-in-interest to Twitter, Inc. X Corp. is a Nevada corporation with its principal place of business at 1355 Market Street, Suite 900, San Francisco, California 94103.

15.    Defendant Wachtell, Lipton, Rosen & Katz is a New York general partnership with its sole office at 51 West 62nd Street, New York, New York 10019.

**JURISDICTION AND VENUE**

16.    This Court has personal jurisdiction over Wachtell pursuant to section 410.10 of the California Code of Civil Procedure and the Due Process Clause of the United States Constitution. All causes of action arise out of conduct in California or directed towards California.

17.    This Court has subject matter jurisdiction over this dispute because the amount in controversy exceeds $25,000.

18.    Venue is appropriate in this Court because the causes of action arose in this county.

**FACTUAL ALLEGATIONS**

I.    **The Musk Parties Negotiate and Agree to Purchase Twitter and Take It Private**

19.    Twitter operates a microblogging social media network that was founded in 2006. Twitter's platform allows users to publish text, photos, and videos in posts referred to as "tweets" that are viewable to other users. Twitter may be used for free, so advertising generates most of its revenue. Twitter quickly grew to function as a global town square with hundreds of millions of users.

20.    Elon Musk is an investor and businessman who, among other things, is the CEO of Tesla, Inc., the world's most valuable automobile manufacturer by market capitalization. Musk is also the founder, CEO, and chief engineer of SpaceX, which partners with NASA and the International Space Station to launch satellites and ferry astronauts into space. Musk is also an active and prominent Twitter user who has over 143 million followers on the platform.

21.    On April 4, 2022, Musk publicly disclosed that he had become Twitter's largest shareholder. Five days later, Musk declined an offer for a seat on Twitter's board of directors. On April 14, 2022, Musk announced an unsolicited offer to purchase Twitter's remaining shares for $54.20 per share. In conveying his offer to Twitter's board, Musk had publicly noted his lack of confidence in

Twitter's existing management. Thus, from the outset of Musk's offer to purchase Twitter, many of Twitter's executives were concerned about the effect the purchase would have on their employment.

22. Twitter's board of directors was also initially resistant to Musk's purchase offer. On April 15, 2022, Twitter's board announced that it had adopted a shareholder rights plan as a defensive maneuver against Musk's takeover bid. Under the shareholder rights plan, existing shareholders would receive the right to purchase additional Twitter shares at a 50% discount in the event that Musk or any other "entity, person or group acquires beneficial ownership of 15% or more of Twitter's outstanding common stock in a transaction not approved by the Board." By adopting this tactic popularly referred to as a "poison pill," a board of directors effectively prevents a company's shareholders from deciding for themselves whether to approve a sale on its merits.

23. Despite Twitter's defensive posture, Musk continued to negotiate the purchase with Twitter. On April 24, 2022, Musk delivered a letter to Twitter's board indicating that the $54.20 per share offer was his "best and final." The next day, Twitter and Musk announced that they had reached an agreement for Musk's purchase of Twitter through his entities X Holdings I, Inc. and X Holdings II, Inc. for $54.20 per share in cash, or a total of approximately $44 billion.

## II.    The Merger Agreement Included Protections for the Period Between Signing and Closing

24. The terms for the Musk Parties' acquisition of Twitter were set forth in the Merger Agreement. Pursuant to the Merger Agreement, X Holdings I, Inc. would acquire Twitter upon the closing of the sale through a merger of Twitter, Inc. and X Holdings II, Inc., a wholly owned subsidiary of X Holdings I, Inc., with Twitter, Inc. as the surviving corporation.

25. Twitter agreed to several covenants in Section 6.1 of the Merger Agreement that were designed to protect the Musk Parties during the period between the Merger Agreement's signing and the closing that would consummate the merger (the "**Closing Period**"). Section 6.1(e) of the Merger Agreement restricted, among other things, Twitter's ability during the Closing Period to "increase the compensation payable or to become payable or benefits provided or to be provided to any Company Service Provider except for increases in cash compensation or benefits to Company Service Providers in the ordinary course of business consistent with past practice." The Merger Agreement defined "Company

Service Provider" to mean "each current or former director, employee, consultant or independent contractor" of Twitter or any of its subsidiaries.

26.     The expert Wachtell later retained on Twitter's behalf for the merger litigation opined in his October 2, 2022 report that the "evident purpose" of Section 6.1(e) of the Merger Agreement was to prohibit "actions in which Twitter would be using its discretion" to increase expenses during the Closing Period "outside the ordinary course of business in a manner that might ultimately harm the acquiror."

27.     The Merger Agreement also contained a number of representations and warranties by Twitter for the benefit of the Musk Parties. In Section 4.21 of the Merger Agreement, Twitter represented and warranted that aside from Goldman Sachs, J.P. Morgan, and Allen & Company, "no broker, finder, investment banker, consultant or intermediary is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with the Merger or any of the other transactions contemplated by this Agreement based upon arrangements made by or on behalf of [Twitter] or any of its Subsidiaries."

## III.    Twitter Retains Wachtell to Enforce Merger Agreement and Initiates Litigation

28.     Beginning in early May 2022, the Musk Parties sought information from Twitter concerning the prevalence of spam bot or fake accounts on the platform, information the Musk Parties noted they were entitled to under the Merger Agreement. Twitter resisted providing the information the Musk Parties requested. The dispute played out publicly with each round of letters filed as part of regulatory disclosures. On June 6, 2022, counsel for the Musk Parties sent a letter to Gadde and Twitter reiterating the information request and indicating that Twitter's efforts to thwart the Musk Parties' information rights was "a clear material breach of Twitter's obligations under the merger agreement and Mr. Musk reserves all rights resulting therefrom, including his right not to consummate the transaction and his right to terminate the merger agreement."

29.     The next morning, on June 7, 2022, Wachtell partner Ben Roth sent a solicitation email to Gadde, Edgett, and Twitter Chief Financial Officer Ned Segal, with the subject line "Transaction." *See* **Exhibit 1**. Roth wrote that he had "been following with interest the news about your pending transaction with Elon Musk," and pitched Wachtell's representation of Twitter in preparing for the "meaningful risk of litigation to enforce the terms of your merger agreement" as something "squarely in our wheelhouse." Roth boasted that his litigation colleagues at Wachtell "have the preeminent Delaware litigation practice,"

noting that former Delaware Supreme Court Chief Justice and Delaware Chancery Court Chancellor Leo Strine "is now with our firm and sits about 25 feet down the hall from me."

30.    Roth described Savitt as "the leading Delaware litigator," adding that Savitt had "led a successful defense against a lawsuit brought against the firm and me personally by Carl Icahn." Roth's email solicitation to Twitter suggested that "I know with certainty that there is no person or litigation group who would take [sic] tackle this with greater conviction or do it better." The pitch concluded: "And having Chief Justice Strine's expertise and advice would be invaluable." Savitt and Strine were copied on the email.

31.    A week later on June 14, 2022, Roth, Strine, and Savitt participated in a phone call with Twitter's legal department, after which Twitter apparently agreed to retain Wachtell to handle potential litigation over the Merger Agreement. Following the call, Twitter's former head of global litigation Karen Colangelo emailed the Wachtell team to say that Twitter preferred to have "all of our firms sign on to our standard engagement letter (allowing for firm-specific additions where necessary)," and sent Wachtell templates of Twitter's standard attorney retention documents, "recognizing that there may be some provisions, such as a potential success fee, that will need to be added / modified."

