# Exhibit D

# Morgan Lewis

**Christopher Boran**
Partner
+1.312.324.1146
christopher.boran@morganlewis.com

February 11, 2025

**VIA E-MAIL**

Caroline A. Wong
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
caroline.wong@sidley.com

Re:   *Agrawal v. Musk*, Case No. 3:24-cv-1304 (N.D. Cal.)
      Response to Plaintiffs' February 5, 2025 Letter

Dear Caroline:

We write in response to your February 5, 2025 letter regarding the parties' February 4, 2025 meet-and-confer call. We are writing to correct the record, provide follow-up information discussed during the February 4 call, and to address Plaintiffs' ongoing refusal to meaningfully engage in any effort to reach agreement on items necessary to move forward with review and production of ESI, which is the vast majority of discovery Plaintiffs seek in this case.

## I.      Correcting The Record

Your letter accurately notes that we conferred on February 4, 2025. Unfortunately, the remainder of your letter is an unfair and misleading recitation of the meeting's substance.

**First**, during our meeting, we stated that Mr. Musk is subject to multiple legal holds covering this case and others, that he is aware of his obligations to preserve relevant ESI, and that we understand he is complying with those obligations. We have confirmation of this compliance. This is, of course, contrary to your inaccurate suggestion that we communicated during our meeting that we are "unaware of any steps" taken to preserve Mr. Musk's ESI, and that we have merely "presumed" that he is doing so.

**Second**, your letter states that we were unable to confirm that Mr. Musk has only one cellphone. This is wrong. We can confirm that Mr. Musk does not use more than one cellphone. The comment we made during the February 4 call was that we were unable to confirm whether Mr. Musk has possession of old cellphones. This is ultimately irrelevant, however, as Mr. Musk's iMessage and SMS/MMS text messages from the relevant time period have been preserved.

**Morgan, Lewis & Bockius** LLP

110 North Wacker Drive
Chicago, IL  60606-1511          +1.312.324.1000

**Third**, you asked whether Mr. Musk's cellphone or prior cellphones were previously "imaged." We were not in a position to confirm this inquiry on the call, but it is ultimately irrelevant.[1] Under the Federal Rules, Mr. Musk is obligated to take reasonable steps to preserve information relevant to the litigation. *See* Fed. R. Civ. P. 37. Reasonable steps do not require forensic imaging of a party's personal cellphone—a very intrusive process. That is particularly true in this case, where the only personal communications by Mr. Musk that are likely to be relevant are limited to a narrow topic during a discrete time period. Plaintiffs allege that, after it became clear that the Twitter merger would close, Mr. Musk plotted to terminate Plaintiffs' employment on or about October 27, 2022, for the sole purpose of interfering with their severance benefits in violation of ERISA § 510. Compl. ¶¶ 59-61 ("In the days leading up to the closing," Musk "hatched a plan to . . . manufacture fake 'cause' for Plaintiffs' terminations"). Under Plaintiffs' own theory, then, it is unlikely that Mr. Musk's cellphone would contain relevant information beyond the few "days" leading up to their terminations.

Further, Mr. Musk was not involved in deciding Plaintiffs' later claims for benefits and related appeals under the Plan. And we have confirmed that the other three individual Defendants—members of the Twitter Severance Administration Committee, who decided Plaintiffs' claims and appeal under the Plan—had *no communications* with Mr. Musk about Plaintiffs, Plaintiffs' claims for severance benefits, or anything else concerning the Committee members' work on the Committee. In sum, potentially relevant cellphone communications are limited to Mr. Musk during a very narrow period of time in October 2022, and we understand that he is continuing to comply with his preservation obligations. Under these circumstances, it is unreasonable for Plaintiffs to suggest that intrusive measures like cellphone imaging are necessary to comply with Rule 37.

**Fourth**, your letter mischaracterizes our explanation of the "technical constraints" referenced in our prior email concerning searches for relevant text messages sent or received by Mr. Musk using his cellphone. Your colleague offered the same mischaracterization during our February 4 call, and we specifically clarified its inaccuracy at that time. As referenced during our call, Mr. Musk's cellphone contains personal information and highly-sensitive professional information. Some of this information, whether individually or in aggregate, may implicate national security matters. Mr. Musk serves as CEO of SpaceX, which closely coordinates with NASA and the U.S. Armed Forces on matters of national defense, among other things. He also plays an active role in the new Presidential administration and leads the newly formed Department of Government Efficiency. Given these roles, there is inherently a meaningful possibility that information that is independently unclassified but in the aggregate rises to the level of classified information may inadvertently be present on Mr. Musk's cellphone. Given this possibility, it is necessary for an individual with national security clearance to conduct text message searches and collections from Mr. Musk's cellphone and for that process to be carefully implemented.

