**SIDLEY**

SIDLEY AUSTIN LLP
555 CALIFORNIA STREET
SUITE 2000
SAN FRANCISCO, CA 94104

+1 415 772 7430
SARMBRUST@SIDLEY.COM

May 23, 2025

Magistrate Judge Laurel Beeler
San Francisco Courthouse
Courtroom B - 15th Floor
450 Golden Gate Ave.
San Francisco, CA 94102

Re:    ***Agrawal et al. v. Musk et al.*, N.D. Cal. 3:24-cv-01304-MMC-LB
Joint Letter Brief – Discovery Disputes Regarding Search of X Corp./Twitter
Email and Slack Data**

Dear Judge Beeler:

In accordance with your Standing Order and the Court's order at Dkt. 92, the parties submit this
Joint Letter Brief regarding a dispute about search terms to be applied to X Corp./Twitter email
and Slack data to identify documents responsive to Plaintiffs' Requests for Production ("RFPs").
Lead trial counsel have conferred by Zoom and have reached an impasse.

<u>**Plaintiffs' Position**</u>

Defendants improperly refuse to apply obviously relevant search terms, including Plaintiffs'
names, in searching X Corp./Twitter email and Slack data for documents responsive to Plaintiffs'
RFPs. The Court should order Defendants to apply Plaintiffs' proposed terms and promptly
complete their review and production of responsive documents.

<u>**Background.**</u> When Defendant Elon Musk bought Twitter in October 2022, he terminated
Plaintiffs Parag Agrawal, Ned Segal, Vijaya Gadde, and Sean Edgett, purportedly "for cause."
But Musk's real intent was to deprive Plaintiffs of benefits under Twitter's ERISA severance
plans. *E.g.*, Dkt. 58 ("Compl.") ¶¶ 4–7. After exhausting the administrative claims process,
Plaintiffs filed this case. Plaintiffs served RFPs on November 8, 2024, and Defendants responded
December 9, 2024. Dkt. 89-2. The parties then began negotiating the scope of Plaintiffs' RFPs.

<u>**Plaintiffs' Compromises in Negotiating Search Terms.**</u> Before the parties agreed on the scope
of Plaintiffs' RFPs, Defendants insisted on negotiating search terms to be applied to certain
electronically stored information ("ESI") – in particular, to X Corp. and Twitter email and Slack
data in Defendants' possession (including Plaintiffs' Twitter email and Slack data – which
Plaintiffs lost access to when Musk terminated them). While it was premature to negotiate search
terms while the scope of discovery was unsettled, Plaintiffs agreed to start discussing the issue.

Defendants' first set of proposed search terms, sent on December 30, 2024, was a non-starter.
The vast majority were limited by connectors that made the proposal unduly narrow. Plaintiffs
counter-proposed terms on January 17, 2025, and invited Defendants to provide hit counts to
allow Plaintiffs to evaluate overbreadth. Defendants provided hit counts later that month.

Sidley Austin (CA) LLP is a Delaware limited liability partnership doing business as Sidley Austin LLP and practicing in affiliation with other Sidley Austin partnerships.

# SIDLEY

Page 2

The parties exchanged a second round of proposals on February 28 and March 11. This time, based on the hit counts, Plaintiffs offered a narrowed counterproposal. To further address Defendants' burden objections, Plaintiffs also proposed using different search terms for different custodians. Specifically, Plaintiffs proposed one set of search terms for Defendants' files, and a separate, narrower set of search terms for Plaintiffs' files in Defendants' possession.

A third round of proposals followed on March 21 and April 7. But despite Plaintiffs' repeated requests, Defendants did not provide hit counts on Plaintiffs' April 7 proposal until May 5 – only *after* Plaintiffs sent Defendants a first draft of their portion of this letter brief.