32.    Savitt responded to Colangelo to set up a call to discuss the engagement letter and noted ahead of the call that "[s]ome of the stuff is different from the way we normally do things but I'm confident nothing that we can't readily work out." Shortly after the June 17, 2022 call, Colangelo followed up with Savitt to report that Twitter would agree to Wachtell's request to eliminate the 15% discount that would normally apply to Wachtell's hourly fees under Twitter's standard engagement terms. Colangelo noted that Wachtell "can add something to the letter about that, or we can just have an email understanding." Savitt responded later that evening that "I don't think we need anything other than this email understanding," and said he would "update the engagement letter, sign it, send it over, and we'll be done with this."

33.    Savitt sent the engagement letter executed on behalf of Wachtell to Colangelo for Twitter's signature the following week on June 21, 2022. The June 21 Engagement Letter does not contain any contingent or success-fee component, much less one that would have complied with California law and Wachtell's ethical duties had the parties intended to award Wachtell a success-based

fee. The June 21 Engagement Letter included a merger clause superseding "all prior agreements regarding our work together." Twitter returned a counter-signed version of the June 21 Engagement Letter to Wachtell on July 28, 2022. *See* **Exhibit 2**. Wachtell did not obtain any other agreement at that time providing for the payment of any success fee or other fee tied to results achieved.

34.    Wachtell proceeded to gear up for litigation against the Musk Parties. On July 8, 2022, the Musk Parties sent Twitter a notice that they were "terminating the Merger Agreement because Twitter is in material breach of multiple provisions of that Agreement, appears to have made false and misleading representations upon which Mr. Musk relied when entering into the Merger Agreement, and is likely to suffer a Company Material Adverse Effect (as that term is defined in the Merger Agreement)." Wachtell and Twitter responded by initiating the merger litigation in Delaware Chancery Court on July 12, 2022.

**IV.    Wachtell Handles Merger Litigation Under an Hourly Fee Arrangement**

35.    Over the next three months, Wachtell represented Twitter in the merger litigation under the June 21 Engagement Letter. On August 25, 2022, Twitter's billing department reached out to Savitt for an estimate for Wachtell's "work done to date" on the merger litigation. The next day, Wachtell submitted its first invoice to Twitter representing Wachtell's hourly fees and expenses from inception on June 13, 2022, through July 31, 2022 (the "**August 26 Hourly Invoice**"), with Wachtell's hourly fees totaling $5,613,238.65 for 5,140.41 hours billed. *See* **Exhibit 3**. Pursuant to the June 21 Engagement Letter, payment on the August 26 Hourly Invoice was due within 60 days from receipt. The August 26 Hourly Invoice was accordingly scheduled for payment on October 25, 2022.

36.    On August 28, 2022, Savitt responded to the earlier request from Twitter's billing department for an estimate of Wachtell's fees for work done to date, reporting that Wachtell had "invoiced approximately $5.9mm to date and that there is approximately another $4.5mm unbilled." On September 28, 2022, Wachtell submitted its invoice for its hourly fees and expenses through August 31, 2022 (the "**September 28 Hourly Invoice**"), which included hourly fees instead totaling $10,025,578.10 for 10,191.19 hours billed. *See* **Exhibit 4**. Consistent with the "net 60" payment terms under the June 21 Engagement Letter, Wachtell's September 28 Hourly Invoice was scheduled for payment when due on November 27, 2022 (60 days after submission of the invoice). The November 27 scheduled payment was

ultimately canceled on the eve of closing after Wachtell re-negotiated its fee arrangement with Twitter once the merger litigation had been resolved, as set forth in more detail below.

37.    Both the August 26 Hourly Invoice and the September 28 Hourly Invoice were approved for payment despite flagrantly improper billing practices. For example, six Wachtell timekeepers—including partners Roth, Brad Wilson, Gregory Pessin, and Joshua Feltman—billed a combined $2,200,893.75 in those two invoices with **completely blank time entry descriptions**. One Wachtell associate billed approximately $935,000 across the two invoices, with all of her time entry descriptions limited to either "strategy" or "factual analysis" without further elaboration. And those time entry descriptions that do contain more specifics reveal that **Wachtell even charged Twitter for work done by Wachtell attorneys on unrelated matters for unrelated Wachtell clients**. Nevertheless, Twitter executives, exhibiting little to no regard for Twitter's interests or established company policy, approved the August 26 Hourly Invoice and the September 28 Hourly Invoice even though they were improper on their face.

**V.    The Musk Parties Agree to Close and the Merger Litigation Is Resolved**

38.    On October 4, 2022, the Musk Parties agreed to resolve the merger litigation by closing on the original deal terms on or around October 28. The Delaware Chancery Court entered an order on October 6 staying the merger litigation pending the closing. That same day, Wachtell reported to Twitter that the firm's "estimated accrual for September is $11MM." *See* **Exhibit 5**.

39.    Around this time, the Musk Parties requested details from Twitter regarding its expected transaction expenses, including legal fees. On October 11, 2022, Twitter emailed Wachtell to request an estimate of Wachtell's October fees "assuming a closing date of 10/28/22." Wachtell does not appear to have ever sent that estimate or any details regarding its hourly billing or expenses—let alone an invoice for its hourly fees and expenses—in connection with its work on the merger litigation after August 31, 2022.

**VI.    Wachtell Proposes a New Fee Agreement with Materially Different Fee Terms**

40.    On the evening of October 13, 2022, Wachtell's team gathered with members of the Twitter litigation department for a celebration. With Wachtell's work on the merger litigation essentially complete, Savitt and Wachtell sought something unusual: an eleventh-hour renegotiation of their fee

arrangement. Standing on the other side of those "negotiations" were lame duck Twitter executives, like Gadde and Edgett, who anticipated they were likely to be terminated following the closing of the merger.

41.     On October 14, 2022, the day after the celebratory gathering, Savitt sent Edgett an email with the subject line "transaction expenses," saying that "we are being pushed to supply a number for transaction expenses and thought it might make sense to discuss our fee---please let me know what you think." Savitt and Edgett had a phone call shortly thereafter. Following the call, Savitt gleefully emailed the Twitter legal team that had attended the gathering the night before to thank "the best clients and foxhole-partners one could hope for," and to say that he was "[l]ooking forward to the full-on blowout in (fingers crossed!) not too long…"

42.     Later that afternoon, Twitter circulated a draft chart of transaction expenses to its counsel and listed $95 million for Wachtell's fees. Edgett emailed Savitt to say that Savitt should "feel free to reach out" to the chairman of Twitter's board of directors Bret Taylor, adding that "Vijaya and I haven't had a chance to talk to him, but will." Savitt responded to tell Edgett that he would let Edgett know after Savitt connected with Taylor.

43.     Savitt followed up with Edgett the following week to let him know that Taylor had not yet returned Savitt's calls. Edgett responded that he had not spoken to Taylor yet and that it was fine for Savitt to reach out to Taylor again. Edgett and Savitt had another call on the afternoon of October 19, 2022. The next day, Savitt sent Edgett an email with the subject line "fee information--confidential," explaining that "[f]ollowing up on our conversation yesterday," Wachtell had pulled together the memo to Twitter attached to his email that set out "some information on comparable fee situations." *See* **Exhibit 6**. Edgett forwarded the Wachtell fee memo to Gadde and Taylor.