Mr. Musk also leads other businesses, including Tesla, a publicly-traded company. His cellphone contains proprietary data relating to Tesla and other companies that are not defendants or involved in this case, and he is not obligated to furnish such data here. Mr. Musk must ensure that Tesla and other non-party company data is not inadvertently turned over to X Corp. or lawyers that do not

---

[1] As we have previously explained, X Corp. does not provide employees with mobile devices. We have not imaged Mr. Musk's current or prior cellphone, and we do not believe that his current cellphone or prior cellphone have been imaged.

Caroline A. Wong
February 11, 2025
Page 3

represent those non-party companies, which is another reason why searches and collections of Mr. Musk's text messages must be done in a targeted fashion.

For these reasons, we have proposed a reasonable protocol for searching and collecting relevant text messages from Mr. Musk's cellphone. Specifically, we will coordinate a direct search of Mr. Musk's text messages for responsive information, using (agreed-upon) single-term searches, in contrast to the Boolean searches that will be used to search emails and Slack messages. The need for a direct search and collection of Mr. Musk's cellphone and the inability to utilize Boolean search terms are the "technical constraints" we referenced in our prior email. We explained this repeatedly during our February 4 call, including after your colleague mischaracterized it. Neither during our call nor in your follow-up letter have Plaintiffs articulated any objection to the reasonable search and collection methodology we have proposed for Mr. Musk's text messages.

**Fifth**, your letter raises questions about "Signal," "WhatsApp, or other non-SMS instant messages." As you know, only text messages (i.e., iMessage and SMS) were discussed during our February 4 call. No one even mentioned Signal, WhatsApp, or any other non-SMS messaging.[2] To the extent your letter suggests otherwise, that suggestion is untrue.

Regardless, the only non-iMessage/SMS messaging we understand Mr. Musk used at times is Signal. As you know, Signal is an encrypted, ephemeral messaging application through which messages may automatically delete. To the extent Mr. Musk utilized Signal during the narrow period surrounding his decision to terminate Plaintiffs' employment on October 27, 2022 (and there is no evidence he used it to discuss anything relevant to this litigation), those messages became unavailable before any duty to preserve arose from this March 2024 litigation. In any event, there is no reason to expect that Mr. Musk's Signal messages would have contained relevant information beyond any that is already available through email, text messages, and other sources. It is not as though Mr. Musk has kept secret his belief that Plaintiffs grossly mismanaged the company and engaged in serious misconduct for which they were ultimately terminated.

**Sixth**, your letter comments on our brief discussion of Defendants' emails and the X Corp. "G-Drive." Your observation that the Committee-member Defendants did not have Twitter/X Corp. email accounts before the merger is correct. Even so, it is beside the point because the only claim against the Committee-member Defendants concerns their work on the Committee, which did not begin until

---

[2] Your letter seems to acknowledge this by instead referring to an email you sent on January 24 in which you referenced discovery in *Twitter, Inc. v. Musk, et al.*, No. 2022-0613 (Del. Ch.). To the extent Plaintiffs are suggesting that discovery obligations in that case are somehow engrafted on to this very different litigation, you are mistaken. *See, e.g.*, *Rockman Co. (USA), Inc. v. Nong Shim Co., Ltd*, 229 F. Supp. 3d 1109, 1111 (N.D. Cal. 2017) (duty to preserve evidence in one matter did not give rise to duty to preserve evidence for the plaintiffs in separate litigation); *Erwine v. Churchill Cnty.*, 2021 WL 4066982, at *6 (D. Nev. Sept. 7, 2021) (recognizing courts have rejected notion that there is a duty to preserve evidence potentially relevant to another litigation); *Brigham Young Univ. v. Pfizer, Inc.*, 282 F.R.D. 566, 572 (D. Utah 2012) (any duty to preserve evidence owed to parties in other litigation would belong to those other parties and not the plaintiff); Fed. R. Civ. P. 37 advisory committee comment ("The fact that a party had an independent obligation to preserve information does not necessarily mean that it had such a duty with respect to the litigation, and the fact that the party failed to observe some other preservation obligation does not itself prove that its efforts to preserve were not reasonable with respect to a particular case.").