Those hit counts prompted a fourth round of proposals. In particular, on May 9, Plaintiffs sent a revised proposal that was further tailored in light of the hit counts.[1] Plaintiffs' proposal – shown in **Exhibit A** – consists of 86 terms for Defendants' files and 3 terms for Plaintiffs' files in Defendants' possession, and eliminates all of the specific terms that Defendants had objected were still overbroad. *See, e.g.*, Ex. B, 5/14/25 Email Chain at 4 (certain of Defendants' objections). On May 14, Defendants provided new hit counts, which showed that Plaintiffs' most recent proposal yielded approximately 14,000 documents *fewer* than the universe of documents that Defendants have opted to review. *Id.* at 1. Nevertheless, Defendants offered to apply only 7 of the terms that Plaintiffs had proposed, and otherwise rejected Plaintiffs' proposal. *Id.*[2]

**<u>Plaintiffs' Search Term Proposal Is Reasonable.</u>** Plaintiffs' May 9 search term proposal is reasonably tailored to seek the information requested in Plaintiffs' RFPs. And because Plaintiffs have "shown that the [sought-after] information is relevant," "it is Defendants' burden to demonstrate why [it] would constitute an undue burden." *Pizzuto v. Tewalt*, -- F.4th --, 2025 WL 1391454, at *14 (9th Cir. May 14, 2025) (citing *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1063–64 (9th Cir. 2004)). Defendants' objections are insufficient to make that showing.

*First*, Defendants' overbreadth objection is unsupported. In fact, the hit counts for Plaintiffs' most recent proposal show that 56,449 documents hit on the proposed terms – far fewer than the more than 70,000 documents that Defendants unilaterally chose to review. *See* Ex. B, 5/14/25 Email Chain at 1. Those hit counts confirm that Plaintiffs' proposal yields a reasonable volume. Moreover, Defendants' arguments regarding the documents they already reviewed are a non-starter. Defendants identified those documents using 242 cherry-picked search strings, which use connectors and limiting terms that make them far too narrow. The Court should not be distracted by their sheer number, nor by Defendants' unilateral decision to begin review.

*Second*, Defendants object that various terms in Plaintiffs' proposal are irrelevant, but those objections are undermined by the allegations and issues in this case. For example:

---

[1] Defendants' characterization of this proposal as "belated" is baseless; Plaintiffs sent this proposal promptly, a mere *four days* after Defendants finally provided hit counts.

[2] Defendants' repeated rejections of Plaintiffs' proposals stand in stark contrast to Plaintiffs' actions. In particular, Defendants have separately proposed search terms for Plaintiffs' search of Plaintiffs' own ESI, and Plaintiffs have agreed to Defendants' proposal in full – not as a "tactic," as Defendants accuse, but rather in the interest of reaching agreement and completing Plaintiffs' document production given the imminent close of fact discovery under the current case schedule, as Plaintiffs explained to Defendants on a recent meet-and-confer.

# SIDLEY

Page 3

- <u>"Jack," "Jared," and "Walter"</u>: These refer to key individuals with whom Musk communicated about Plaintiffs' terminations. Musk texted Jack Dorsey about his frustration with Plaintiff Agrawal. Compl. ¶ 112. Jared Birchall is a key confidant of Musk's, and Defendants' amended initial disclosures identify him as an individual with knowledge of relevant matters. Walter Isaacson is Musk's biographer, to whom Musk admitted that his terminations of Plaintiffs "for cause" was a sham. *Id.* ¶¶ 4–7.
- <u>"Spiro," "Quinn," "Ringler," "Skadden"</u>: Alex Spiro (from Quinn Emanuel Urquhart & Sullivan, LLP) and Mike Ringler (from Skadden, Arps, Slate, Meagher & Flom LLP during the relevant period) had non-privileged communications with Musk in front of third parties regarding Musk's plan to deprive Plaintiffs of benefits. *Id.* ¶¶ 4, 106.
- <u>"ERISA" and "COBRA"</u>: The severance plans at issue in this case are governed by ERISA and provide for COBRA benefits.
- <u>"dragon"</u>: Musk told his biographer that "what Twitter needs is a fire-breathing dragon," "and Parag is not it." Moreover, Plaintiffs already agreed to limit this search term by modifying it as: "(ERM OR Musk OR Elon) AND (dragon)."

Plaintiffs are prepared to address the relevance of each of their proposed terms at any hearing.

***Third***, Defendants' burden objection to Plaintiffs' proposal to apply different terms to the two custodial groups is simply not credible. Plaintiffs' proposal ***lessens*** Defendants' burden by minimizing the number of terms for Plaintiffs' custodial data in Defendants' possession. For that custodial group, Plaintiffs proposed only ***3 terms***. Assuming Defendants are using modern e-discovery tools, it would be simple to run different terms over different custodians' data.