44.     Wachtell's October 20 fee memo to Sean Edgett stated, "You have asked us to supply information regarding fee arrangements comparable to the arrangements contemplated in WLRK's Twitter engagement." *See* **Exhibit 7**. The memo first discussed "Engagement fees as a percentage of banker fees," claiming that "[a]s we discussed, in engagements related to pending transactions as to which a premium fee is contemplated, our Firm often receives a fee in the range of 60 to 80 percent of the fees paid to investment advisors." The memo then generally described seven Wachtell representations related to mergers or acquisitions from 2020–2022 where Wachtell claimed to have received fees that ranged

from 67% to 100% of the fee charged by the investment banks on those deals. Wachtell's memo did not specify whether those representations were in connection with Wachtell's M&A work or were received in connection with its work as litigation counsel where hourly fees were paid, like in the Twitter merger litigation, or whether that distinction might be meaningful.

45.     Moreover, Wachtell's statements regarding the premium fees it supposedly "often" received were incomplete, misleading, and otherwise inadequate to provide any basis for informed consent by its client Twitter, even though Wachtell's ethical and fiduciary duties required that Wachtell make full disclosure to, and obtain informed consent, from its client. Specifically, Wachtell did ***not*** disclose:

- Whether Wachtell had received a premium fee as a percentage of investment banker fees in transactions anywhere near as large as the $45 billion Twitter merger;

- How premium fees that Wachtell had previously received as a percentage of investment banker fees compared to the billed time spent on such matters;

- Whether Wachtell had negotiated such premium fees as a percentage of investment banker fees at the outset of the engagement as an alternative to hourly fee engagements, meaning that Wachtell faced some risk of non-payment to the extent the deal failed to close (as opposed to its representation of Twitter on an hourly-fee basis);

- Whether Wachtell had engagements in which no premium fees were obtained above Wachtell's time billed at standard hourly rates, and the frequency of such engagements; and

- Whether Wachtell had engagements in which premiums over standard hourly rates were paid on some basis other than as a percentage of investment banker fees, the frequency of such engagements, and the premiums over hourly rates paid in such engagements.

Nor did Wachtell disclose that its ethical duties and California law contained specific requirements for any agreements pertaining to fees tied to a client's success, including that such agreements be reduced to

writing, and that Twitter as its client had no obligation whatsoever to pay a success fee or any other contingency fee to Wachtell due to Wachtell's failure to earlier obtain such an agreement.

46.    In addition, Wachtell's fee memo alternatively described "Engagement fees as a percentage of run rate," explaining that "[i]n premium-billing matters that involve substantial litigation, we also frequently invoice on a fee basis of 2x-2.5x of our run-rate amounts." Wachtell's memo claimed that "in litigations involving a corporate defense against hostile takeovers in [*sic*] we received fees of more than 3x run-rate in one recent instance (involving a pharmaceutical client), and 2.25x run-rate in another (involving an aggregates-building manufacturer)," and that "[i]n litigation involving mortgage-backed securities coming out of the financial crisis, we received a fee of approximately 2x our run rate." The memo added that the "total fee amounts in these illustrative matters range from approximately $33mm to $134mm."

47.    Wachtell's fee memo did not specify the length of time that any of the described cases were litigated by Wachtell. Moreover, Wachtell's statements regarding engagement fees "as a percentage of run rate" were misleading in that Wachtell did not disclose whether Wachtell had negotiated for such fee arrangements at the outset of its engagement in the described matters, nor did it provide any sense of the frequency of litigation matters in which Wachtell received no such premium. Wachtell's fee memo also failed to advise Twitter of the merger agreement's restrictions on such payments.

48.    The October 20 fee memo's reference to "fee arrangements comparable to the arrangements contemplated in WLRK's Twitter engagement" is puzzling to say the least given that the June 21 Engagement Letter between Twitter and Wachtell did not contemplate a fee arrangement like those described in the self-serving memo. And because Wachtell never shared with Twitter any details regarding its hourly billing or expenses after August 31, 2022, Twitter was not even capable of properly determining Wachtell's "run rate" as described in Wachtell's memo.

49.    On Friday, October 21, Savitt followed up with Edgett by email to say, "With apologies for the pain in the a-- on this, I'm told that we're due to send fee numbers across to the other side on Monday so we wanted to make sure to come to a landing on our figure before then," explaining that Wachtell had "drafted a short letter agreement to memorialize whatever the number is." *See* **Exhibit 8**. Savitt followed up with Edgett again on Sunday, October 23, and noted that the $95 million number

1   included in the draft chart of transaction expenses "is of course fine from our perspective, but I wanted

2   to make sure you were comfortable with it, as we hadn't had a further discussion." *See* **Exhibit 9**. Savitt

3   also stressed, "As I mentioned before ***we think it's important to have a letter agreement on the fee***,

4   whatever it is," recognizing that Twitter had no basis to pay a success fee to Wachtell under the existing

5   June 21 Engagement Letter. (Emphasis added). Savitt attached a draft of Wachtell's proposed letter

6   agreement "with the number blank for your review."

7       50.    Wachtell's draft letter agreement stated, "With the closing of the transaction with affiliates

8   of Elon Musk now in prospect, we wanted to be in touch to memorialize our understanding on the total

9   fee, inclusive of the success fee, contemplated by our engagement with Twitter." *See* **Exhibit 10**. The

10  letter continued: "Confirming our agreement, subject to and effective as of a closing on or about October

11  28, 2022, Twitter agrees that Wachtell Lipton will be paid a total fee of \$[●] million (the 'Final Fee')

12  immediately prior to the closing of the transaction in consideration of its work on Twitter's behalf since

13  inception of its engagement." The draft letter agreement explained that the "Final Fee will constitute the

14  entire fee payable to Wachtell Lipton and all prior invoices will be deemed satisfied by the payment of

15  the Final Fee." In the event the merger did not close on or about October 28, the draft letter agreement

16  contemplated that Wachtell would "continue to bill its time on an hourly basis and Twitter and Wachtell

17  Lipton will endeavor to agree on final fee at a future time when the completion of our engagement is

18  once again in prospect."

19      51.    Wachtell's draft letter agreement contained no reference to the June 21 Engagement

20  Letter. The draft letter agreement also purported to make Twitter's fee payment to Wachtell due

21  immediately prior to closing instead of on the net 60 terms applicable under the June 21 Engagement

22  Letter. Of course, Wachtell and the now-former Twitter executives were fully aware that if the

23  circumstances surrounding the fee were fully disclosed to the Musk Parties, it would never have been

24  paid.

25      52.    Wachtell's proposed draft letter agreement violated its legal and ethical duties to its client

26  Twitter. The applicable rules of professional conduct prohibit attorneys from soliciting a gift from a client

27  or preparing documentation to facilitate such a gift. Those rules of professional conduct also prohibit

28  attorneys from making an agreement to charge an excessive, unconscionable, or illegal fee. And because

Wachtell's draft letter agreement proposed a modification of an existing client's fee arrangement, it is subject to the strictest scrutiny under those ethical rules. Twitter's status as an existing client additionally meant that the fee modification implicated Wachtell's fiduciary duties to Twitter. Wachtell breached its fiduciary duties to Twitter by soliciting and facilitating payment of an unconscionable success fee as part of the $90 million total fee. Finally, Wachtell's proposed draft letter agreement lacked the necessary information required by California law for contingency fee contracts under § 6147 of the California Business & Professions Code, rendering it ineffective and voidable.

53.     Edgett nonetheless responded to Savitt that the draft letter agreement "looks fine," but that Edgett was "still trying to get time with Bret." *See* **Exhibit 11**. Edgett also noted that Wachtell's $95 million fee number reflected in Twitter's draft chart of transaction expenses represented "a high estimate" to assure "there were no surprises," but that Edgett "imagine[d] the number comes back lower." Edgett proceeded to set up a call with Twitter directors Bret Taylor and Patrick Pichette for the next morning, Monday, October 24, 2022. In advance of the call with Taylor and Pichette, Edgett forwarded Pichette a copy of Wachtell's October 20 fee memo. While Taylor and Pichette were members of the Transaction Committee of the board, the third member of that committee, Martha Lane Fox, was conspicuously absent from that discussion. Notably, just weeks prior, Ms. Fox had expressed concern over professional fees on other matters, and the need to "manage" such fees "tightly."