Caroline A. Wong
February 11, 2025
Page 4

after the merger when they had Twitter/X Corp. email accounts. Thus, it suffices for Defendants to search those email accounts—over which Defendant X Corp. has possession, custody, and control[3]—particularly considering that Plaintiffs are not entitled to discovery beyond the administrative record on their section 502(a)(1)(B) claims, except for very limited purposes. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006); *Hoskins v. Bayer Corp. & Bus. Servs. Long Term Disability Plan*, 564 F. Supp. 2d 1097, 1102 (N.D. Cal. 2008), *aff'd*, 362 F. App'x 750 (9th Cir. 2010).

As for Mr. Musk's emails, he has not had a personal email account at any point during the so-called "relevant period." To the extent Plaintiffs seek production of emails from accounts Mr. Musk has with other companies he leads, those may be requested through a subpoena properly served on that company. *See e.g., Am. Maplan Corp.*, 203 F.R.D. at 502 (denying motion to compel defendant, president and minority shareholder of non-party corporation, to produce non-party corporation's documents in suit brought against defendant in his individual capacity).

As for the G-Drive, which was discussed only briefly during our call, we stated our understanding that the Committee-member Defendants did not use that platform in connection with their work relating to Plaintiffs' claims for benefits. However, we agreed to review that issue and confirm whether our understanding was correct. Similarly, when you asked about tablets, we likewise stated our understanding that the Committee-member Defendants did not use any tablets, but that we would confirm that, too.[4] It is important to note that the February 4 call was the parties' first and only meet-and-confer conference addressing ESI sources, and it is unreasonable for you to expect us to have at our fingertips all of the answers to questions you posed during that conference. We are discussing these items further with our clients and will update you accordingly.

## II.     Plaintiffs' Overbroad Discovery Demands and Refusal to Engage Meaningfully or Productively in Efforts to Reach Agreement on ESI Review

To date, Plaintiffs have propounded 34 document requests, many of which are sweeping, overbroad, and tangential at best. For example, Plaintiffs seek all documents and communications that even touch on a subject matter relating to a reason for Plaintiffs' terminations for cause. Plaintiffs also seek the administrative records for six other claimants who sought severance benefits. The aperture for Plaintiffs' discovery is unreasonably wide.

Importantly, the overwhelming majority of documents Plaintiffs seek through their 34 document requests is ESI.[5] Defendants have already agreed to go beyond the administrative record and search 8 custodians' company email and Slack messages for responsive ESI. We have also agreed to search the individual Defendants' text messages. Even so, that process must be reasonable and proportional to the particular claims and defenses at issue in this case.

---

[3] Defendants here do not have possession, custody, or control over emails sent or received from other entities, such as SpaceX or Tesla. *See, e.g., Genomics v. Song*, 2024 WL 2044627, at *7-9 (N.D. Cal. May 7, 2024), *R&R aff'd*, 2024 WL 3279511 (N.D. Cal. June 5, 2024); *Am. Maplan Corp. v. Heilmayr*, 203 F.R.D. 499, 502 (D. Kan. 2001).

[4] While your letter raises hard drives, that was not a topic of discussion at the February 4 meet-and-confer or previously mentioned.

[5] Defendants have already produced the administrative record, which comprises the "core" documents relating to Plaintiffs' ERISA § 502(a)(1)(B) claims.

Caroline A. Wong
February 11, 2025
Page 5

With that in mind, on December 30, 2024, we provided you with a list of proposed ESI custodians and search terms and agreed to apply those terms to the ESI custodians' email and Slack messages—the largest sources of potentially relevant ESI. The terms we proposed were logically connected to issues and witnesses identified by the parties in this case, and were indeed quite broad. As we have explained and demonstrated through search term hit reports, applying our proposed search terms would result in a review universe of approximately 70,000 documents.