***Fourth***, Defendants' proposed search terms are unacceptably narrow. For example, Defendants have refused to run any of Plaintiffs' first or last names as standalone search terms across any of Defendants' X Corp. or Twitter custodial data. This refusal is inexcusable. The central issues in this case are Musk's animus toward and intent in terminating Plaintiffs, and conflicts of interest or bias that the Committee members had against Plaintiffs or otherwise affecting Plaintiffs' claims process. Defendants' communications about Plaintiffs cut to the heart of those issues. Their refusal to even search for those communications is insupportable.

Plaintiffs therefore ask the Court to order Defendants to proceed with a search of X Corp. and Twitter email and Slack data using Plaintiffs' proposed search terms, set forth in **Exhibit A**.

## <u>Defendants' Position</u>

Defendants have ***already applied 242 ESI search terms***—reflecting a combination of both parties' proposed terms, not a "cherry-picked" set, as Plaintiffs contend—and are reviewing and producing responsive ESI from the over 58,000 documents those terms implicate.[3] The Court

---

[3] As explained in Defendants' contemporaneously filed letter brief, discovery on Plaintiffs' claims for benefits under ERISA § 502(a)(1)(B) is generally limited to the administrative record, produced months ago. Plaintiffs primarily seek discovery on their separate § 510 claim. Further, while Plaintiffs boast about their agreement just last week to apply the ***mere 49 search terms*** Defendants proposed for purposes of their own limited discovery, they did so after refusing to for months and as an apparent tactic to lend ostensible support to their argument here.



Page 4

should deny Plaintiffs' request to force Defendants to apply 86 more terms, because it would unreasonably and disproportionately expand Defendants' already extensive discovery burden.

The parties have been negotiating search terms since December 30, when Defendants provided Plaintiffs with the first set of proposed search terms. Since then, Defendants offered three revised sets of terms (containing terms proposed by both parties) on February 28, March 21, and May 14, each set broader than the last. Plaintiffs remained unsatisfied, rejecting each compromise.[4] It is odd that Plaintiffs complain that Defendants have already started reviewing and producing based upon the 242 search terms noted above, because: (a) this has allowed Defendants to start producing documents; (b) had Defendants waited to apply search terms and review ESI while the parties resolved scope-of-discovery disagreements, they would *still* be waiting; and (c) Plaintiffs have taken the same approach to their own document production.

**Plaintiffs' Additional Terms Would Impose Disproportional Burden.** Plaintiffs must show that requiring 86 more search terms is proportional. *E.g.*, *Richards v. Centripetal Networks, Inc*., 2024 WL 4375785, at *1 (N.D. Cal. Oct. 2, 2024). They have not carried their burden.

Plaintiffs downplay that Defendants ***have already applied 242 ESI search terms***, resulting in a review universe of ***over 58,000 ESI documents*** that Defendants are currently reviewing and have already started producing. Ex. C. This review is particularly painstaking and burdensome because two Plaintiffs are former in-house attorneys and the search topics overlap with active litigation involving Twitter at the time, meaning the volume potentially *privileged* ESI is significant and must be reviewed carefully. Had Defendants delayed this review, Plaintiffs would have complained that no ESI was being produced. Stuck between a rock and a hard place, Defendants opted to proceed with review and production using a reasonable set of search terms. It is odd that Plaintiffs take issue with this approach, for the reasons noted above.

Further, Plaintiffs have not identified any gaps in Defendants' production. Instead, Plaintiffs have repeatedly proposed search terms that are incredibly broad, would greatly expand the scope of review, and impose additional and disproportional burden based only on their supposition that their additional 86 terms will somehow materially alter the production of relevant documents. Meanwhile, they ignore that adding those terms would require Defendants to review an ***additional 57,000 documents on top of the 58,000*** email and Slack messages already in the queue.[5] Plaintiffs' suggestion that their terms would somehow reduce the total review universe is nonsense; it simply ignores that the ESI review has ***already commenced*** based on the same 242 terms they ***admit*** capture ***more*** total documents than their belated proposal. Defendants should not be penalized for diligently proceeding with reviewing and producing ESI from their 242 reasonable search terms, particularly when there is no reason to believe the resulting production is likely to be insufficient. Plaintiffs' demand is the definition of disproportional discovery.

---

[4] While Plaintiffs have offered a "narrowed" counterproposal, consider where they started: Their initial proposal resulted in 485,153 documents, an extreme volume capturing over 90% of available data. Plaintiffs have continued to seek unreasonable review volumes that are unwarranted given the limited claims and scope of discovery here.