54.     Following his call with Taylor and Pichette, Edgett emailed Savitt to report that "Bret and Patrick have aligned on $90M" and that "[t]hey'll discuss it with the board on Thursday, but we can update our transaction expenses file." *See* **Exhibit 12**. Edgett asked Savitt to update the draft Closing Day Letter Agreement with the $90 million figure and to reflect that Gadde would be signing on behalf of Twitter so that Gadde could "sign right after the board meeting" that had been scheduled for Thursday, October 27.

55.     It is impossible to determine what portion of the $90 million total fee due to Wachtell under the Closing Day Letter Agreement represents the referenced success fee. Based on the hourly billing invoices, the success fee was astronomical, whatever its precise value. If calculated as the excess of the $17,943,567.49 combined total previously invoiced in the August 26 Hourly Invoice and the September 28 Hourly Invoice, Wachtell's success fee would be $72,056,432.51. Even deducting the

$11 million in estimated accrued fees for September 2022 that Wachtell reported to Twitter on October 6, Wachtell's success fee would still be $61,056,432.51 on top of full payment of the two invoices and estimated hourly billings for September 2022.

## VII.    Twitter Plans to Expedite Payments to Preferred Law Firms Including Wachtell

56.    During the same time period between the merger litigation being stayed on October 6 and the closing, the now-former Twitter executives similarly agreed to pay tens of millions in "project fees" to other law firms who represented Twitter on top of payment of those firms' full hourly fees. However, Wachtell and the other law firms understood that it would not be enough for Twitter to agree to pay those amounts; they also needed Twitter to actually pay those fees on expedited terms prior to closing so that the Musk Parties would not have the opportunity to review and challenge the law firm invoices.

57.    On October 22, 2022, Twitter's Business Operations Manager emailed Twitter's billing department to report that "*[p]ursuant to requests from the firms*, the Litigation team is asking if we can pay some of our legal vendors on expedited pay terms." *See* **Exhibit 13**. The email indicated that the law firms' request had been approved by Edgett and Colangelo, and offered to provide any information needed "to help facilitate immediate payment" of the preferred law firm invoices that would normally not have been due until after the closing. A Twitter employee responded on October 24, 2022, that they had received guidance from Twitter's Chief Accounting Officer Robert Kaiden "**that we are not to pay bills on an accelerated schedule unless approved by Robert**." (Emphasis added). Edgett replied that he had "connected with Robert" and that "**we're good to move ahead as I'm approving**" the law firm invoices "for payment on or before 10/28." (Emphasis added).

58.    Wachtell's August 26 Hourly Invoice was paid as scheduled on October 25, 2022. On October 26 (the day before the scheduled meeting of Twitter's board), Savitt re-sent the draft letter agreement to Edgett "as well as our invoice for the agreed amount (which we understood we should send along so it can be set up in the system in advance of closing)." *See* **Exhibit 14**. Savitt noted that Wachtell had reduced the $90 million total fee in the invoice to account for the $5,705,037.03 payment Wachtell had received the day before on the August 26 Hourly Invoice, leaving $84,294,962.97 payable on the new invoice. Savitt attached the invoice to Twitter dated October 26, 2022, in Word format (the

"**October 26 Invoice**"). *See* **Exhibit 15**. The October 26 Invoice stated that the remaining balance of the $90 million total fee was "payable immediately prior, but subject to, the closing."

59.    Edgett forwarded Wachtell's October 26 Invoice to Segal and Twitter's billing department "for approval," explaining that "we will have the Board approve in the morning." Edgett added that if Twitter went ahead and paid Wachtell's September 28 Hourly Invoice, Twitter could reduce the amount due on the October 26 Invoice by the $12,238,530.46 payment. Edgett reported that he would respond back to the group "once the Board has approved" execution of Wachtell's draft letter agreement.

**VIII.   Twitter Executives Receive Clear Directive on Day of Closing to Halt Outbound Payments**

60.    The Musk Parties moved up the scheduled closing of the Merger Transaction by one day to October 27, 2022. At 5:11 a.m.[1] (8:11 a.m. Eastern) on the morning of October 27, counsel for the Musk Parties sent a directive on behalf of their client instructing Twitter, Inc. "to immediately discontinue all outbound payments and other disbursements to third parties in order to assist Mr. Musk's funds flow preparations for the completion of the pending merger." *See* **Exhibit 16** (the "**Closing Day Directive**"). The Closing Day Directive also provided advance instructions "in anticipation of the imminent completion of the merger" with respect to "outbound payments and disbursements to third parties following completion of the merger," explicitly including "outside advisors, including, without limitation, financial advisors, legal advisors, accounting advisors, litigation experts, and all other external advisors." The Closing Day Directive was an unequivocal statement on behalf of Twitter's residual claimants of the corporation's preference to pause outbound payments pending that day's closing so that the company's new owner could have "a reasonable opportunity to review such payments."

61.    The Closing Day Directive was addressed to Gadde but sent to counsel for Twitter and its board of directors, who proceeded to forward the Closing Day Directive to Gadde, Edgett, and Savitt four minutes later. Edgett later forwarded the letter to Segal and Kaiden with the note "FYI. The latter half of this letter asks us to revoke all payment authority internally as of the closing. Let's discuss how best to make sure that happens without anything breaking." Edgett, Segal, Kaiden, and the other Twitter

---

[1] All times described in this Complaint are Pacific (UTC−7:00) unless otherwise stated. The times reflected in the email exhibits to this Complaint are UTC.

executives ignored the first half of the Closing Day Directive and instead accelerated Twitter's outbound payments to third parties.

## IX. Twitter's Board Meets Hours Before Closing to Approve Last-Minute Fee Requests

62.     Twitter's executives proceeded to seek approval from Twitter's outgoing board of directors to execute the Closing Day Letter Agreement and commit to paying Wachtell $84,294,962.97 prior to closing at a meeting convened later that morning at 7:00 a.m. The meeting was attended by outgoing Twitter board members Pichette, Taylor, Agrawal, Mimi Alemayehou, Egon Durban, Omid Kordestani, and Martha Lane Fox. At that point, each of Twitter's board members had already signed their resignation letters that were being held for closing. The meeting was additionally attended by others including Gadde, Edgett, Colangelo, and Savitt. Edgett acted as secretary of the meeting.

63.     Although the minutes of the October 27, 2022 board meeting state that Savitt was present for the Board's review of the proposed fees, the final minutes do not specify what that review entailed or if there was any debate regarding the proposed fees. Edgett had circulated draft board minutes in advance of the meeting, but those draft minutes did not include the referenced exhibit listing the professional fees that the minutes purported to approve. Edgett finally emailed the outgoing Twitter board the chart of professional fees for approval at 7:29 a.m.

64.     Several of Twitter's non-executive board members aside from Pichette and Taylor apparently had not been advised of the magnitude of the proposed fees they were supposed to approve prior to Edgett's 7:29 a.m. email. For example, within one minute of receiving Edgett's email, Fox—who had been excluded from the earlier discussion of Wachtell's fee despite her role on the Transaction Committee—replied directly to Edgett: "O My Freaking God." *See* **Exhibit 17**. Despite the shocking nature of Wachtell's last-minute fee request and the instructions in the Closing Day Directive, Twitter's board nonetheless approved the handout at their final October 27, 2022 meeting.