In response to our terms, you initially refused to propose any of your own, claiming you would not do so until the parties had fully negotiated and reached resolution on all 34 of your document requests. Only after our repeated requests did Plaintiffs finally send, on January 17, their "initial set of additional proposed search terms." While the terms were self-evidently over-broad on their face (e.g., fee*, expense*, disclos*, and claim*), we nevertheless promptly applied them to the custodians' email and Slack messages. The result demonstrated the obvious overbreadth of Plaintiffs' proposed terms: Plaintiffs' terms hit on over 500,000 unique documents—approximately 90% of all available email and Slack messages for these custodians.

Because Plaintiffs' terms come nowhere near a reasonable review universe, since January 21, we have repeatedly urged you to meaningfully engage by proposing more tailored search terms. You have simply refused. And when we raised this issue once again during our February 4 call, you merely equivocated—cryptically stating that Plaintiffs "likely may" propose narrowed terms. This puts Defendants in an untenable situation. If we move forward with reviewing and producing ESI based on our reasonable search terms, you will likely claim it is incomplete and ask us to apply additional search terms. A second review would undoubtedly lead to increased costs and burden and potentially result in re-reviewing documents. On the other hand, if we continue to wait for you to decide whether you will propose more sensible search terms, then you will unfairly blame us for the delay manufactured by your refusal to engage meaningfully on the topic (while you simultaneously have proposed a five-month extension of case deadlines, no less).

Your letter notes that Plaintiffs served discovery three months ago. What you fail to mention is that during this period, Defendants have repeatedly made clear that they will search for and produce responsive ESI, but Plaintiffs have responded by refusing to engage meaningfully to reach agreement on the search terms that will be necessary to guide that process. It appears Plaintiffs are less interested in obtaining ESI than manufacturing a basis for complaining about supposed discovery "delays" by Defendants. This is improper.

There is no serious question that Plaintiffs have sufficient information to propose more refined search terms to help achieve a reasonable and proportionate ESI review universe. Plaintiffs stubbornly refuse to do so because Defendants supposedly have not shown that Plaintiffs' proposed terms are overbroad, even though we have provided detailed hit reports showing Plaintiffs' terms implicate more than 90% of available ESI. Those reports show, for example, that Plaintiffs' proposed variations of former CEO Agrawal's name alone resulted in 171,000 hits and the proposed term fee* generates over 99,000 hits. It is obvious that these terms implicate a large number of unresponsive and otherwise irrelevant communications. Simply put, your suggestion that this determination cannot be made without sampling and document-by-document review is disingenuous. We made a good-faith search term proposal and Plaintiffs have responded by effectively demanding that Defendants review 90% of all email and Slack messages sent or received by the identified custodians. This position is not reasonable, and it is hard to see how Plaintiffs can possibly maintain it in good faith. Given your unwillingness to work cooperatively to identify appropriate search terms, Defendants will

Caroline A. Wong
February 11, 2025
Page 6

revise their original terms and incorporate a selection of Plaintiffs' terms for purposes of moving forward with ESI review and discovery. We will separately propose single-term searches to be applied to Mr. Musk's text messages.

### III.   Sources of Plaintiffs' ESI and Plaintiffs' Preservation Efforts

Plaintiffs also have discovery obligations of their own. To that end, we ask you to identify on or before February 17, 2025, all sources of relevant documents and ESI that exist for each of the four Plaintiffs, including but not limited to hard-copy documents, files, binders, email accounts, computers, laptops, hard drives, cellphones, tablets, iPads, other mobile devices, cloud-based storage locations, and messaging platforms or apps such as iMessage, SMS/MMS, Slack, Discord, Signal, WhatsApp, non-SMS instant messages, and any other web-based messaging platform.

In doing so, we ask that you also identify which of these sources each Plaintiff has searched for relevant material and whether each Plaintiff has relevant documents from any of the identified sources. Because Plaintiffs are under an obligation to preserve relevant documents and ESI, we also ask that you describe the steps that each Plaintiff has taken to preserve relevant materials contained in each of the sources of documents and ESI identified.

Regards,

*/s/ Christopher Boran*

Christopher Boran


c:     Sheila A.G. Armbrust (sarmbrust@sidley.com)
       David L. Anderson (dlanderson@sidley.com)
       Nicole M. Ryan (nicole.ryan@sidley.com)
       Sarah E. Gallo (sgallo@sidley.com)
       Chaddy Georges (cgeorges@sidley.com)