[5] This 58,000 excludes other ESI that Defendants have agreed to review. Applying Plaintiffs' search terms would result in a review universe of at least 115,000 documents—nearly five times the amount that Plaintiffs are reviewing of their own ESI.



Page 5

Plaintiffs say the 242 search terms Defendants applied are too narrow. But these terms—which, again, include terms proposed by both Plaintiffs and Defendants—capture the very categories of documents Plaintiffs claim to be relevant. Ex. C. They will locate any termination-related discussions, including searches of Plaintiffs' names near terms such as terminat* and fire*. Plaintiffs argue above that "Jack," "Jared," "Spiro" and "Walter"—common names that Plaintiffs do not limit in any way and hit on 4,421, 10,451, 2,763, and 5,866 documents, respectively—are necessary to find communications between those individuals and Mr. Musk. But Defendants need not review every communication with one of those individuals to find relevant documents. That would be a fishing expedition. Further, Spiro was Twitter's chief legal counsel and Jared Birchall was the company's financial advisor at the time. Searching only their names will capture every *irrelevant* (and privileged) document in which either advised.

Defendants' terms, by contrast, are reasonably designed to locate documents Plaintiffs seek. For instance: "(Elon OR Musk) AND (Jack OR Dorsey) AND (Parag OR Agrawal OR Vijaya OR Gadde OR Ned OR Segal Or Sean Or Edgett) AND (terminat* OR fir* OR job OR position OR perform*)." Plaintiffs' unlimited terms "ERISA" and "COBRA" hit on over 6,800 documents, including documents that have nothing to do with Plaintiffs, as Defendants Chapman and Bjelde are HR professionals. On the other hand, Defendants' search terms are crafted to find documents relating to *Plaintiffs'* claims for benefits—for example, Plaintiffs' first or last names nearby terms like "appeal," "benefits," and "claim."

Plaintiffs also ignore the other ESI Defendants have produced or will be producing:

    i.   All testimony and exhibits comprising over 12,500 pages of materials from the private and confidential arbitration between X Corp. and Wachtell, Lipton, Rosen & Katz.

    ii.   Mr. Musk's Tesla emails, even though Defendants' 242 terms yielded only a tiny percentage (0.23%) of relevant materials.

    iii.   Text messages from Mr. Musk's cellphone based on 100 additional search terms.

    iv.   Plaintiffs have demanded the application of their May 9 search terms to Chapman's and Bjelde's SpaceX email accounts and to the email and Slack data of a new ESI custodian, non-party Jared Birchall, despite the duplicative and cumulative nature of this discovery.[6] The parties are negotiating Defendants' proposal to apply Plaintiffs' names instead.

In sum, requiring 86 more search terms on top of the 242 search terms Defendants have already applied is unduly burdensome and disproportional to the needs of this case. *E.g.*, *SPS Techs., LLC v. Briles Aerospace, Inc.*, 2020 WL 13910585, at *1 (C.D. Cal. Aug. 14, 2020); *Yuntek Int'l, Inc. v. Xiamen Jxd Elec. Com. Co.*, 2022 WL 215121, at *3 (N.D. Cal. Jan. 25, 2022). Defendants have reasonably compromised on this issue, and Plaintiffs have not demonstrated that anything more should be required at this stage.

**<u>Defendants' Proposal</u>**. Defendants respectfully request the Court deny Plaintiffs' demand for 86 more ESI search terms.

---

[6] Although Defendants lack possession, custody, or control over the emails at non-party entities, they are coordinating with those companies to obtain the requested emails for review.



Page 6

Date:  May 23, 2025

SIDLEY AUSTIN LLP

By: */s/ Sheila A.G. Armbrust*
    David L. Anderson
    Sheila A.G. Armbrust

*Attorneys for Plaintiffs Parag Agrawal,*
*Ned Segal, Vijaya Gadde, and Sean Edgett*


Date:  May 23, 2025

MORGAN LEWIS & BOCKIUS LLP

By: */s/ Christopher Boran*
    Christopher Boran
    Abbey M. Glenn

*Attorneys for Defendants Elon Musk, X*
*Corp., Twitter, Inc. Change of Control and*
*Involuntary Termination Protection Policy,*
*Twitter, Inc. Change of Control Severance*
*and Involuntary Termination Protection*
*Policy, Lindsay Chapman, Brian Bjelde, and*
*Dhruv Batura*