## X. Twitter Executives Scramble to Wire Out Hundreds of Millions in Cash Before Closing

65.     Within hours of closing and Gadde's eventual termination, Gadde emailed her Twitter director and officer indemnification agreement from her company email account to her personal Gmail account at 7:55 a.m. Eight minutes later, Gadde emailed the Closing Day Letter Agreement to a Twitter employee requesting that they add her signature to the agreement and return it. At 9:15 a.m., "[f]ollowing

1   the board's approval and ratification of your fees," Gadde sent Savitt the fully executed Closing Day

2   Letter Agreement. *See* **Exhibit 18**.

3       66.     An hour later, Edgett emailed Savitt to say Twitter had paid the September 28 Hourly

4   Invoice and requested that Wachtell "send us a new final invoice ASAP subtracting that amount so we

5   can process per the Board's instruction." Realizing they had no time to spare and that Wachtell's

6   submission of a new invoice would likely delay payment until after the merger closed, Twitter executives

7   quickly changed course. Ten minutes after Edgett's request that Wachtell submit a new invoice,

8   Colangelo replied to Edgett's email to tell Savitt that she had "[j]ust confirmed with the team, we're just

9   going to cancel the $12M invoice and pay the $84M one so we don't make you all do more work," and

10  confirmed that "we should be all set." At 12:07 p.m., Twitter's accounting department submitted a request

11  to wire Wachtell $84,294,962.97 from Twitter's Citibank account, and the wire was processed and posted

12  at 3:50 p.m., a mere ten minutes before the Merger Transaction closed. At 4:01 p.m., Gadde and Edgett

13  received their notices of termination from Twitter "on behalf of Elon R. Musk." Needless to say, Twitter's

14  now-former fiduciaries went to extraordinary lengths to make sure that the Wachtell fee was paid in spite

15  of the fact that there was no ascertainable benefit that would flow to Twitter as a continuing corporation

16  as a result of the expedited payment.

17      67.     Twitter's former executives, in violation of their fiduciary duties and the underlying

18  merger agreement, managed to accelerate the transfer of nearly $130 million for legal expenses alone

19  from Twitter's cash accounts between the time the Closing Day Directive was sent on October 27 and

20  the closing of the merger later that day.

21  **XI.    Twitter's New Management Investigates Unusual Payment Activity**

22      68.     Following the closing of the merger, the Musk Parties learned details regarding a range of

23  misconduct by former Twitter executives, including the egregious corporate waste described above, and

24  initiated an investigation at Twitter. On or about March 15, 2023, Twitter, a Delaware corporation,

25  merged with and into the newly formed Nevada corporation X Corp., leaving X Corp. as Twitter's

26  successor-in-interest.

27

28

69.     As part of X Corp.'s investigation of payments to law firms by Twitter in the final days of the Closing Period, counsel for X Corp. sent Wachtell a demand for fee-related portions of the Twitter client file pursuant to Wachtell's professional and fiduciary obligations to its former client.

70.     On May 16, 2023, Wachtell responded that it was reviewing X Corp.'s request and expected to provide a response by May 30. On June 7, 2023, Wachtell finally responded to X Corp.'s client file demand and produced six documents it claimed were responsive to the request for fee-related materials: (1) the June 21 Engagement Letter; (2) the August 26 Hourly Invoice; (3) a single page from the 99-page September 28 Hourly Invoice; (4) the October 26 Invoice; (5) the Closing Day Letter Agreement; and (6) Gadde's October 27 email transmitting the signed Closing Day Letter Agreement to Savitt. Wachtell's October 20, 2022 fee memo to Twitter was notably absent from Wachtell's client file production. Wachtell's June 7, 2023 letter in response to X Corp.'s client file demand objected to the characterization of Twitter's fee payments to Wachtell as improper, asserting that the payments were sanitized because Twitter's lame duck "Board of Directors specifically approved and authorized Twitter's entry into an agreement to pay Wachtell Lipton's fee."

### THE SUCCESS FEE AND THE CLOSING DAY LETTER AGREEMENT THAT WACHTELL SOLICITED WERE UNCONSCIONABLE

71.     The success fee and the Closing Day Letter Agreement that Wachtell procured through the eleventh-hour Closing Day Letter Agreement were unconscionable when considering all the surrounding facts and circumstances.

72.     First, Wachtell engaged in improper overreaching in soliciting and negotiating the success fee. Wachtell and Twitter were parties to the June 21 Engagement Letter, which did not entitle Wachtell to a success fee. Wachtell had not procured any other written agreement entitling it to a success fee or any other fee tied to results achieved, as required by California law and Wachtell's ethical duties. And Wachtell had already performed all work on an hourly fee basis under the June 21 Engagement Letter, for which Wachtell had already procured a material concession from Twitter in the form of Twitter's waiver of its normal request for a 15% discount. Moreover, Wachtell engaged in overreaching because, as discussed below, it made misleading statements and omissions surrounding its fee.

73.     <u>Second</u>, Wachtell failed to disclose all material facts to Twitter related to the success fee. Wachtell did not disclose its ethical duties and obligations related to fee modifications or related to the requirement for written agreements for any success fees or similar fees. And Wachtell did not disclose facts sufficient to enable Twitter to evaluate the reasonableness of the success fee portion of Wachtell's requested $90 million total fee relative to Wachtell's fees in other matters, instead sending the incomplete and self-serving October 20, 2022 memo. As described above, Wachtell's October 20, 2022 memo on fees suggested that Wachtell "often" received premium fees of 67%–100% of investment banking fees, while failing to disclose numerous factors that would be relevant and necessary to compare those fees (in dissimilar transactional matters) to the size of the fee Wachtell was requesting from Twitter. In the end, Wachtell was paid ***more*** than any of the investment banks. Similarly, as described above, Wachtell's October 20, 2022 memo self-servingly suggested that Wachtell "frequently" received fees of 2x to 2.5x its run rate fees in litigation, without disclosing facts relevant to assessing whether those matters were fairly representative and comparable to the fee Wachtell was requesting from Twitter. In other words, Wachtell transmitted a memo to Twitter making it sound like the premium it requested in the form of the success fee was typical and ordinary, when in reality the fee represented a windfall—even by Wachtell's standards—for a litigation matter in which Wachtell bore zero risk and had already completed all work under the June 21 Engagement Letter on an hourly basis.

74.     <u>Third</u>, the fee was grossly excessive in proportion to the value of the services performed. Wachtell would have received a windfall relative to the value of the services performed had it just been paid in full for hourly time billed given that (1) Wachtell's hourly rates are already high relative to market rates, (2) Wachtell billed unreasonable amounts of time to the litigation, and (3) several Wachtell timekeepers failed to provide any description whatsoever of the time supposedly spent, let alone adequate detail to assess the work performed. The addition of Wachtell's requested success fee drove its already-excessive billings higher still, resulting in a $90 million total fee that was nearly six times the already inflated hourly fees in the invoices Wachtell submitted. And unlike in traditional contingency fee engagements where premiums over hourly rates establishing market norms are justified because the law firm took on substantial risk, Wachtell took on no risk whatsoever in connection with the Closing Day Letter Agreement. All services had already been performed, deal closing was imminent, and the Closing

Day Letter Agreement provided that Wachtell would continue to be paid both its full hourly rates in the extremely unlikely event that the merger failed to close at the last minute plus a (presumably higher) success fee to be determined later.

75.     Fourth, Wachtell was more sophisticated and knowledgeable than Twitter when it comes to the market rate for legal services in mergers and litigation surrounding mergers. In addition, Wachtell knew that it was dealing with lame duck fiduciaries who made no attempt to honor their duties to Twitter as a continuing corporation. So, Wachtell exploited that information asymmetry, and the ill-will of Twitter's disgruntled executives, to pass off its success fee request as normal or typical when the size of its $90 million total fee was anything but typical.

76.     Fifth, Wachtell was one of six large law firms that represented Twitter in connection with the merger litigation, a relatively straightforward breach of contract dispute in which Twitter sought to hold the Musk Parties to the Merger Agreement and to close the transaction. While there were important factual disputes, there were not novel or difficult questions of law involved, nor did the litigation require any special skills beyond that which Twitter could have procured by paying hourly rates to many other reputable law firms with experience litigating in the Delaware Chancery Court, including those hired to work alongside Wachtell.

77.     Sixth, entering into the Closing Day Letter Agreement did not preclude Wachtell from taking on other matters (i.e., there were no opportunity costs) because the litigation had concluded and Wachtell's work was complete.

78.     Seventh, at the time the Closing Day Letter Agreement was entered into, there were no time limitations imposed by Twitter or other circumstances that would have required some outsized fee to retain counsel to pursue the representation. Rather, the litigation had already been resolved.

79.     Eighth, even assuming Wachtell attorneys' experience, reputation, and ability may command a slightly higher fee than other counsel, any justifiable premium was already incorporated into Wachtell's standard hourly rates. Wachtell had agreed to represent Twitter for its full hourly rates (after rejecting the standard 15% discount requested by Twitter) under the June 21 Engagement Letter.

80.     Ninth, while the success fee requested by Wachtell was conditioned on the merger closing, the fee was not a typical contingency fee in that: (a) the Closing Day Letter Agreement was not entered

into until the day the merger closed and *after* the litigation for which Wachtell was retained had already been resolved; and (b) the Closing Day Letter Agreement provided that Wachtell would still receive payment on all time billed at its full hourly rates even if the transaction fell apart later that day. Thus, Wachtell bore no risk whatsoever (unlike a typical contingency fee arrangement).

81.    Tenth, no additional time and labor was likely to be required at the time Wachtell negotiated its success fee and entered into the Closing Day Letter Agreement. The litigation had already been resolved, after which it became a foregone conclusion that the merger would close.

82.    Eleventh, Twitter did not give informed consent to the success fee. Although Twitter's board of directors ultimately approved the $90 million total fee, the directors were not provided with all material facts, largely due to Wachtell's own lack of disclosure. Wachtell did not advise Twitter to seek independent counsel with respect to the last-minute modification of the fee. Despite ample opportunity to do so, Wachtell did not provide the details of its hourly billings after August 31, 2022, to make it clear how much of a bonus it was requesting Twitter pay.

83.    Further, Wachtell's October 20, 2022 memo was self-servingly misleading (for the reasons discussed above) and was never provided to the members of Twitter's board aside from Taylor and Pichette. And Twitter's board was likewise not provided with other information—such as Wachtell's prior invoices or the terms of the June 21 Engagement Letter—that would enable the board to ascertain the outlandishness of authorizing the requested success fee at the conclusion of Wachtell's engagement.

84.    Finally, the Closing Day Fee Letter was an eleventh-hour, blatantly impermissible modification of a pre-existing written contract for which Wachtell offered no new consideration whatsoever. Indeed, the Closing Day Letter Agreement expressly acknowledged that the closing of the merger was imminent, and that the contemplated $90 million total fee payment, including the unspecified success fee, was "in consideration" solely for Wachtell's past "work on Twitter's behalf since inception of its engagement." And, even if the transaction did not close later the same day that the Closing Day Letter Agreement was executed, Wachtell would still be paid its hourly fees consistent with the June 21 Engagement Letter. In other words, it took zero risk on the representation that would have entitled it to seek such an extraordinary success fee.

## CAUSES OF ACTION

### COUNT 1: RESTITUTION (UNJUST ENRICHMENT)

85.    Plaintiff re-alleges and incorporates by reference all of the allegations set forth above.

86.    The Closing Day Letter Agreement was not a valid, effective, and legally binding and enforceable express contract at the time Twitter paid the success fee to Wachtell shortly before the merger closed on October 27, 2022. Rather, the Closing Day Letter Agreement was void or voidable, and/or otherwise legally invalid, ineffective, and unenforceable for several reasons.

87.    First, for the many reasons described above, the Closing Day Letter Agreement called for payment of an unconscionable fee and was an unconscionable agreement.

88.    Second, the Closing Day Letter Agreement was not an enforceable contractual modification of the pre-existing June 21 Engagement Letter. Specifically, Wachtell provided no new consideration whatsoever for the Closing Day Letter Agreement. Indeed, the Closing Day Letter Agreement expressly acknowledged that the closing of the merger was imminent, and that the contemplated $90 million total fee, including the success fee, was "in consideration" solely for Wachtell's *past* "work on Twitter's behalf since inception of its engagement." Because the only consideration offered by Wachtell was for services it had *previously* rendered, there was no consideration for the Closing Day Letter Agreement, and it was an impermissible and ineffective contractual modification.

89.    Third, the Closing Day Letter Agreement was void and ineffective as the product of Wachtell's breaches of professional duties and ethical rules. The Closing Day Letter Agreement called for an unconscionable fee, and Wachtell engaged in overreaching in the process. Wachtell failed to fully inform its client, including Twitter's board, regarding the basis for Wachtell's request to belatedly modify its fee arrangement with an existing client. Nor did Wachtell inform its client of the import of Wachtell's failure to procure a written agreement for the success fee at the outset of the engagement, that Twitter had no obligation to enter into such an agreement or to pay any such fees, or that Twitter should consider seeking the advice of independent counsel. Wachtell effectively solicited a substantial gift or gratuity from a client in violation of its professional duties and the rules of professional conduct. Wachtell took on no risk whatsoever in exchange for the purported success fee. The merger transaction was on the verge

of closing later that same day, and Wachtell would still receive its full hourly fees at its full hourly rates if the transaction failed at the last minute. Wachtell additionally breached its professional duties and the rules of professional conduct by drafting the Closing Day Letter Agreement, the instrument whereby Wachtell was given that substantial gift by its client Twitter.

90.    Fourth, the Closing Day Letter Agreement was void and ineffective because the success fee portion of the $90 million total fee represented an improper gift by Twitter to its fiduciary Wachtell. The success fee paid to Wachtell, considering all facts and circumstances, was so one-sided that no businessperson of ordinary, sound judgment could conclude that Twitter received adequate consideration for it. Wachtell had already received payment for its hourly fees that had been invoiced and had become due and payable, and there was a pre-existing agreement, the June 21 Engagement Letter, which required Twitter to pay Wachtell for any not-yet-invoiced work. There was no good-faith judgment by either Twitter's former officers or directors that the last-minute Closing Day Letter Agreement provided any value to Twitter.

91.    Fifth, the Closing Day Letter Agreement is voidable as an unlawful contingency fee agreement under California Business & Professions Code § 6147, and Plaintiff hereby contends that the agreement is void. There was no agreement between Wachtell and Twitter that complied with California Business & Professions Code § 6147(a). Specifically, neither the June 21 Engagement Letter nor the Closing Day Letter Agreement included statements required by California Business & Professions Code § 6147(a), including "[a] statement of the contingency fee rate that the client and attorney have agreed upon," "[a] statement as to how disbursements and costs incurred in connection with the prosecution or settlement of the claim will affect the contingency fee and the client's recovery," "[a] statement as to what extent, if any, the client could be required to pay any compensation to the attorney for related matters that arise out of their relationship not covered by their contingency fee contract," and "a statement that the fee is not set by law but is negotiable between attorney and client."

92.    Because both the Closing Day Letter Agreement and the success-based fee paid thereunder are void, voidable, ineffective, and unenforceable, the Closing Day Letter Agreement does not bar an equitable claim for restitution or unjust enrichment.

93.    Wachtell received a benefit at Twitter's expense when it received the success fee.

94.    It would be unjust for Wachtell to keep the excess fees it received at Twitter's expense for all of the reasons alleged herein. Wachtell bore no risk in the engagement to warrant any premium over the fees contemplated in the June 21 Engagement Letter that Wachtell agreed to. Wachtell flagrantly engaged in unreasonable staffing and billing practices, and yet Wachtell—in part due to overreaching—procured a success fee for *past* services by soliciting lame duck Twitter directors and officers to effectively pilfer cash from the company right before the merger closed. The total fee that Wachtell received was several multiples of what a reasonable fee would have been under the hourly engagement that Wachtell agreed to in the June 21 Engagement Letter.

95.    Due to its egregious violations of its professional duties and applicable ethical rules, Wachtell should be required to forfeit its entire $90 million total fee under the Closing Day Letter Agreement and make restitution in the amount of $90 million.

96.    To the extent that Wachtell is not required to forfeit its entire fee, it should be ordered to make restitution for the difference between the $90 million total fee it received and the reasonable fees it would have received had it adhered to the billing guidelines it agreed upon in the June 21 Engagement Letter.

## COUNT 2: BREACH OF FIDUCIARY DUTY

97.    Plaintiff re-alleges and incorporates by reference all of the allegations set forth above.

98.    Wachtell served as counsel to Twitter in litigation surrounding the merger. Wachtell thus owed fiduciary duties to Twitter, its client. The fiduciary duties owed by Wachtell to Twitter included a fiduciary duty of loyalty and a fiduciary duty to charge only fair, reasonable, and conscionable fees. Those fiduciary duties encompassed applicable professional rules of conduct, including those related to unconscionable fees and securing appropriate written agreements for any alternative fee arrangements tied to results achieved for the client. And because Twitter was an existing client of Wachtell at the time that the Closing Day Letter Agreement was proposed and executed, the Closing Day Letter Agreement's purported modification of the fee arrangement between Wachtell and Twitter during the engagement's twilight is subject to the strictest scrutiny.

99.    Wachtell breached its fiduciary duties to Twitter by soliciting and then facilitating Twitter's payment of the unconscionable success fee as part of the $90 million total fee. The success fee

and related Closing Day Letter Agreement were unconscionable based on all the surrounding facts and circumstances, as alleged above at ¶¶ 71–84, *supra*, and elsewhere herein.

100.    Wachtell's breaches of its fiduciary duties to Twitter caused injury and harm to Twitter and resulted in a windfall to Wachtell, which Wachtell received at Twitter's expense. Specifically, Twitter would not have paid anywhere close to $90 million in total fees to Wachtell had it not been for (1) Wachtell seeking the unconscionable success fee and procuring the Closing Day Letter Agreement at the eleventh hour, (2) Wachtell's failure to procure any written agreement providing for a success fee at the outset of the litigation (at which point Twitter's board never would have agreed to such an outrageous sum when there was risk that the deal might not close), and (3) Wachtell's fundamentally self-serving and misleading October 20, 2022 "memo" seeking to justify an excessive fee. Wachtell's actions were a substantial factor in bringing about the injury and harm Twitter suffered in depleting its cash to pay a grossly excessive and unconscionable success fee as part of the $90 million total fee collected by Wachtell.

101.    Plaintiffs seek equitable remedies of: (a) forfeiture and restitution of the excess fees that Wachtell received from Twitter as a result of egregiously and willfully breaching its fiduciary duties and professional duties; and/or (b) disgorgement of all profits that Wachtell received as a result of the grossly excessive and unconscionable success fee it received from breaching its fiduciary duties.

### COUNT 3: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

102.    Plaintiff re-alleges and incorporates by reference all of the allegations set forth above.

103.    Twitter's former officers and directors owed fiduciary duties to both Twitter and its shareholders.

104.    Twitter's former officers and directors breached their fiduciary duties to Twitter when they approved the last-minute modification to Wachtell's fee in the Closing Day Letter Agreement. The Closing Day Letter Agreement and purported success fee paid to Wachtell provided no value to Twitter or its shareholders. The success fee paid to Wachtell amounted to a huge cash gift that was so one-sided that no businessperson of ordinary, sound judgment could conclude that Twitter received adequate consideration for it. Wachtell had already received payments for its hourly fees that had been invoiced

and become due and payable, and there was a pre-existing agreement—the June 21 Engagement Letter—which required Twitter to pay Wachtell for any not-yet-invoiced work.

105.    There was no good-faith judgment by either Twitter's former officers or directors that the last-minute Closing Day Letter Agreement provided any value to Twitter. There was a pre-existing agreement governing the fees to which Wachtell was entitled, Wachtell had already performed the required services for Twitter, and the firm was not reasonably being considered for future work. Not only was there a complete lack of good faith surrounding the approval of the gift to Wachtell in the form of the success fee, but Twitter's directors and officers, knowing that their positions would soon be terminated, acted with bad faith in approving the Closing Day Letter Agreement and related success fee. These directors and officers knew that the Musk Parties, not Twitter's current shareholders, would effectively be picking up the tab for the gift to Wachtell.

106.    Further, when Twitter's former officers presented the Closing Day Letter Agreement to the board of directors, they failed to provide those directors with all material facts concerning the agreement and the proposed success fee to Wachtell. Twitter's former directors, for their part, simply rubber-stamped the agreement, despite recognizing that the fee amount was on its face absurd. Thus, Twitter's former officers breached their fiduciary duties of care and candor to the board.

107.    Finally, Twitter's directors separately breached their fiduciary duty of care in approving the success fee to Wachtell as part of the $90 million total fee under the Closing Day Letter Agreement. The former directors' duty of care required them to act prudently to maximize value for Twitter and to engage in informed, deliberative decision-making based on all material information reasonably available. The directors breached their fiduciary duty of care in not acting on an informed basis and instead hurriedly approving the Closing Day Letter Agreement and success fee to Wachtell on the day of the closing. Setting aside Wachtell's unethical, unreasonable, and excessive billing practices, there was no reason to pay any more to Wachtell than the maximum amount it billed pursuant to the pre-existing contractual arrangement between Wachtell and Twitter memorialized in the June 21 Engagement Letter, especially when it was readily apparent that no future services would be needed from Wachtell (given that the litigation had concluded and the merger was set to close later that same day). Yet the directors approved payment of Wachtell's requested success fee on the same day they were asked to after a single board

meeting and hasty discussion with management. Moreover, Twitter's directors summarily approved the success fee and the whopping $90 million total fee to Wachtell even though Twitter had not received any Wachtell hourly billing details for September or October 2022, even though Wachtell had only invoiced approximately $15.6 million in hourly fees at that point, and even though the directors were not presented with any data or analysis indicating that such a grossly excessive fee was remotely reasonable. The amount of Wachtell's success fee was never disclosed to the directors and could not have been calculated using the information they were provided. The amount of fees Wachtell sought was not even disclosed to most of the directors until the October 27, 2022 board meeting was already underway. Twitter's directors thus failed to inform themselves or engage in a deliberative decision-making process, and instead acted recklessly and grossly negligently in approving the success fee as part of the $90 million total fee to Wachtell despite having done no due diligence surrounding the reasonableness of the included success fee under the surrounding circumstances.

108. Wachtell knew of this corporate waste and the breaches of fiduciary duty, including the Twitter board's violations of the duty of care, because the firm instigated the breaches by asking for the unlawful modification to its fees, drafting the Closing Day Letter Agreement, and inducing Twitter's fiduciaries to approve and enter into it.

109. Wachtell's actions in soliciting the unlawful fees (and its related lack of candor and misleading statements to Twitter regarding the propriety of the fees), drafting the Closing Day Letter Agreement, and ensuring that it received payment prior to closing of the merger constitute substantial assistance and encouragement to Twitter's former officers and directors to breach their fiduciary duties to Plaintiff and was a substantial factor in harming Plaintiff because it cost Plaintiff tens of millions of dollars.

110. Because Wachtell aided and abetted the breaches of fiduciary duty by Twitter's former officers and directors, Plaintiff is entitled to the equitable remedies of unjust enrichment and disgorgement of excess fees paid to Wachtell in connection with the Closing Day Letter Agreement.

### COUNT 4: VIOLATION OF CAL. BUS. & PROF. CODE § 17200

111. Plaintiff re-alleges and incorporates by reference all of the allegations set forth above.

112.    Plaintiff lost tens of millions of dollars because of reliance on unlawful, unfair, or fraudulent conduct of Wachtell.

113.    The Closing Day Letter Agreement that Wachtell proposed violated numerous laws and ethical rules and was therefore unlawful under § 17200 of the California Business & Professions Code. The Closing Day Letter Agreement was unlawful because: (1) it lacked necessary information as required by California law for contingency fee contracts under § 6147 of the California Business & Professions Code; (2) it violated Rule 1.5 of the California Rules of Professional Conduct; (3) it violated Rule 1.5 of the New York Rules of Professional Conduct; (4) it violated Rule 1.8.3 of the California Rules of Professional Conduct; (5) it violated Rule 1.8(c) of the New York Rules of Professional Conduct; and (6) it was otherwise unlawful and unfair.

114.    Rule 1.5 of the California Rules of Professional Conduct prohibits lawyers from making an agreement for, charging, or collecting an unconscionable or illegal fee. Wachtell violated this rule when it engaged in a renegotiation of its fee in the hours before closing.

115.    This conduct constituted an unconscionable or illegal fee because Wachtell was "overreaching in negotiating or setting the fee;" the fee was enormous "in proportion to the value of the services performed;" at that point in time, the legal skills involved were negligible, and the "skill requisite to perform the legal service properly" was practically non-existent; and there was no danger that "acceptance of the particular employment [would] preclude other employment" by Wachtell because the matter was nearly concluded. Cal. R. Prof. Cond. 1.5(b)(1), (b)(3), (b)(5) & (b)(6).

116.    Likewise, the New York Rules of Professional Conduct, which also apply to the Wachtell lawyers in this case, also provide a basis for a § 17200 claim.

117.    New York's Rule for "Fees and Division of Fees" is similar to California's. It provides: "A lawyer shall not make an agreement for, charge, or collect an excessive or illegal fee or expense." N.Y. R. Prof. Cond. 1.5(a). Just as it did under the California Rules, Wachtell made an agreement for, charged, and collected an excessive fee because the "time and labor required" was practically nothing by this point of the deal; "the novelty and difficulty of the questions involved" was extremely low by this point in time since the deal was essentially done; "the skill requisite to perform the legal service properly" was negligible; and there was no danger that "acceptance of the particular employment [would] preclude

other employment" by Wachtell because the matter was nearly concluded. N.Y. R. Prof. Cond. 1.5(a)(1) & (a)(2).

118.    Rule 1.8.3 of the California Rules of Professional Conduct prohibits lawyers from "solicit[ing] a client to make a substantial gift . . . to the lawyer or a person related to the lawyer" or preparing "on behalf of a client an instrument giving the lawyer or a person related to the lawyer any substantial gift." Rule 1.8(c) of the New York Rules of Professional Conduct similarly states that a lawyer shall not "solicit any gift from a client . . . for the benefit of the lawyer or a person related to the lawyer" or "prepare on behalf of a client an instrument giving the lawyer or a person related to the lawyer any gift." As set forth in detail above, Wachtell improperly solicited a substantial gift from its client Twitter in the form of the success fee portion of its $90 million total fee and drafted the Closing Day Letter Agreement to add the thinnest veneer of legitimacy to the unseemly last-minute arrangement.

119.    Wachtell's last-minute success fee arrangement also violates general principles of legal ethics in that the modification was made at the very end of Wachtell's representation of Twitter despite Wachtell's work on the matter being substantially complete. *See* Restatement (Third) of the Law Governing Lawyers § 18(1)(a) (noting that while modifying an existing contract between a lawyer and client can be enforced in some circumstances, it cannot be enforced where "the contract or modification is made beyond a reasonable time after the lawyer has begun to represent the client in the matter"); ABA Comm. on Ethics & Prof. Resp., Formal Op. 11-458 (2011) ("Modifications sought by a lawyer that change the basic nature of a fee arrangement or significantly increase the lawyer's compensation absent an unanticipated change in circumstances ordinarily will be unreasonable."); Charles W. Wolfram, *Modern Legal Ethics* § 9.2.1 ("The courts are generally in accord that once the initial contract has been formed and the fiduciary relationship of client and lawyer has begun, any change in the contract will be regarded with great suspicion.").

120.    Because the Closing Day Letter Agreement constituted an unlawful violation of California's Business & Professions Code § 6147, constituted an unlawful violation of both the California and New York Rules of Professional Conduct, and was otherwise unlawful and unfair as a modification beyond a reasonable time after Wachtell began its engagement, Plaintiff is entitled to seek equitable relief in the form of repayment of money paid to Wachtell.

## **PRAYER FOR RELIEF**

In this Complaint, Plaintiff respectfully does not seek any compensatory damages but rather seeks the equitable remedies of restitution, fee forfeiture, and disgorgement of legal fees. Specifically, Plaintiff respectfully asks the Court to enter judgment awarding the following specific relief:

a.    voiding the Closing Day Letter Agreement and any associated excess fee payment made thereunder;

b.    restitution, forfeiture, and/or disgorgement of fees charged by Wachtell in connection with the Closing Day Letter Agreement;

c.    attorneys' fees and costs, in the Court's discretion;

d.    pre- and post-judgment interest as Plaintiff may be justly entitled to; and

e.    other equitable relief as may be deemed just or proper.

DATED: July 5, 2023                              Respectfully submitted,

**REID COLLINS & TSAI LLP**

By: _/s/ Marc S T Dworsky_
Marc S T Dworsky (State Bar No. 157413)
920 Camino Viejo
Santa Barbara, CA 93108
Telephone: (626) 437-3117
Email: mdworsky@reidcollins.com

William T. Reid, IV*
Joshua J. Bruckerhoff*
Scott D. Saldaña*
Aaron Brown*
Julia Di Fiore*
1301 S. Capital of Texas Hwy, Ste. C300
Austin, TX 78746
Telephone: (512) 647-6100
Facsimile:  (512) 647-6129
Email: wreid@reidcollins.com
             jbruckerhoff@reidcollins.com
             ssaldana@reidcollins.com
             abrown@reidcollins.com
             jdifiore@reidcollins.com

* *Pro hac vice* application forthcoming

*Counsel for Plaintiff X Corp.*